UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

G. WESLEY BLANKENSHIP,

      Plaintiff,                           Case No. _____

v.                                      Honorable _____

SUPERIOR CONTROLS, INC., a Michigan
corporation, RANDALL E. BRODZIK, MARK
E. SOBKOW, RODERICK L. EMERY,
KEVIN T. BUTLER, GREG D. CAMERON,
CHRISTOPHER J. LAKE, ROGER M.
TEMPLIN, individuals,

      Defendant.

_____/

Daniel D. Quick (P48109)
Robert P. Zora (P74231)
DICKINSON WRIGHT PLLC
Attorneys for Plaintiff
2600 West Big Beaver Road, Suite 300
Troy, MI 48084
Phone:  248-433-7200
dquick@dickinsonwright.com
rzora@dickinsonwright.com

_____/

## COMPLAINT

      There is no other pending or resolved civil action arising out of the
transactions or occurrences alleged in this complaint, nor has any
such action been previously filed and dismissed or transferred after
having been assigned to a Judge.

      Plaintiff Wesley Blankenship, by his counsel, Dickinson Wright PLLC, states as follows

for his Complaint:

## INTRODUCTION

1.      This lawsuit is filed by G. Wesley Blankenship ("Plaintiff"), a 37.41% shareholder of Superior Controls, Inc. (the "Company" or "SCI"). Plaintiff was responsible for SCI securing over $80 million in defense-related contracts, yet resigned in January 2012 due to Defendants' mismanagement and mistreatment of Plaintiff. Plaintiff's resignation triggered a mandatory buy-back of his shares of SCI with a value set by contract -- Net Book Value (cash basis assets, minus cash basis debt) as of December 31, 2011. At that date, the Company had significant cash holdings due to payments on the contracts which Plaintiff secured as well as other assets, and Plaintiff's shares are worth approximately $6,316,024 pursuant to the agreed-upon contractual formula. In order to avoid paying the agreed-upon consideration to Plaintiff, Defendants instead are intent on dragging out the process, while depriving Plaintiff of his rights as a shareholder and attempting to hold him to an onerous non-compete. Defendants' conduct is motivated in part by their complete and utter mismanagement of the customer contracts; they are attempting to hoard cash until Plaintiff is no longer a shareholder in the Company, and then distribute the funds to themselves as quickly as possible before the customers sue SCI for breach and non-delivery. Defendants' actions will deprive Plaintiff of his right to receive the proper value for his shares in the Company after the closing of the sale of his shares. Defendants' strategy is illegal, fraudulent and oppressive to Plaintiff (and SCI's creditors).

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff G. Wesley Blankenship ("Plaintiff") is an individual domiciled in Wake County, North Carolina.

2

3.      Defendant Superior Controls, Inc. (the "Company" or "SCI") is a Michigan corporation with its principal place of business located at 46247 Five Mile Road, Plymouth, Michigan, within Wayne County.

4.      Plaintiff is a shareholder in SCI.

5.      Upon information and belief, Randall E. Brodzik is an individual residing at 9300 Napier Road, Northville, MI 48176.

6.      Upon information and belief, Mark E. Sobkow is an individual residing at 3352 Brighton Road, Howell, MI 48843.

7.      Upon information and belief, Roderick L. Emery is an individual residing at 648 Merrimac Road, Canton, MI 48188.

8.      Upon information and belief, Kevin T. Butler is an individual residing at 21063 Greenbriar Lane, South Lyon, MI 48178.

9.      Upon information and belief, Greg D. Cameron is an individual residing at 37731 W Meadowhill, Northville, MI 48167.

10.     Upon information and belief, Christopher J. Lake is an individual residing at 7526 Embassy Drive, Canton, MI 48187.

11.     Upon information and belief, Roger M. Templin is an individual residing at 4148 W 128th Ter, Leawood, KS 66209-3329.

12.     Defendants Randall E. Brodzik, Mark E. Sobkow, Roderick L. Emery, Kevin T. Butler, Greg D. Cameron, Christopher J. Lake, and Roger M. Templin are hereinafter referred to collectively as the "Individual Defendants."

13.     Upon information and belief, each of the Individual Defendants serves as director of the Company, and have the fiduciary duty to operate the Company consistent with their duties of good faith and loyalty on behalf of all shareholders of the Company.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

15.     The amount in controversy exceeds $25,000.00.

16.     This Court possesses personal jurisdiction over the parties.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

### Plaintiff's Initial Shareholder Agreements with Superior Controls, Inc.

18.     SCI is a for-profit corporation which provides systems integration, project management, engineering design and machine build services to manufacturing companies.

19.     Plaintiff became a shareholder of the Company on or about June, 2001.  On January 11, 2002, Plaintiff and the Company executed a Shareholder Agreement.  (Shareholder Agreement, **Exhibit A**).

20.     Plaintiff currently owns 89,159 shares (37.41%) of the Company's outstanding stock.

21.     Plaintiff served as the Chairman and Chief Executive Officer and as director of the Company until January 2012.

22.     Article 2, Section A of the Shareholder Agreement requires Plaintiff to sell all of his shares back to the Company in the event Plaintiff is no longer an "active participant" in the Company.

