UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

G. WESLEY BLANKENSHIP,

              Plaintiff,

v.                                                          Case No. 13-CV-12386
                                                            Honorable Denise Page Hood

SUPERIOR CONTROLS, INC., a Michigan
corporation, RANDALL E. BRODZIK, MARK
E. SOBKOW, RODERICK L. EMERY,
KEVIN T. BUTLER, GREG D. CAMERON,
CHRISTOPHER J. LAKE, ROGER M.
TEMPLIN, individuals,

              Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.      INTRODUCTION

        This matter involves a request for injunctive relief, enjoining Superior Controls,

Inc., ("SCI" or the "Corporation") from deeming Plaintiff's shares in the Corporation

"redeemed" and depriving Plaintiff of his status as a shareholder in the Corporation,

in violation of Mich. Comp. Laws § 450.1489 and the stipulations of their Shareholder

Agreement.  Before the Court is Plaintiff's Motion for Preliminary Injunction.  This

matter has been fully briefed.  Oral argument was heard on August 28, 2013.

For the reasons discussed below, the Court DENIES Plaintiff's Motion for Preliminary Injunction.

## II.    BACKGROUND

Plaintiff, G. Wesley Blankenship, filed the present action in this Court on July 12, 2013.[1]  The action was brought against Defendants Superior Controls, Inc., and Randall Brodzick, Mark Sobkow, Roderick Emery, Kevin Butler, Greg Cameron, Christopher Lake, and Roger Templin in their individual capacities, alleging violation of Mich. Comp. Laws § 450.1489 and their Shareholder Agreement.  Plaintiff requests that the Court grant its Motion for Preliminary Injunction and order that Defendants are enjoined from deeming his shares 'redeemed' during the pendency of this litigation.

---

[1]

On July 23, 2013, Defendants filed a Counterclaim requesting (a) "that the Fee Agreement and the First Amendment to Employment, Noncompetition and Confidentiality Agreement be deemed rescinded nunc pro tunc;" (b) "that the Company be awarded the return of its $3 million paid under illegal duress and coercion;" (c) that the Court "award the Company its attorney fees and costs incurred in bringing this action;" and (d) "such other and different or equitable relief as this Honorable Court may determine appropriate under the circumstances."  Plaintiff filed an Answer to the Counterclaim on August 14, 2013.

Plaintiff became a shareholder in SCI in 2001.  SCI is a corporation that provides mechanical and electrical services to manufacturing companies.  **[Pl. Ex. 1, Shareholder Agreement at 1]**  On January 11, 2002, Plaintiff and the Corporation executed a Shareholder Agreement.  **[Pl. Ex. 1, Shareholder Agreement]**  On July 15, 2002, Plaintiff signed an Employment, Noncompetition Confidentiality Agreement with SCI which prohibited him from working for any competitor anywhere in the United States for 18 months after he ceased being a shareholder**. [Pl. Ex. 2]**  Plaintiff served as Chairman and Chief Executive Officer for the Corporation until January 13, 2012, when he resigned.  **[Def. Ex. C]**  Upon resignation, Plaintiff held 89,159 shares — or 37.4% — of the Corporation's outstanding stock.

Pursuant to Article 3, Section A of the Shareholder's Agreement, following Plaintiff's resignation, the Corporation had the "first option to purchase some or all" of Plaintiff's shares, an option that extended up to 180 days.  **[Pl. Ex. 1, Shareholder Agreement at 2]**  The Corporation did not exercise its purchase option.  When the option lapsed, Article 3, Section B of the Agreement provided the other shareholders in the Corporation a "Second Purchase Option" that also extended up to 180 days.  This time also lapsed without purchase of the shares.  Article 3, Section C of the Shareholder Agreement states that "[i]f all of the shares to be transferred are not purchased by either Corporation or the Remaining Shareholders, or both, before the

expiration of the section option period, the Corporation shall purchase the remaining shares." **[Pl. Ex. 1, Shareholder Agreement at 3]**