23.     Article 3, Section A of the Shareholder Agreement provides a First Purchase Option, wherein the Company has a 180-day period from Plaintiff's employment termination date to purchase Plaintiff's shares.

24.     Following the 180-day First Purchase Option period, Article 3, Section B of the Shareholder Agreement provides the remaining shareholders in the Company a 180-day period to purchase any of Plaintiff's shares that were not purchased by the Company during the First Purchase Option period.

25.     Article 3, Section C of the Shareholder Agreement provides that "[i]f all of the shares to be transferred are not purchased by either Corporation or the Remaining Shareholders, or both, before the expiration of the second option period, the Corporation shall purchase the remaining shares."

26.     Article 6, Section A of the Shareholder Agreement, entitled "Determination of Purchase Price" provides:

> If the parties to a transfer of stock required by this Agreement cannot agree on the price to be paid for the subject shares of stock, the price will be determined by dividing "Net Book Value" of the Company computed on a cash basis of accounting as of the first prior business year end (currently December 31) by the total number of shares outstanding, including the shares subject to resale.   "Net Book Value" shall be computed by subtracting all cash basis debt from the total of all cash basis assets.

27.     Article 6, Section D of the Shareholder Agreement provides that the closing of any purchase and sale of stock under the Shareholder Agreement shall occur no later than one-hundred and twenty (120) days following the date of the notice of intent to purchase.

28.    On January 11, 2002, Plaintiff and the Company also executed an "Employment, Noncompetition and Confidentiality Agreement" (the "Noncompetition Agreement"). (Noncompetition Agreement, **Exhibit B**).

29.    The Noncompetition Agreement provides that, for a period of 18 months after the sale of his stock, Plaintiff may not "engage in, or have any interest or be associated with" . . . "any corporation, firm or enterprise which is engaged in any business anywhere in North America which is competitive with [the Company's] business . . . ."

**Plaintiff Secures the Company's contracts with CCAD and Sikorsky**

30.    Prior to Plaintiff joining the Company, the Company's annual revenues never exceeded $10 million since its founding in 1983.

31.    Average revenue grew by more than 12% annually to more than $20 million by 2007, due largely in part to Plaintiff's efforts to expand the Company's business within its historical core competencies.

32.    In 2007, Plaintiff secured a series of contracts, totaling more than $27 million, with Force Protection, Inc. to engineer and install an assembly line for critical military Mine Resistant Ambush Protected Vehicles.  This contract was worth more than the annual Company revenue in any prior year.

33.    In 2010, in a departure from the Company's normal business, Plaintiff succeeded in obtaining over $43 million worth of contracts for the Company from the U.S. Military's Corpus Christi Army Depot ("CCAD").

34.    The Company's contracts with CCAD were directed through Federal Program Integrators, LLC – a Native American SBA Section 8(a) Tribal Organization – which then

contracted Tiburon Associates, Inc. ("TAI") to manage the programs. The Company then received its initial contracts from TAI.

35.     Under the terms of the contracts, the Company was to deliver five highly engineered machines to CCAD by March, 2012 for the testing of helicopter transmissions and gearboxes used by the military.

36.     After these initial contracts, CCAD subsequently awarded the Company contracts to deliver two additional machines, and the Company has also received orders for tooling, fixtures, teardown, and shipping and handling. The estimated worth of the Company's contracts with CCAD exceeds $60 million.

37.     Upon information and belief, CCAD has paid most of the $60 million contract price to the Company.

38.     In August of 2011, Plaintiff succeeded in obtaining an approximately $21 million contract to provide three machines, similar to those to be delivered to CCAD, to Sikorsky Aircraft Corporation ("Sikorsky"), under a wholly owned subsidiary of the Company called RedViking Group, LLC ("RV").

39.     After several required engineering milestone reviews were completed under the Sikorsky contract, Sikorsky paid the Company over $5 million, which was deposited into an RV bank account in late 2011.

**Plaintiff's Resignation from the Company**

40.     For years, Defendants reaped the benefits of Plaintiff's efforts to obtain new business. Despite Plaintiff's unprecedented success in raising revenue through lines of work outside of the Company's normal business, the Individual Defendants continually disagreed with

7

Plaintiff over the future direction of the Company.   In January of 2012, after many months of discord, Plaintiff resigned as an officer and employee of the Company.

41.     Upon information and belief, the Company has treated Plaintiff's resignation from the Company effective February 10, 2012.

42.     On February 15, 2012, in recognition of his efforts and to secure Plaintiff's continued cooperation with Company with regard to the CCAD and Sikorsky contracts, the Company paid Plaintiff a $3 million fee.  The payment was memorialized in a Fee Agreement executed by Plaintiff and the Company (Fee Agreement, **Exhibit C**) as well as a First Amendment to Shareholder Agreement (the "Amendment").  (Amendment to SA, **Exhibit D**).

43.     Under Section 1 of the Amendment, "[i]f the parties cannot agree on the price to be paid for shares of stock as provided in Article 6, Section A [of the Shareholder Agreement,] the amount of the 'Net Book Value' as defined therein'" shall be decreased by $3 million as a result of the February 13, 2012 fee paid to Plaintiff, and the resulting amount shall be deemed the "Net Book Value" for purposes of Article 6, Section A.