On June 15, 2012, Plaintiff sent a letter to the Corporation pursuant to Section 487 of the Michigan Business Corporation Act requesting the Corporation's books and records. **[Pl. Ex. 3]** In the letter, Plaintiff told the Corporation that he was intending to "sell his stock" and "need[ed] to review each of the documents [the he requested] to monitor the Company's financial health, and to help establish the value of [his] ownership interest." **[Pl. Ex. 3 at 1]** Plaintiff sent an additional request for books and records on April 4, 2013 because he felt that he had "not been provided the information [he was] entitled to" per his prior request. **[Pl. Ex. 4 at 1]** Plaintiff told the Corporation that the documents that he had been provided "were completely inadequate to be able to analyze the Company's performance in 2011 or to establish a value for [his] shares." **[Pl. Ex. 4 at 1]**

On April 12, 2013, with the buy-out date less than two months away, the Corporation provided Plaintiff with its unaudited financial statements for the years ending December 31, 2011, and December 31, 2012. Determining that this information was still inadequate, Plaintiff (through counsel) wrote a letter to SCI on May 9, 2013. In the letter, Plaintiff noted that he incurred both Federal and State tax liability amounting to $72,051 because $433,983 of the Corporation's taxable income had been attributed to him for the 2012 fiscal year. **[Pl. Ex. 5 at 1]** Plaintiff also

questioned the Corporation's decision to refrain from giving distributions and requested that the Corporation give him a distribution "sufficient to cover, on an after-tax basis, his tax liability related to the Company for 2012" as well as 2011, for which he was also not paid. **[Pl. Ex. 5 at 2]** Lastly, Plaintiff reiterated his request for details regarding shareholder distributions, bonuses, and other non-salary compensation that was paid to the Corporation's officers and directors after June 1, 2011. **[Pl. Ex. 5 at 2]** On May 7, 2013, Plaintiff sent Defendants another letter in which he acknowledged Defendants' decision to treat his resignation as having been effective on February 10, 2012. **[Pl. Ex. 6 at 1]** Plaintiff noted that this necessitated that the sale of his shares to the company "close no later than June 5, 2013." **[Pl. Ex. 6 at 1]** Plaintiff maintained that Article 6, Section A of the Shareholder Agreement states

> If the parties to a transfer of stock required by this Agreement cannot agree on the price to be paid for the subject shares of stock, the price will be determined by dividing the "Net Book Value" of the Company computed on a cash basis of accounting as of the first prior business year end (currently December 31) by the total number of shares outstanding, including the shares subject to resale. "Net Book Value" shall be computed by subtracting all cash basis debit from the total of all cash basis assets. **[Pl. Ex. 1, Shareholder Agreement at 5]**

Because his resignation was effective in February 2012, Plaintiff noted that the valuation of his shares would be based on the Corporation's financials for the year ending December 31, 2011. Plaintiff notified the Corporation that he had retained

UHY Advisors, Inc. to compute the valuation of his stock in the company and noted that based on the financial information that he had received, his shares in the company were valued at $6,316,024. **[Pl. Ex. 6 at 1-2]** Defendants disagreed with this valuation and in a letter dated May 16, 2013, notified Plaintiff that their belief was that Plaintiff's shares were valued at $1,178,093.[2] **[Pl. Ex. 7 at 1]**

On June 4, 2013, Defendants again wrote Plaintiff, this time referencing a phone call in which Defendants suggested that Plaintiff stipulate "to the fact that [his] interest in SCI [be] deemed . . . redeemed by SCI effective June 5, 2013, with the actual purchase price to be determined by agreement or otherwise." **[Pl. Ex. 8 at 1]** On June 6, 2013, Plaintiff sent Defendants a letter stating that he would not accept the proposal "as it divest[ed] [him] of his rights as a shareholder and would permit [Defendants] to engage in any number of improper acts injurious to [his] interests." **[Pl. Ex. 9 at 1]** Instead, Plaintiff proposed that he retain his shares and continue to be treated as a shareholder until they were able to have a hearing before the Court.