44.     Also on February 15, 2012, Plaintiff and the Company executed a First Amendment to Employment, Noncompetition and Confidentiality Agreement, wherein the Company created an exception to Plaintiff's original Noncompetition Agreement (the "Amended Non-compete").  (Amended Non-compete, **Exhibit E**).

45.     Under the Amended Non-compete, Plaintiff is permitted to separate from the Company and provide program management services, configuration management services, requirements management services, research and development services, and various other consulting services.

46.     Although Plaintiff has resigned as an officer of the Company and is required to sell his interest in the Company, the Company has failed to return certain valuable equipment to Plaintiff that he previously loaned to the Company.

**Issues with the CCAD and Sikorsky Contracts**

47.     After Plaintiff's resignation, the Company suffered from numerous technical and manufacturing issues with performance of the CCAD contracts.

48.     CCAD is presently constructing a new facility to house the new machines it contracted the Company to engineer. The construction of the building, however, is one year behind schedule. Upon information and belief, the building is currently scheduled to be completed during the third or fourth quarter of 2013.

49.     Upon information and belief, the Company has not been able to demonstrate functionality of the machines to specifications and requirements despite an original March, 2012 delivery date.

50.     Upon information and belief, the Company has suffered substantial staff attrition, both voluntary and involuntary, which has further impacted its ability to perform under its contracts with CCAD.

51.     Upon information and belief, Sikorsky has put its contracts with RV on hold and/or delayed construction and/or shipment of the machines due to various reasons, including, but not limited to, non-performance to specifications and operational problems within the Company.

52.     Upon information and belief, the machines engineered by the Company under its contract with Sikorsky suffer from the same types of technical and manufacturing issues as the machines the Company has engineered under its contracts with CCAD.

9

53.     Upon information and belief, the Company and RV cannot deliver the machines as promised under the Sikorsky contract.

54.     Since Plaintiff's resignation from the Company, RV is being managed by principals who have no tangible knowledge or training in aerospace powertrain testing and/or the associated disciplines required for the Company to perform under its contracts with CCAD and Sikorsky.

**Defendants Intend to Disenfranchise Plaintiff Without Proper Payment**

55.     The Company did not exercise its option under the First Purchase Option of the Shareholder Agreement, and the Remaining Shareholders did not exercise their option under the Second Purchase Option of the Shareholder Agreement.

56.     Plaintiff must now sell his stock back to the Company pursuant to Article 3, Section C of the Shareholder Agreement.

57.     Based upon the Company's designation of February 10, 2012 as Plaintiff's last day of employment, any sale of Plaintiff's shares under the Shareholder Agreement must close by June 5, 2013.

58.     Since early 2012, Plaintiff has requested various documents from Defendants in order to calculate the value of his shares and to monitor improper transactions by Defendants pending payment.  Most of those efforts have been blocked, although some documents have been recently produced.

59.     By letter dated June 15, 2012, and pursuant to Section 487 of the Michigan Business Corporation Act, MCL § 450.1487, Plaintiff requested that the Company make available for inspection various books and records of the Company and its affiliates, including

RV.  This letter authorized Plaintiff's attorney to act on his behalf with respect to the shareholder and director demand for records.  (6/15/12 Letter, **Exhibit F**).

60.     In his June 15, 2012 shareholder and director demand letter, Plaintiff identified for inspection twenty-two specific documents relating to the Company and each subsidiary and affiliate of the Company.  Plaintiff also requested that the Company provide for itself and each of its affiliates, "the balance sheet, statement of income, and statement of source and application of funds for the year ending December 31, 2011."  (6/15/13 Letter, p. 1).

61.     In response, the Company did not provide all of the materials requested in Plaintiff's June 15, 2012 letter, and those materials that the Company submitted to Plaintiff were inadequate.  Among the inadequate materials submitted to Plaintiff were a seven-line "Balance Sheet," a seven-line "Statement of Operations," and a rudimentary "2011 Year End Summary" that did not coincide with the accompanying "Statement of Operations."  (See Response Materials, **Exhibit G**).

62.     By letter dated April 4, 2013, Plaintiff sent another request for books and records to the Company, pursuant to Section 487 of the Michigan Business Corporation Act, MCL § 450.1487.  (4/4/13 Letter, **Exhibit H**).  This April 4, 2013 shareholder and director demand letter also authorizes Plaintiff's attorney to act on his behalf with respect to the shareholder and director demand for records.

63.     The April 4, 2013 letter requested, *inter alia*, that the Company provide for itself and each affiliate, "in consolidated and consolidating forms, the balance sheet, statement of income, and statement of source and application of funds for the years ending December 31, 2011, and December 31, 2012."  (4/4/13 Letter, p. 1). The requests called for information, in

11

part, in order to monitor improper withdrawals from the Company designed to enrich Defendants at Plaintiff's expense.

64.     With the buy-out date only two months away, the Company submitted some documents in response to Plaintiff's latest demand for books and records.   The Company provided its unaudited financial statements for the years ending December 31, 2011, and December 31, 2012.