---

[2]

Defendants argued that because "cash basis accounting reflects only 'cash' less the total dollar amount represented by checks issued by the Company but not cleared [through] the Company's bank[,]" the cash basis sum totaled $279,118. Therefore, as of December 31, 2011, the total cash basis value was $6,148,964. After deletion of the $3 million dollars that Defendants paid to Plaintiff, Defendants concluded that Plaintiff's shareholder interest was valued at $1,178,093. Defendants noted that a portion of the total Plaintiff used in his calculation ($5,457,809 in Sikorsky deposits) should not have been included because the "cash was not under the control of the company on December 31, 2011." **[Pl. Ex. 7 at 1]**

**[Pl. Ex. 9 at 1-2]**  Defendants did not agree with this modification and on July 2, 2013, notified Plaintiff that pursuant to the terms of the Shareholder Agreement, Plaintiff's shares in the Corporation were to be considered redeemed as of June 5, 2013, the first payment of the purchase price to be received by Plaintiff no later than June 4, 2014, as provided by the promissory note which presented the terms of the sale.[3]  **[Pl. Ex. 10 at 1; Def. Ex. 8 at 1]**  Defendants' counsel also apprised Plaintiff's counsel of his preference to arrange a meeting to discuss their differing opinions on the valuation of the shares.  **[Pl. Ex. 10 at 1; Def. Ex. 8 at 1]**

Plaintiff contends that notwithstanding Defendants' compliance in turning over financial documents in April 2013 (though he argues he never received all of the documents that he needed), Defendants' "delay in providing financial information, its bad faith 'restatement' of its 2011 financial statements in early 2013, and its improper calculation of the value of [his] shares were all actions taken . . . [to] deprive him of the value of his significant shareholdings." **[Pl. Mot. Prelim. Inj. at 7]**  Additionally, he argues that his independent assessment of the valuation of his shares completed by UHY Advisors is in accordance with the requirements of the Shareholders Agreement

---

[3]

Also pursuant to the Shareholder Agreement, Defendants attached a promissory note to its notice of redemption notifying Plaintiff that the note was payable in five equal annual installments (plus interest compounded annually at the annual rate of 4.25%) to begin no later than June 4, 2014.  **[Pl. Ex. 10 at 3]**

and that Defendants "cannot redeem [his] shares and deprive [him] of his shareholder status" until the Corporation complies with the requirement that the sale occur at a "Closing."[4] **[Pl. Ex. 1, Shareholder Agreement, Article 6, Section D]**

## III.   ANALYSIS

### A. Preliminary Injunction Standard

The Court must balance and consider four factors when determining the appropriateness of a preliminary injunction pursuant to Federal Rule of Civil Procedure 65: 1) the likelihood of the plaintiff's success on the merits; 2) whether plaintiff will suffer irreparable injury without the injunction; 3) the balance of harm to others that will occur if the injunction is granted; and 4) whether the injunction would serve the public interest. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.

---

[4] Article 6, Section D states that

> [u]nless otherwise provided, the closing of any purchase and sale of stock contemplated by this Agreement shall take place at the office of the Corporation at a date designated by the Corporation, which shall not be more than one hundred twenty (120) days following the date of the notice of intent to purchase, and not less than ten (10) days following that date. **[Pl. Ex. 1, Shareholder Agreement at 5]**

2001); *In re Eagle-Pitcher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 778-79 (E.D. Mich. 2001). Specific findings must be made as to each factor unless fewer factors would be dispositive of the issues. *Bonnell*, 241 F.3d at 809; *Lucero*, 160 F. Supp. 2d at 778. A finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction, where the movant has at minimum shown serious harm that decidedly outweighs any potential harm to the defendants if the injunction is issued. *Gaston Drugs, Inc., v. Metro. Life Ins., Co.*, 823 F.2d 984, 988 n.2 (6th Cir. 1987); *Lucero*, 160 F. Supp. 2d at 778. The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994). Thus, no single factor will be determinative as to the appropriateness of equitable relief. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) (citing *Metro. Detroit Plumbing & Mech. Contractors Ass'n v. Dep't of Health, Educ. & Welfare*, 418 F. Supp. 585, 586 (E.D. Mich. 1976)).

A preliminary injunction is meant to preserve the relative positions of the parties pending a resolution on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). To be granted a preliminary injunction, Plaintiff must demonstrate specific harm and the likelihood of success on the merits. *Leary v. Daeschner*, 228

F.3d 729, 739 (6th Cir. 2000).  A showing of a 'possibility' of success on the merits is insufficient.  *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987).  Rather, at a minimum, the movant must show "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendants if an injunction is issued."  *In re Delorean*, 755 F.2d at 1229.