65.     The 2011 financial statements contained the Accountant's Review Report indicating the original report had been dated March 29, 2012.   However, the 2011 financial statements were subsequently "restated" at management's request in February, 2013.   The restatement does not appear to have merit, but was done only to support Defendants' position that nearly $5.5 million of the Company's cash at December 31, 2011, is not a "cash basis asset" and should therefore be excluded in valuing the Plaintiff's common shares.

66.     Despite the Company's April 12, 2013 production of some documents, it has not produced all of the documents requested in Plaintiff's April 4, 2013 letter, and the Company's response remains inadequate.

67.     More than five (5) business days have elapsed since Plaintiff delivered to the Company his shareholder and director demand to inspect the records of the Company.

68.     The Company has not provided all of the documents, books, records, and materials requested in Plaintiff's June 15, 2012 letter, or in Plaintiff's April 4, 2013 letter, and has not permitted Plaintiff to inspect said documents, books, records, and materials.

**The Valuation of Plaintiff's Shares**

69.     After analyzing the limited financial information provided by the Company, Plaintiff's retained, public accounting firm, UHY Advisors ("UHY"), determined the value of Plaintiff's shares in accordance with the formula set forth in Article 6, Section A of the Shareholder Agreement.

70.     By letter dated May 7, 2013, Plaintiff notified the Company that, based upon the financial information submitted to Plaintiff by the Company, the Company's Net Book Value (cash basis assets, minus cash basis debt) as of December 31, 2011, totals $19,882,834.

71.     After reducing the Net Book Value by the $3 million paid to Plaintiff in February of 2012, as required by the First Amendment to Shareholder Agreement, Plaintiff has determined the Company's Adjusted Net Book Value as of December 31, 2011, was $16,882,834.  (*Id.*). The price per common share is $70.84 given 238,316 shares outstanding.  Accordingly, the Plaintiff has determined his shares in the Company to be valued at $6,316,024 under Article 6, Section A of the Shareholder Agreement.

72.     By letter dated May 16, 2013, the Company advised Plaintiff that it has determined that Plaintiff's shares are worth only $1,178,903.  The Company has otherwise been unwilling to further discuss the valuation of Plaintiff's shares.

73.     Article 6, Section A of the Shareholder Agreement provides that the purchase price of Plaintiff's shares is based on the Company's Net Book Value, and requires a determination of Net Book Value under cash basis accounting.

74.     The Company did not use a proper method of cash basis accounting when determining the Net Book Value of the Company, resulting in an inaccurate and artificially low value for Plaintiff's shares.

13

75.     Based upon the Company's calculation and correspondence – which is not stated as being based upon the review of an independent firm such as UHY – the Company is excluding from the calculation all assets of the Company except actual "cash" held as of December 31, 2011.  Moreover, the Company excluded approximately $5.5 million of cash held in a RV bank account, largely representing the proceeds of the Sikorsky contract payment.

76.     The Company's interpretation of Net Book Value as consisting of only the Company's cash in its bank accounts, and excluding other significant cash basis assets, is a violation of Article 6, Section A of the Shareholder Agreement.

77.     To date, the Company and the Individual Defendants have refused to participate in good faith discussions to determine an agreed upon value of Plaintiff's shares.

78.     Defendants' actions have demonstrated an intent to force a buy-out on June 5, 2013, based upon the Company's inaccurately calculated purchase price, and simply issue a note for any amount they deem appropriate, thereby divesting Plaintiff of his shares of the Company.

**Defendants' Other Acts of Oppression and Demonstrating Their Fraudulent Intent**

79.     As the discussions regarding access to records and valuation were progressing, Defendants increasingly took actions demonstrating their intentions to try and "have their cake and eat it, too" by divesting Plaintiff of his shares (and thus his rights as shareholder, including the right to vote on asset sales and other corporate actions and participate in distributions), paying grossly improper amounts under the Shareholder Agreement, and otherwise depriving Plaintiff of his value in SCI and related entities.

80.     Defendants' scheme first involves the improper calculation of Net Book Value under the Shareholder Agreement.  Upon information and belief, Defendants have taken the

14

position that they may simply issue a note for any amount they deem appropriate, and thus divest Plaintiff of his shares of the Company.

81.    Such a tactic, if permitted, would allow Defendants to then carry on the affairs of SCI in private, including the making of massive distributions to shareholders and/or the sale of assets of the Company.  Defendants know that they are in deep trouble with regard to the CCAD and Sikorsky contracts and will likely have to return most of the contract amounts already received due to non-delivery and breach.  Defendants are thus intent upon getting rid of Plaintiff as a shareholder, then distributing its funds as quickly as possible, and in a manner which excludes Plaintiff.

82.    Defendants' stratagem has been revealed in its correspondence with Plaintiff.  For example, in June 2012, the Company refused to produce many documents being sought by Plaintiff, alleging that he was "engaged in establishing one or more business enterprises … for the purpose of competing with the Company … in direct violation" of Plaintiff's non-compete. Defendants ignored the fact that Plaintiff was receiving no salary or other remuneration from the Company after leaving its employ in January 2012 and was free to pursue business opportunities not in violation with the agreement, as provided for by the Amended Non-compete.  Defendants also ignored that the non-compete provision, assuming it was enforceable at all, only prohibited Plaintiff from working with a company "which is engaged in any business … which is competitive with the Corporation's business," included specific examples of what Plaintiff could do under the Amended Non-compete, and does not (nor could it, as a matter of Michigan public policy) prohibit mere efforts to prepare to compete once free of non-compete obligations.  By purposefully misstating the scope of the non-compete, Defendants sought to further oppress Plaintiff and deprive him of his rights.