### 1.  Success on the Merits

Plaintiff argues that based on Michigan common law, he must remain a shareholder

> until the Company complies with all the buy-back terms of the Shareholder Agreement, including the requirement that the company value [his] shares based upon the true and accurate Net Book Value of the Company as of December 31, 2011, and the requirement that the sale of [his] shares occur at a formal closing. **[Pl. Mot. Prelim. Inj. at 14]**

Plaintiff relies primarily on *Allen v. Plummer*, 2002 Mich. App. LEXIS 2379, 2002 WL 652129 (Apr. 19, 2002) as evidence that he should retain his shareholder status. There, after months of disagreements with the Defendants (the Plummers), the Plaintiffs (the Allens) used their put option to compel the Plummers to purchase their shares in the corporation.  However, the parties did not proceed with the buy-out procedures set out in their Shareholder Agreement and the Defendants sold most of the corporations assets to a third party without Plaintiffs' knowledge or consent.  Over a year after the Allens elected to use their put option, they received a check (for $159.

10

628.83 which the Plummers stated was the buy-out price) and a one-page document that listed the corporations monthly earnings for the year proceeding the date of the elected option.   The Allens filed a complaint requesting declaratory judgment regarding their status as shareholders as well as a declaratory judgment and equitable relief pursuant to Mich. Comp. Laws §§ 600.3605 and 450.1487.   They alleged that the Plummers and their attorney sold the corporation for less than it was worth and without the proper consent from the corporate body.   They also alleged breach of fiduciary duty, breach of contract, waste, misappropriation of corporate opportunities, and unjust enrichment.

Following an eight-day trial on the issue of shareholder status, the trial court ruled that the Allens became "mere creditors" of the corporation when they elected to validly exercise their put option and could not maintain any shareholder derivative claims against the Plummers or the Corporation.   Based on the language of the Shareholder Agreement, the Court of Appeals reversed the trial court's ruling, determining that the agreement did "not evidence an intent to divest the [Plaintiffs'] legal or equitable ownership of the shares at the time they merely notify the [Defendants] of their decision to exercise the option and, because the buy-out did not

occur under the terms of the option agreement, the [Plaintiff's] remain[ed] shareholders of [the corporation]."[5]  *Allen*, 2002 Mich. App. LEXIS 2379, at *10-11.

The present case is distinguishable from *Allen*.  Here, the Corporation was required to purchase back the shares (*See* Pl. Ex. 1, Shareholder Agreement, Article 2, Section A "Required Sale of Stock[6]," Article 3, Section C "Required Purchase By Corporation"), the purchase of which had to be "satisfied by the execution of a promissory note . . . in the amount of the purchase price."  **[Pl. Ex. 1, Shareholder Agreement at 4-5]**  The purchase price is payable in five equal annual installments and not "simultaneous[ly]" as required in *Allen*.  Additionally, the Shareholder Agreement in the instant case (which Defendants state was created by Plaintiff) is not nearly as detailed as that in *Allen*.  There is no indication of shareholder rights that can

---

[5]

The Agreement provided that "[i]n the event that Allen makes a proper election to exercise the option . . . , then no later than nine(9) months after the delivery of the written election to exercise said option, Allen shall sell and Plummer shall purchase all, but not less than all  of the Shares owned by Allen at the Purchase Price set forth . . . ."  The court noted that the subsection "ma[d]e[] no reference to an immediate change in the Allens' shareholder status upon exercise of the option, and specifically contemplate[d] a potential nine-month delay in consummating the sale."  *Allen*, 2002 Mich. App. LEXIS 2379, at *11.