83.    Similarly, in 2013, when Defendants sent along their bogus Net Book Value calculation, Defendants claimed that even that artificially low amount would not be paid due to a laundry list of specious allegations, which incredibly included "extortion" for the $3 million fee paid to Plaintiff under the Fee Agreement in February 2012 (and where both sides were represented by counsel and formal documentation was drafted and signed) and raising a host of issues ranging from the petty (a $4,500 expense item) to the bizarre (histrionic claims of "diverted" funds and "fictitious" lease payments).  These claims – surfaced for the first time after 18 months of correspondence and efforts to come to resolution on the stock re-purchase price – were obviously designed to intimidate and harass Plaintiff in to accepting Defendants' low-ball and improper offer.  Moreover, those claims, which are arbitrable and not offsets but rather independent claims, have nothing to do with what the Company owes Plaintiff.  This is simply further evidence that these "claims" are asserted frivolously to deprive Plaintiff of both his shareholdings and his consideration.

84.    Other oppressive acts of Defendants include:

  a.  Defendants' intentional failure to make dividend distributions in 2011 and 2012 in order not to share same with Plaintiff;

  b.  Defendants even failed and refused to pay a dividend distribution adequate to compensate a large income tax liability incurred by Plaintiff due to the Company's taxable income despite such distributions having been made previously;

  c.  refusal to return loaned assets (equipment) belonging to Plaintiff;

  d.  refusal to have the Company pay contractual obligations to entities affiliated with Plaintiff, to wit, CY Holdings, Inc., which is owed approximately $164,999.92 under a written Equipment Rental Agreement with Company; and

  e.  Defendants' intentional exclusion of Plaintiff from the management of SCI Capital Partners, LLC, an affiliated entity, and as to which Plaintiff is

16

a member and Manager, in order for Defendants to enter in to financing arrangements designed to further bleed cash away from Plaintiff.

## COUNT I – APPLICATION FOR ORDER COMPELLING
## INSPECTION OF BOOKS AND RECORDS UNDER MCL § 450.1487
### (Against Superior Controls, Inc.)

85.     Plaintiff incorporates by reference paragraphs 1 through 84 of this Complaint as if stated fully herein.

86.     Plaintiff has fully complied with MCL § 450.1487 respecting the form and manner of making demand for inspection of the documents.

87.     Under MCL § 450.1487, Plaintiff, as a shareholder of the Company, possesses an absolute and unconditional right to the documents requested in the June 15, 2012 and April 4, 2013 written demand letters for books and records.

88.     Under MCL § 450.1487, Plaintiff seeks the documents requested in the June 15, 2012 and April 4, 2013 written demand letters for books and records for a proper purpose, and those documents sought are directly connected with that purpose.

89.     Under the MCL § 450.1487(2), a "proper purpose" is one that "in good faith, seeks information bearing upon protection of the shareholder's interest and that of other shareholders in the corporation, and is not contrary to the corporation's interest." *North Oakland County Bd of Realtors v Realcomp, Inc,* 226 Mich App 54, 59 (1997).

90.     Plaintiff's written demands explained that Plaintiff requires an inspection of the above-mentioned documents in order to: (1) analyze SCI's performance since 2011; and (2) establish a value for Plaintiff's shares in the Company.

91.     Each category of requested documents is directly related to those proper purposes.

92.     Pursuant to MCL § 450.1487(3), the Company had five (5) business days, or until April 11, 2013, to permit the inspection requested by Plaintiff.  The Company, however, has not produced many of the requested documents or permitted the requested inspection.  Accordingly, Plaintiff is entitled to an Order permitting the requested production and inspection.

93.     There exist no permissible legal grounds for the Company to withhold those documents.

WHEREFORE, Plaintiff G. Wesley Blankenship respectfully requests that this Honorable Court issue an order and judgment:

(a)     compelling the Company to immediately produce and make available for inspection and photocopying all documents, books, records and materials responsive to the requests set forth in the April 4, 2013 letter attached hereto as Exhibit G;

(b)     compelling the Company to preserve all documents, books, records, and materials in their present state and condition;

(c)     compelling the Company to preserve all electronic data in its present state;

(d)     under MCL § 450.1487(5), awarding Plaintiff his costs, including reasonable attorney fees, incurred in obtaining the Court's order; and

(e)     awarding such other relief as the Court deems appropriate.

## COUNT II – BREACH OF FIDUCIARY DUTY (COMMON LAW)
### (Against All Individual Defendants)

94.     Plaintiff incorporates by reference paragraphs 1 through 93 of this Complaint, as if fully stated herein.

95.     The Individual Defendants, as directors of the Company, have exercised control and direction over the management of the Company and its subsidiaries and affiliates.

96.     As officers and directors of the Company, the Individual Defendants owe and continue to owe to Plaintiff, as a minority shareholder in the Company, fiduciary duties of good faith, due care, loyalty and honesty by virtue of their common law obligations, the trust reposed by Plaintiff in the Individual Defendants to operate the Company in good faith, and the Individual Defendants' superior knowledge and control of the current financial operation of the Company.