[6]

Article 2, Section A of the Shareholder Agreement states that "[i]n the event that the Shareholder's employment status is terminated for any reason (in this case resignation), . . . the Shareholder shall sell all shares of the Corporation he or she owns for the price and on the terms and conditions set forth in this Agreement."  **[Pl. Ex. 1, Shareholder Agreement at 2]**

possibly remain following resignation and repurchase of shares, even though payment is not received automatically.  Further, as Defendants noted, there is very little detail about the formal "Closing" required by the Agreement, the actual document stating only that the closing "shall take place at the office of the Corporation as a date designation by the Corporation, which shall not be more than one hundred twenty (120) days following the date of the notice of intent to purchase, and not less than ten (10) days following that date."  **[Pl. Ex. 1, Shareholder Agreement at 5]**  Because the "Closing" requirement is ambiguous in regards to a mandatory repurchase of shares due to the failure of both the Corporation and shareholders' utilization of the option to purchase, it is somewhat unclear if Defendants were in full compliance with the requirements of the Shareholder Agreement.  However, Defendants provided Plaintiff with a promissory note as required and though there was no specific valuation of the shares stated, Defendants noted that the purchase price would "be determined pursuant to the terms of the Shareholder Agreement" (which required a "Net Book Value" valuation because both parties could not agree on an appropriate share value).  Plaintiff's argument that the Corporation could not redeem the shares without giving a "fair value" is true but somewhat misguided as the "value" which Defendants stated would be given is in compliance with the Agreement and therefore "fair," though the actual monetary value has not yet been determined due to

13

disagreement on the amount of the "Net Book Value." There is no indication that Defendants have conducted "illegal, fraudulent, or willfully unfair and oppressive" acts against Plaintiff and it is unlikely that Plaintiff will have success on an Mich. Comp. Laws § 450.1489 claim on the merits.

### 2. Irreparable Injury Without the Injunction

It is well settled that a plaintiff's harm is not irreparable if it is fully compensable by money damages. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). However, "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Id.* at 511-12. "[I]rreparable injury has been characterized as loss of a movant's enterprise." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (citation omitted); *see also id.* ("The loss of [plaintiff's] distributorship, an ongoing business . . . constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent money damages.") (quoting *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 125-26 (2d Cir. 1984)). "Mere injuries, no matter how substantial, in terms of money, time, and energy necessarily expended to comply with an injunction are not enough to show irreparable injury." *Bromley v. Bromley*, 2006 U.S. Dist. LEXIS 72398, 23, 2006 WL 2861875 ( E.D. Mich. Oct. 4, 2006) (citing *United States v. Edward Rose*

14

& *Sons*, 384 F.3d 258, 264 (6th Cir. 2004)). "[T]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

There is no indication that Plaintiff will suffer irreparable injury as the language of the Shareholder Agreement gives Defendants up to one year to make the first payment, providing Plaintiff and Defendants ample time to determine the "purchase price." The "amount of the purchase price" in this case must be the "Net Book Value," "computed by subtracting all cash basis debit from the total of all cash basis assets." Though Plaintiff and Defendants cannot agree on the valuation of the shares, the formula to ascertain the value is clear. Because Defendants have up to a year to make the first annual payment, it is hard to determine that Plaintiff will suffer irreparable harm because the value is not yet ascertained, especially in light of Plaintiff's apparent reluctance to meet with Defendants to discuss the disagreement regarding value of the shares. **[***See*** Pl. Ex. 10 at 1; Def. Ex. 8 at 1]**

As noted by Defendants, the redemption of the shares by the Corporation is beneficial to Plaintiff in many ways. First, if title to the disputed shares is passed as of the June 5, 2012 date designated by Defendants, it will prevent Plaintiff from

incurring additional Federal and State tax liability based on the Corporation's taxable income being attributed to him for any additional years.  Plaintiff requested that Defendants provide him with distributions to cover the tax liability for the 2011 and 2012 fiscal years, but requests that the court allow him to retain ownership of the same shares for which he claims he should receive distribution for tax liability. Additionally, Plaintiff argues that Defendants acted in bad faith in taking the entire 180 days of the option to purchase because they knew that the Noncompetition Agreement prohibited Plaintiff from working for any competitor company.  **[Pl. Mot. Prelim. Inj. at 5]** Plaintiff contends he "cannot earn a livelihood in his lifelong field of expertise until sometime in December 2014, a total of almost 3 years after ceasing work for the Company." **[Pl. Mot. Prelim. Inj. at 5]** However, while Defendants are attempting to start the clock on the 18 month ban, Plaintiff is asking the court to toll the clock while arguing that Defendants are acting in bad faith by delaying the running of the clock.  Lastly, Plaintiff's argument that his shareholder's (in a minority capacity) rights are important for purposes of voting is in direct conflict with his argument that "the rest of the shareholders of SCI are all aligned with one another." **[Pl. Mot. Prelim. Inj. at 1]** Plaintiff would also still have access to the requested documents through formal discovery requests which could possibly fare better than his shareholder requests to which he claims he did not receive the requested