97.     The Individual Defendants have breached their fiduciary duties by, among other actions:

a.  Repeatedly and unlawfully failing and refusing to make dividend distributions to its shareholders in amounts attributable to its 2011 and 2012 profits.

b.  Repeatedly and unlawfully failing and refusing to even make dividend distributions to its shareholders sufficient to cover, on an after-tax basis, their income tax liability related to the Company for 2012.

c.  Failing to make shareholder dividend distributions attributable to the Company's 2011 and 2012 profits until Plaintiff has sold his shares back to the Company under the Shareholder Agreement, in order to deprive Plaintiff of his share of Company profits and retain profits for themselves.

d.  As of this date, only 5 days before the mandated repurchase date, refusing to participate in good faith discussions to determine an agreed upon value of Plaintiff's shares, as required under the Shareholder Agreement.

e.  Intentionally and unlawfully manipulating the Company's financial statements, including improperly restating cash assets, in an effort to minimize the Company's 2011 Net Book Value prior to the Company's purchase of Plaintiff's shares.

f.  Intentionally and unlawfully using an improper method of cash basis accounting, which understates the assets – cash basis, in an effort to minimize the Company's Net Book Value prior to the Company's purchase of Plaintiff's shares.

g.  Intentionally and unlawfully failing to designate approximately $5,457,809 in cash deposits to an RV bank account from Sikorsky as a

cash asset in its financial statements, and failing to include this cash asset in the Company's calculation of Net Book Value.

h. Artificially minimizing the Company's 2011 Net Book Value prior to Plaintiff's sale of his shares to the Company, so that the Individual Defendants can retain the cash assets of the Company for distribution to themselves after Plaintiff is no longer a shareholder in the Company.

98.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff has suffered damages.

WHEREFORE, Plaintiff G. Wesley Blankenship respectfully requests that this Honorable Court issue an order and judgment:

(a)     compelling the Company to immediately pay to Plaintiff his entitled distribution of profits for the year ending December 31, 2011, and for the year ending December 31, 2012;

(b)     compelling the Company to at least make distributions to its shareholders sufficient to cover, on an after-tax basis, their tax liability related to the Company for 2012;

(c)     compelling the Company to purchase Plaintiff's shares in the Company in an amount equal to $6,316,024, which reflects the true value of Plaintiff's shares under a proper cash basis accounting;

(d)     awarding Plaintiff his costs, including reasonable attorney fees, incurred in obtaining the Court's order;

(e)     declaring that Plaintiff remains a shareholder of Company until his shares are properly purchased by the Company under the terms of the Shareholder Agreement and that Plaintiff remains entitled to all such rights as shareholder through said time; and

(f)     awarding such other legal and equitable relief as the Court deems appropriate.

## COUNT III – MINORITY SHAREHOLDER OPPRESSION UNDER MCL 450.1489
### (Against All Individual Defendants)

99.     Plaintiff incorporates by reference paragraphs 1 through 98 of this Complaint, as if fully stated herein.

100.   MCL § 450.1489(1) allows Plaintiff to sue the Individual Defendants "to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder."

101.   MCL § 450.1489(3) defines "willfully unfair and oppressive conduct" as "a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder."

102.   MCL § 450.1489(1)(c) authorizes the Court to order "[t]he cancellation, alteration, or injunction against a resolution or other act of the corporation."

103.   MCL § 450.1489(1)(d) authorizes the Court to order "[t]he direction or prohibition of an act of the corporation or of shareholders, directors, officers, or other persons party to the action."

104.   MCL § 450.1489(1)(e) authorizes the Court to order "[t]he purchase at fair value of the shares of a shareholder . . . ."

105.   The acts of the Individual Defendants as "directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive" by, *inter alia*:

(a)   Failing and/or refusing to follow the requirements of MCL § 450.1487, and provide the documents and information demanded on April 4, 2013;

(b)   Failing and/or refusing to provide on a timely basis financial and other corporate documents and information Plaintiff has demanded pursuant to statute, so that Plaintiff may determine if the officers and directors in control are acting in the Company's and Plaintiff's best interests;

(c)   Failing and/or refusing to make distributions of the Company's profits in 2011 and 2012;

(d)   Refusing to participate in good faith discussions to determine an agreed upon value of Plaintiff's shares, as required under the Shareholder Agreement;

21

(e)    Intentionally and unlawfully manipulating the Company's financial statements, including improperly designating and restating cash assets, in an effort minimize the Company's Net Book Value prior to the Company's purchase of Plaintiff's shares;

(f)    Intentionally and unlawfully failing to designate approximately $5,457,809 in cash deposits from Sikorsky as a cash asset in its financial statements, and failing to include said cash in its valuation of the Company's Net Book Value;

(g)    Intentionally and unlawfully using an improper method of cash basis accounting, which understates assets – cash basis, in an effort to minimize the Company's Net Book Value prior to the Company's purchase of Plaintiff's shares;

(h)    Engaged in each of the other aforesaid acts and omissions as set forth in this Complaint.

106.    As a direct and proximate cause of the Individual Defendants' actions, Plaintiff has suffered the following injuries and damages:

(a)    Prevented Plaintiff from learning the Company's accurate financial status prior to the Company's purchase of Plaintiff's shares;

(b)    Caused Plaintiff lost distributions from the Company;

(c)    Caused Plaintiff to suffer an artificial decrease in the value of his shares;

(d)    Caused Plaintiff to lose his rights as shareholder in the Company and to participate meaningfully as a shareholder.

WHEREFORE, Plaintiff G. Wesley Blankenship respectfully requests that this Honorable Court issue an order and judgment:

(a)    compelling the Company to immediately pay to Plaintiff his entitled distribution of profits for the year ending December 31, 2011, for the year ending December 31, 2012, and for the year beginning January 1, 2013, through the present;

(b)    compelling the Company to make dividend distributions to its shareholders sufficient to cover, on an after-tax basis, their income tax liability related to the Company for 2012;

22

(c)     for injunctive relief from the Company's illegal, fraudulent, and
unauthorized purchase Plaintiff's shares;

(d)     requiring the Company and Individual Defendants to include all
assets – cash basis, including the $5,457,809 in cash deposits from
Sikorsky, in its valuation of the Company's Net Book Value, as
required under the Shareholder Agreement;

(e)     compelling the Company to purchase Plaintiff's shares in the
Company for the price of $6,316,024, which reflects the true value
of Plaintiff's shares under the Shareholder Agreement based upon
a proper cash basis accounting;

(f)     awarding Plaintiff his costs, including reasonable attorney fees,
incurred in obtaining the Court's order;

(g)     declaring that Plaintiff remains a shareholder of Company until his
shares are properly purchased under the terms of Shareholder
Agreement and that Plaintiff remains entitled to all such rights as
shareholder through said time; and

(h)     awarding such other legal and equitable relief as the Court deems
appropriate.

## COUNT IV – BREACH OF CONTRACT AND DECLARATORY JUDGMENT
### (Against Superior Controls, Inc.)

107.    Plaintiff incorporates by reference paragraphs 1 through 106 of this Complaint, as
if fully stated herein.

108.    This Count IV is brought pursuant to MCR 2.605.

109.    This Court has jurisdiction to hear this matter because this is a case of actual
controversy within its jurisdiction.

110.    An actual controversy is present when a declaratory judgment is necessary to
direct a party's future conduct for preservation of his/its legal rights.

111.    Under the terms of the Shareholder Agreement, the closing of the sale and
purchase of Plaintiff's shares in the Company must occur on or before June 5, 2013.

23

112.    Under Article 6, Section A of the Shareholder Agreement, if the parties "cannot agree on the price to be paid for the subject shares of stock, the price will be determined by dividing 'Net Book Value' of the Company computed on a cash basis of accounting . . . by the total number of shares outstanding, including the shares subject to resale."   The Shareholder Agreement provides that "'Net Book Value' shall be computed by subtracting all cash basis debt from the total of all cash basis assets."

113.    Implicit in this provision is that the parties must make a good faith effort to "agree on the price to be paid" for Plaintiff's shares.

114.    In April, 2013, less than two months before the latest possible closing date for the sale of Plaintiff's shares under the Shareholder Agreement, Plaintiff finally received the Company's 2011 financials.

115.    On May 16, 2013, less than three weeks before the latest possible closing date for the sale of Plaintiff's shares under the Shareholder agreement, Plaintiff, for the first time, received the Company's proposed purchase price for Plaintiff's shares.

116.    The Company has repeatedly ignored efforts on the part of Plaintiff to discuss a purchase price of his shares that is agreeable to both Plaintiff and the Company.

117.    The Company failed to use standard accounting principles and improperly determined that the Company's Net Book Value on December 31, 2011, was $6,148,964 -- approximately $13 million less than the Company's true Net Book Value (cash basis assets, minus cash basis debt).

118.    As a result, the Company stated that the value of Plaintiff's shares under the formula provided in Article 6, Section A is $1,178,093.

24

119.    The Company's valuation of Plaintiff's shares is significantly lower than the true value of Plaintiff's shares under the formula provided in Article 6, Section A of the Shareholder Agreement.

120.    Upon information and belief, the Company improperly considered only cash in certain bank accounts, and no other assets or debt-cash basis, in its calculation of Net Book Value, rather than the standard cash basis accounting method of considering the value on a cash basis of all Company assets and liabilities.

121.    Upon information and belief, the Company manipulated its financial statements, by, among other actions, improperly designating and restating cash assets, including more than $5 million in cash deposited with RV, its wholly-owned subsidiary, by Sikorsky in relation to the Company's Sikorsky contracts.

122.    By improperly designating and restating the Sikorsky deposits and other cash assets of the Company, the Company has artificially reduced the Company's Net Book Value, thereby diminishing the purchase price of Plaintiff's shares under the formula provided in the Shareholder Agreement.

123.    An actual controversy exists because, absent Court intervention, Plaintiff will be forced to sell his shares on June 5, 2013 for approximately $5 million less than their true Net Book Value – cash basis.

124.    Plaintiff will not only suffer significant financial harm, but Plaintiff will also lose all rights and privileges associates with being a shareholder, including his right to shareholder distributions, attend shareholder meetings, and vote as a shareholder in the Company.

125.    Plaintiff asks that this Court declare his rights and the Company's obligations under the Shareholder Agreement.

126.     Moreover, due to the Company's actual and anticipatory breach of the Shareholder Agreement, Plaintiff asks this Court for a declaratory ruling that Plaintiff is not bound by his non-compete obligations as of June 5, 2013 or at any other time.

127.     Moreover, Plaintiff asks this Court for a declaratory ruling that the non-compete agreement, under these circumstances, violates Michigan law and is unenforceable; does not protect a legitimate business interest; is over-broad; violates Michigan public policy; and otherwise is without force or effect.

WHEREFORE, Plaintiff G. Wesley Blankenship respectfully requests that this Honorable Court issue a declaratory judgment for the following relief:

(a)     Declare that the Company has not engaged in good faith negotiations to determine an agreed upon price for Plaintiff's shares, as required under Article 6, Section A of the Shareholder Agreement;

(b)     Declare that the Company did not use a proper method of cash basis accounting when it determined that the Company's Net Book Value (cash basis assets, minus cash basis debt) on December 31, 2011 equals $6,148,965, and the price to be paid for Plaintiff's shares under Article 6, Section A equals $1,178,093.

(c)     Declare that Article 6, Section A of the Shareholder Agreement requires that the Company include all cash basis assets and liabilities, and not just cash on hand, in its calculation of the Company's Net Book Value.

(d)     Declare that the $5,457,809 Sikorsky deposits, along with other improperly designated cash assets, must be included as a cash asset when determining the Company's Net Book Value.

(e)     Declare that the purchase price for Plaintiff's shares under Article 6, Section A of the Shareholder Agreement is $6,316,024, and that the Company must pay this amount for Plaintiff's shares.

(f)     Declare that Plaintiff is not required to sell his shares to the Company until the Company complies with all the requirements and conditions of the Shareholder Agreement, including those described in items (a) through (e), above.

26

(g)    Declare that Plaintiff is not bound by the non-compete provisions of the Shareholder Agreement.

(g)    Awarding such other legal and equitable relief as the Court deems appropriate.

## COUNT V – CONCERT OF ACTION/CIVIL CONSPIRACY
### (Against All Defendants)

128.    Plaintiff incorporates by reference paragraphs 1 through 127 of this Complaint, as if fully stated herein.

129.    Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of committing the tortious acts as more fully set forth herein.

130.    Defendants, in combination and concert with one another, acted unlawfully in the manner set forth herein.

131.    By engaging in the conduct described in this Complaint, Defendants acted maliciously, fraudulently and oppressively, and with full knowledge of the consequences and damage to Plaintiff.

132.    As a direct and proximate result of the conspiracy and Defendants' illegal, wrongful, or tortious acts, Plaintiff has suffered the following injuries and damages:

(a)    Prevented Plaintiff from learning the Company's accurate financial status prior to the Company's purchase of Plaintiff's shares;

(b)    Caused Plaintiff lost dividend distributions from the Company;

(c)    Caused Plaintiff to suffer an artificial decrease in the value of his shares;

(d)    Caused Plaintiff to lose his rights as shareholder in the Company and to participate meaningfully as a shareholder.

133.    Due to the civil conspiracy between the Defendants, Defendants are jointly, severally and/or alternatively liable to Plaintiff for all of his injuries and damages.

WHEREFORE, Plaintiff G. Wesley Blankenship respectfully requests that this Honorable Court issue an order and judgment:

(a)    compelling the Company to immediately pay to Plaintiff his entitled dividend distribution of profits for the years ending December 31, 2011 and December 31, 2012;

(b)    compelling the Company to make dividend distributions to its shareholders sufficient to cover, on an after-tax basis, their income tax liability related to the Company for 2012;

(c)    for injunctive relief from the Company's illegal, fraudulent, and unauthorized purchase Plaintiff's shares;

(d)    requiring the Company and Individual Defendants to include all cash basis assets, including the $5,457,809 in cash deposits from Sikorsky, in its valuation of the Company's Net Book Value (cash basis assets, minus cash basis debts), as required under the Shareholder Agreement;

(e)    compelling the Company to purchase Plaintiff's shares in the Company for the price of $6,316,024, which reflects the true Net Book Value (cash basis assets, minus cash basis debts) of Plaintiff's shares under the Shareholder Agreement;

(f)    awarding Plaintiff his costs, including reasonable attorney fees, incurred in obtaining the Court's order;

(g)    declaring that Plaintiff remains a shareholder of Company until his shares are properly purchased under the terms of Shareholder Agreement and that Plaintiff remains entitled to all such rights as shareholder through said time; and

(h)    awarding such other legal and equitable relief as the Court deems appropriate.

Dated:  May 31, 2013 DICKINSON WRIGHT PLLC


By:  /s/ Daniel D. Quick
  Daniel D. Quick (P48109)
  Robert P. Zora (P74231)
Attorneys for Plaintiff
2600 West Big Beaver Road, Suite 300
Troy, MI 48084
Phone:  248-433-7200
dquick@dickinsonwright.com
rzora@dickinsonwright.com


DETROIT 50707-1 1282630v3