16

information.  Plaintiff is seeking what he deems adequate payment for the sale of his

shares, something that can be "be undone through monetary remedies."  *Interox Am.*,

736 F.2d at 202.  For these reasons, it is unlikely that Plaintiff will suffer irreparable

harm if the injunction is not granted.

### 3.  Balance of Harm To Others

Defendants contend that the Corporation will be harmed if Plaintiff is granted

injunctive relief because "Plaintiff has harmed the Company in the past, and continues

to threaten the Company with financial ruin." **[Def. Res. Mot. Prelim. Inj. at 19]**

Defendants further argue that maintaining shareholder status will give "Plaintiff an

apparent knowledge and authority of the Company that can be used to harm the

Company."  **[Def. Res. Mot. Prelim. Inj. at 20]**  Though "[h]arm to business

reputation and goodwill may constitute irreparable harm for the purpose of an

injunction[,]" *Beztak Co. v. Bank One Columbus, N.A.*, 811 F. Supp. 274, 284 (E.D.

Mich. 1992), there is insufficient information to make a finding that Defendants will

suffer actual harm if the injunction is granted.

### 4.  Public Interest

The Michigan Business Corporation Act provides that:

> (1) A shareholder may bring an action in the circuit court of
> the county in which the principal place of business or
> registered office of the corporation is located to establish
> that the acts of the directors or those in control of the

17

corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder. If the shareholder establishes grounds for relief, the circuit court may make an order or grant relief as it considers appropriate, including, without limitation, an order providing for any of the following:

. . . .

> (c) The cancellation, alteration, or injunction against a resolution or other act of the corporation.

. . . .

(3) As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder. The term does not include conduct or actions that are permitted by an agreement, the articles of incorporation, the bylaws, or a consistently applied written corporate policy or procedure.   Mich. Comp. Laws § 450.1489.

"[T]he relationship among those in control of a closely held corporation requires a higher standard of fiduciary responsibility . . . ." *Estes v. Idea Eng'g & Fabrications, Inc.*, 250 Mich. App. 270, 281 (2002).   Michigan's public policy discourages oppressive and unfair actions in close corporations.  *See Bromley v. Bromley*, 05-71798, 2006 WL 2861875 at *9 (E.D. Mich. Oct. 4, 2006).   However, here, there is no indication that Defendant's have acted oppressively or in any way unfairly to Plaintiff as a shareholder.  Though § 450.1489 "specifically grants the Court authority

18

to intervene in the inner workings of a corporation to remedy oppressive conduct[,]" *Bromley*, 2006 U.S. Dist. LEXIS 72398, at *28, the disagreement over the "Net Book Value" based on what should and should not be included based on what is before the Court — specifically in light of what has previously been discussed — does not equate bad faith or the kind of "oppressive conduct" covered under the Act.  Public policy does not favor an injunction.

## IV.  CONCLUSION

The Court has reviewed the evidence in the record and finds that Plaintiff, G. Wesley Blankenship, has not met his burden of showing a likelihood of success on the merits because he has failed to offer sufficient evidence showing that any actions taken by the Corporation were in bad faith or violative of either Mich. Comp. Laws § 450.1489 or the stipulations of their Shareholder Agreement.  The Court further finds that the evidence in the record shows that Plaintiff has not demonstrated that irreparable harm will result if injunctive relief is not given, and further finds that the evidence in the record shows the possibility that Defendants will suffer irreparable harm if an injunction is wrongly issued.  Finally, the Court finds that the public

interest will not be served by the issuance of an injunction. The balance of equities does not favor injunctive relief in this case.

Accordingly,

IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction [Docket No. 23, filed July 12, 2013] is **DENIED**.

**IT IS SO ORDERED**.


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  September 4, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 4, 2013, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager