UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

G. WESLEY BLANKENSHIP,

      Plaintiff,

v.

      Case No.  13-cv-12386
      Honorable Denise Page Hood

SUPERIOR CONTROLS, INC., a Michigan
corporation, RANDALL E. BRODZIK, MARK
E. SOBKOW, RODERICK L. EMERY,
KEVIN T. BUTLER, GREG D. CAMERON,
CHRISTOPHER J. LAKE, ROGER M.
TEMPLIN, individuals,

      Defendants.

SUPERIOR CONTROLS, INC.,

      Counter-Plaintiff,

v.

G. WESLEY BLANKENSHIP,

      Counter-Defendant.
_____/

| | |
|---|---|
| Daniel D. Quick (P48109) | Mark McGowan (P24188) |
| Robert P. Zora (P74231) | Michael J. Barton (P34509) |
| DICKINSON WRIGHT PLLC | PLUNKETT COONEY |
| Attorneys for Plaintiff/Counter-Defendant | Attorney for Defendants/Counter-Plaintiff |
| 2600 West Big Beaver Road, Suite 300 | 38505 Woodward Avenue, Suite 2000 |
| Troy, MI 48084 | Bloomfield Hills, MI 48304 |
| Phone:  248-433-7200 | Phone: (248) 901-4009 |
| dquick@dickinsonwright.com | mmcgowan@plunkettcooney.com |
| rzora@dickinsonwright.com | mbarton@plunkettcooney.com |

_____/

## BLANKENSHIP'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT
## AND SUMMARY JUDGMENT ON SCI'S COUNTERCLAIM

Plaintiff/Counter-Defendant   G.   Wesley   Blankenship   ("Plaintiff"   or "Blankenship"), through his counsel, Dickinson Wright PLLC, moves pursuant to FED. R. CIV. P. 56 for entry of an order: (1) granting summary judgment in Plaintiff's favor and against Defendants on Count IV of Plaintiff's Complaint; and (2) dismissing Defendant/Counter-Plaintiff SCI's First Amended Complaint in its entirety.

In further support of his motion, Plaintiff relies upon the facts, argument, and authority set forth in the accompanying brief.

Pursuant to L.R. 7.1(a), Plaintiff sought concurrence in the relief requested by this motion, which has not been forthcoming.  Therefore, it is necessary to bring this motion for hearing.

WHEREFORE, Plaintiff respectfully requests that this Court grant this Motion and enter an order: (1) granting summary judgment in Plaintiff's favor and against Defendants   on   Count   IV   of   Plaintiff's   Complaint;   and   (2)   dismissing Defendant/Counter-Plaintiff SCI's First Amended Complaint in its entirety.

Respectfully submitted,

Dated:  June 2, 2014                    DICKINSON WRIGHT PLLC

By:  /s/ Daniel D. Quick_____
     Daniel D. Quick (P48109)

2

Robert P. Zora (P74231)
Attorneys for Plaintiff
2600 W. Big Beaver Road, Suite 300
Troy, MI 48084
Phone:  248-433-7200
dquick@dickinsonwright.com
rzora@dickinsonwright.com

# TABLE OF CONTENTS

I.    Introduction.................................................................................................1

II.   Statement of Facts.......................................................................................2

III.  Argument .....................................................................................................3

     A.   Plaintiff is entitled to summary judgment as to Count IV of his
          Complaint. ..........................................................................................3

          1.   The unambiguous purchase price formula results in a
               value of $5,653,274.92................................................................4

               a)   The Agreement unambiguously calls for the
                    inclusion of "all cash assets", not just cash. ....................4

               b)   The $5.4 million must be included in the price
                    calculation.........................................................................6

               c)   Judgment should enter for Plaintiff in the amount
                    of $5,653,274.92 (plus interest)......................................10

          2.   SCI breached the Agreement by failing to issue a note
               and failing to timely make the first payment. ...........................11

     B.   SCI's Counterclaim should be dismissed............................................12

          1.   Count I should be dismissed. ....................................................12

          2.   Count II should be dismissed....................................................14

          3.   Count III should be dismissed...................................................15

          4.   Counts IV-VI should be dismissed ...........................................17

          5.   Counts VII and VIII should be dismissed.................................19

               a)   SCI's duress claim fails. .................................................21

               b)   Count VIII should be dismissed. .....................................23

IV.  Conclusion ................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Apfelblat v. Nat'l Bank,* 158 Mich. App 258, 263; 404 N.W.2d 725 (1987)..........22

*Barnett v. International Tennis Corp.*, 80 Mich. App. 396; 263 N.W.2d 908 (1978)....................................................................................................22

*Beachlawn Bldg. Corp. v. St. Clair Shores*, 370 Mich. 128, 133 (1963) ...............22

*Carrols Corp. v. Cain Rest. Co.*, Docket No. 07-10947, 2009 U.S. Dist. LEXIS 89869 (E.D. Mich. Sept. 29, 2009) ..........................................................3

*Flannery v. Tri-State Div.*, 402 F. Supp. 2d 819, 825 (E.D. Mich. Dec. 2, 2005) ....................................................................................................22

*Frank v. Equitable Life Assurance Soc.*, 136 Mich. App. 616, 620; 358 N.W.2d 21 (1984) ....................................................................................9

*Hofmann v. Auto Club Ins. Ass'n.*, 211 Mich. App. 55, 108; 535 NW2d 529 (1995)....................................................................................................18

*Hughes v. Almena Twp.*, 284 Mich. App. 50, 78; 771 N.W.2d 453 (2009) .............9

*Kheder Homes at Charleston Park v. Charleston Park*, No. 307207, 2014 Mich. App. LEXIS 3 at *7 (Jan. 2, 2014)..........................................................24

*Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 468; 663 N.W.2d 447 (2003) ....................................................................................................5

*Miller-Davis Co. v. Ahrens Constr., Inc.*, 495 Mich. 161, 178 (2014)....................18

*Mino v. Clio School Dist.*, 255 Mich App 60, 78; 661 NW2d 586 (2003)..............18

*People v. Yamat*, 475 Mich. 49, 55; 714 N.W.2d 335 (2006) ...................................5

*Petroleum Enhancer, LLC v. Woodward*, 2013 U.S. Dist. LEXIS 24180 (E.D. Mich, Feb. 22, 2013) ........................................................................ 17, 18

*Raska v. Farm Bureau Mut. Ins. Co.*, 412 Mich. 355, 362 (1982)............................5

*Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC*, 276 Mich. App. 146, 161; 742 N.W.2d 409 (2007) ..................................................................24

*Shawl v. Dhital*, 209 Mich. App. 321, 325, 529 N.W.2d 661, 663 (1995)..............15

*Transcontinental Leasing v. Michigan Nat'l Bank of Detroit*, 738 F2d 163, 166 (6th Cir. 1984)...........................................................................22

*Virginia M. Damon Trust v. Mackinaw Fin. Corp*., Docket No. 03-135 2008 U.S. Dist. LEXIS 21 (W.D. Mich. Jan. 2, 2008) ...............................15

*Zirin Laboratories International v. Mead-Johnson & Company*, 208 F. Supp. 633, 635 (E.D. Mich. Jun. 28, 1962) .......................................19

**Statutes**

MCL 450.1541a ............................................................................ 13, 18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

G. WESLEY BLANKENSHIP,

      Plaintiff,                              Case No.  13-cv-12386
                                            Honorable Denise Page Hood

v.

SUPERIOR CONTROLS, INC., a Michigan
corporation, et al,

      Defendants.

SUPERIOR CONTROLS, INC.,

      Counter-Plaintiff,

v.

G. WESLEY BLANKENSHIP,

      Counter-Defendant.

_____/

| | |
|---|---|
| Daniel D. Quick (P48109) | Mark McGowan (P24188) |
| Robert P. Zora (P74231) | Michael J. Barton (P34509) |
| DICKINSON WRIGHT PLLC | PLUNKETT COONEY |
| Attorneys for Plaintiff/Counter-Defendant | Attorney for Defendants/Counter-Plaintiff |
| 2600 West Big Beaver Road, Suite 300 | 38505 Woodward Avenue, Suite 2000 |
| Troy, MI 48084 | Bloomfield Hills, MI 48304 |
| Phone:  248-433-7200 | Phone: (248) 901-4009 |
| dquick@dickinsonwright.com | mmcgowan@plunkettcooney.com |
| rzora@dickinsonwright.com | mbarton@plunkettcooney.com |

_____/

**BRIEF IN SUPPORT OF BLANKENSHIP'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT
AND SUMMARY JUDGMENT ON SCI'S COUNTERCLAIM**

# I.     INTRODUCTION

Plaintiff/Counter-Defendant   G.   Wesley   Blankenship   ("Plaintiff"   or "Blankenship") was a 37.41% minority shareholder in Superior Controls Inc. ("SCI"). The remaining shareholders of SCI are aligned with one another and constituted a majority.  Plaintiff served as President, Chairman and CEO of SCI for almost a decade and was personally responsible for increasing its revenues by tens of millions of dollars during that span.

After Defendants conspired to ride Plaintiff out of SCI, Plaintiff resigned in January 2012, triggering the redemption of his shares under his Shareholder Agreement.  Defendants then dragged out the buy-back process to the greatest extent possible, retroactively modified its books to try and artificially minimize the price due to Plaintiff, began fabricating claims against Plaintiff, and tendered a low-ball value in violation of the Shareholder Agreement.  Further, Defendants refused to close on the sale of Plaintiff's shares and unilaterally redeemed them, providing only an illusory promissory note with no listed value in exchange.  The time for payment under the contract has now passed, and SCI has not paid a dime to Plaintiff in exchange for his shares.

Plaintiff moves for summary judgment as to Count IV of his Complaint – breach of the Shareholder Agreement.  SCI breached the Agreement by failing to comply with the purchase price provisions.  Plaintiff is also entitled to the acceleration of all amounts due given SCI's breach.  As a result, Plaintiff asks this Court to enter a

1

Judgment as to Count IV holding SCI liable in the amount of $5,653,274.92, plus pre-judgment interest.  Plaintiff also moves for summary judgment of SCI's Counterclaim in its entirety.  SCI's eight Counts either fail to state a claim or must be dismissed based upon uncontroverted facts.

## II.  <u>STATEMENT OF FACTS</u>[1]

In 2001, Plaintiff became a 37.41% shareholder in SCI.  (Shareholders, **Ex. A**).  On January 11, 2002, Plaintiff and SCI executed a Shareholder Agreement (Shareholder Agreement, **Ex. B**) and an Employment, Noncompetition and Confidentiality Agreement (the "ENC Agreement").  (**Ex. C**).  On January 13, 2012, Plaintiff resigned as Chairman and CEO.  (Resignation Letter, **Ex. D**).  The parties have treated Plaintiff's resignation effective February 10, 2012.  Plaintiff's resignation triggered a share redemption provision of the Shareholder Agreement. (Shareholder Agreement, Art. 2).

On February 15, 2012, after negotiations between counsel for Plaintiff and SCI, the parties executed a First Amendment to Employment, Noncompetition and Confidentiality Agreement.  (Amended ENC, **Ex. E**).  Under the Amended ENC, Plaintiff agreed to provide continued services to SCI with respect to a significant customer (CCAD).  On the same day, Plaintiff and SCI executed a Fee Agreement, which provided that Plaintiff would receive a $3 million bonus from SCI.  (Fee

---

[1] This statement of facts is limited to those necessary to this motion and is not a full recitation of Plaintiff's case as to counts which are not part of this motion.  Additional facts are included within the respective argument sections.

2

Agreement, **Ex. F**).   Finally, Plaintiff and SCI executed a First Amendment to Shareholder Agreement, which provided that "Net Book Value" under the purchase price set forth in the Shareholder Agreement would be reduced by $3 million as a result of the fee paid to Plaintiff. (Amendment to SA, **Ex. G**).

Plaintiff successfully did what was asked of him to transition customers to new executives at SCI.   Throughout 2012, certain purchase options under the Shareholder Agreement were not exercised and SCI was required to purchase Plaintiff's shares by June 5, 2013.   Shortly before that date, SCI disclosed for the first time that it would not pay the agreed-upon price for Plaintiff's shares, and raised a host of claims against Plaintiff.   This litigation followed.   Based on how he was forced out of SCI and then conspired against by Defendants, Plaintiff alleges minority shareholder oppression and breach of fiduciary duty.   Those claims are not the subject of this Motion.

## III.   <u>ARGUMENT</u>

**A.   Plaintiff is entitled to summary judgment as to Count IV of his Complaint.[2]**

Under Article 6, Section A of the Shareholder Agreement, the price for Plaintiff's shares must be calculated by "dividing 'Net Book Value' of the Company computed on a cash basis of accounting as of the first prior business year end" [in this instance, December 31, 2011] "by the total number of shares outstanding, including the

---

[2] This Court is well familiar the standard governing Rule 56 motions.  *See Carrols Corp. v. Cain Rest. Co.*, Docket No. 07-10947, 2009 U.S. Dist. LEXIS 89869 (E.D. Mich. Sept. 29, 2009).

shares subject to resale."  The provision requires that "'Net Book Value' shall be computed by subtracting all cash basis debt from the total of all cash basis assets."

The parties have two disagreements as to this pricing formula.  **First**, Plaintiff asserts that the Agreement is unambiguous and that its provisions require the inclusion of "**all** cash basis assets," which include more than simply cash.  SCI wants to read out terms of the Agreement and count only cash in the calculation.  Plaintiff is entitled to summary judgment on this issue because the Agreement is unambiguous in that it calls for the inclusion of more than just cash. **Second**, SCI wants to exclude approximately $5.4 million in cash from the calculation under the theory that this cash was not under the "control" of SCI as of December 31, 2011.  Plaintiff is entitled to summary judgment on this issue because SCI verified under oath that the $5.4 million was, in fact, held by SCI as of December 31, 2011, and further because there is no genuine issue of fact supporting SCI's theory.

Plaintiff also moves for summary judgment under this Count because SCI has indisputably breached its payment obligation (at any amount) by failing to issue a promissory note and failing to make the initial payment due to Plaintiff, both of which are unambiguously called for in the Agreement.

**1.    The unambiguous purchase price formula results in a value of $5,653,274.92.**

**a)    The Agreement unambiguously calls for the inclusion of "all cash assets", not just cash.**

A contract is ambiguous when its language can be reasonably interpreted in two or more ways. *Raska v. Farm Bureau Mut. Ins. Co.*, 412 Mich. 355, 362 (1982). Absent ambiguous language, courts must define contract terms in accordance with their "plain or common meanings," *People v. Yamat*, 475 Mich. 49, 55; 714 N.W.2d 335 (2006), and "give effect to every word, phrase, and clause in a contract." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 468; 663 N.W.2d 447 (2003).

This Court has already opined that the purchase price formula in the Agreement is "clear" (Dkt. No. 31, p. 15) and the Court was right.  Article 6, Section A of the Agreement, entitled "Determination of Purchase Price" provides:

> If the parties . . . cannot agree on the price to be paid for the subject shares of stock, the price will be determined by dividing "Net Book Value" of the Company computed on a cash basis of accounting as of the first prior business year end (currently December 31) by the total number of shares outstanding, including the shares subject to resale.  "Net Book Value" shall be computed by subtracting all cash basis debt from the total of all cash basis assets.

Based on this provision, Net Book Value for the purpose of Plaintiff's buy-out must be calculated as of December 31, 2011.

The term "cash basis of accounting" is not defined in the Agreement, but the parties' accounting experts agree that there are two types of cash basis accounting: "pure" cash basis accounting and "modified" cash basis accounting.  SCI advocates for the "pure" cash basis method.  Under that approach, there are no "cash basis debts" and the only asset which is considered is cash itself. (Crawford, pp. 46-47, **Ex. H**).  Under the "modified" cash basis accounting method, cash is considered an asset, but so too

5

are certain other tangible assets (such as inventory and real estate). (Crawford, pp. 22-24).   Moreover, under this method, there are actually "cash basis debts" which correspond to some of the cash basis assets (e.g., customer deposits and retirement plan obligations).  (*Id.*; Peterson Report, pp. 6-8, **Ex. I**).

The plain language of the Shareholder Agreement requires adoption of Plaintiff's approach.  To count only "cash" reads out of the Agreement the phrase "all cash basis assets" in 3 ways: (1) if what was intended was to simply count cash, then it would have said that, but instead refers to something else (Peterson Report, p. 7; Peterson, p. 96-98, **Ex. J**); (2) the Agreement uses the word "all" and the plural "assets", which makes no sense if there is only one asset (*viz.*, cash); and (3) the Agreement says to deduct "cash basis debts," but there are no "cash basis debts" if one uses a "pure" cash basis approach.  Each of these is a fatal flaw to SCI's argument and each would violate the laws of contract interpretation set forth above.

Also, SCI's expert admits that its "pure" cash basis approach is less commonly used than a modified cash basis approach (Crawford, p. 26); that he has *never* seen "pure" cash basis used to value stock and would recommend any other method before such an approach (Crawford, pp. 28-29, 36-38); and that a "pure" cash basis method is arbitrary and does not correspond to actual value of the company (Crawford, p. 28, 32).  These same observations are made by Plaintiff's expert. (Peterson Report, pp. 6-7).

**b)      The $5.4 million must be included in the price calculation.**

6

SCI excludes $5.4 million from the price calculation under the theory that those assets were not under the control of SCI as of December 31, 2011.  (Crawford Report, p. 12-14, **Ex. K**).  This is claimed because certain executives of SCI did not know about the account and, when it was discovered on December 15, 2011, an attempt to "freeze" the account before the year-end was allegedly unsuccessful.

Without reciting all facts on this issue, in August 2011, RedViking Group, LLC (a wholly owned subsidiary of SCI as to which Plaintiff was put in charge in May 2011) (RedViking Resolution, **Ex. L**) opened a bank account with Ann Arbor State Bank ("AASB").  In November and December 2011, $5.4 million was deposited in to this account by a RedViking customer, Sikorsky, for work performed.  The following are uncontested facts:

- The account was in the name of RedViking Group LLC, and not in Plaintiff's personal name. (AASB documents, **Ex. M**).

- The signatories on the account, Plaintiff and Steve Brodzik, were the two top executives at RedViking Group and shareholders and directors of SCI. (*Id*.; *see* Ex. A; S. Brodzik, p. 16, **Ex. N**).

- The controller at RedViking, Michael Ingram, knew about the AASB account and regularly received the account statements, which were mailed to the office.  (Ingram Vol. 1, pp. 118-122, **Ex. O**).  Ingram reported to Kevin Butler, CFO of SCI and a Defendant.  (Ingram Vol. 1, p. 9).

- Defendants claim they first learned of the existence of the account on December 15, 2011.  (Butler Vol. 1, p. 93, **Ex. P**; R. Brodzik, p. 107, **Ex. Q**).  But at no time between then and December 31, 2011 did SCI ask or direct RedViking to transfer the account funds to SCI nor did SCI ask anyone to add signatories other than Plaintiff and  Steve Brodzik on the account.  Overall, there was no effort whatsoever made to withdraw the funds from the RedViking Group account before December 31, 2011.  (Butler Vol. 2, pp. 299-302, 309-310, **Ex. R**; Crawford, p. 58).

- With full knowledge of the account, in March 2012, SCI issued its financial statements for the year ending December 31, 2011 in which the $5.4 million in Sikorsky funds was included as "cash." (Original 2011 Financials, p. 1, **Ex. S**; R. Brodzik, pp. 205-207).  In addition, SCI (via its President and CFO) executed a management letter verifying the accuracy of those financials.  (2011 Management Letter, **Ex. T**; Doyle, p. 138, **Ex. U**; R. Brodzik, pp. 205-06).

Based upon these uncontroverted facts, SCI's attempt to exclude the $5.4 million must be rejected as a matter of law.  First, even under SCI's own arguments, it cannot prevail.  Defendants initially claimed that they did not retain control of the account because they could not freeze the account.  (*See* Crawford Report, pp. 13-14; 12/4/12 Letter, **Ex. V**).  In fact, SCI succeeded in freezing the account by December 30, 2011 and for the remainder of the year.  (Broucek, p. 15, **Ex. W**).  SCI then changed its argument, arguing that it still did not "control" the funds.  However, SCI admits that to be in "control" of cash, it need not be physically holding it, but simply have it available.  (Crawford Report, p. 13; Crawford, pp. 56-57) (under control "if notice of intention to withdraw had been given").  Here, SCI could have, but did not, have either of the authorized RedViking signers transfer the funds; in fact, neither was even asked to do so.[3]  Alternatively, SCI could have added signatories to the RedViking account by simply submitting a resolution of SCI's Board of Directors to the bank.  (Broucek, pp. 16-17).  Defendants, however, never attempted to submit any such resolution to the

---

[3] At deposition, Kevin Butler testified that he may have instructed Steve Brodzik to transfer the funds prior to December 31, 2011, but a review of the e-mail referenced by Mr. Butler reveals that he made no such request to Steve Brodzik. (*See* 12/28/2011 E-Mail, **Ex. X**).

8

bank on or before December 31, 2011 (Broucek, p. 21) and never attempted to add SCI signatories to the account.

SCI should also be estopped from arguing that the $5.4 million is not cash after consistently reporting it as "cash" from December 2011 through March 2013.[4]  "An equitable estoppel arises where (1) a party by representation, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts."  *Hughes v. Almena Twp.*, 284 Mich. App. 50, 78; 771 N.W.2d 453 (2009).  "[T]here must be a representation . . . concerning some material fact, which representation is contrary to the condition of affairs later asserted by the party to be estopped."  *Frank v. Equitable Life Assurance Soc.*, 136 Mich. App. 616, 620; 358 N.W.2d 21 (1984).

Defendants reported the $5.4 million as operating cash in company-prepared financial statements in March 2012 which were sworn to by management. (2011 Management Letter, Doyle, pp. 138). On the basis of that representation letter, the accountants then issued their report, also including the $5.4 million as cash. (*See* Original 2011 Financials; Brodzik, pp. 205-06).  All of this occurred even though both SCI and its accountants knew almost immediately and before the financial statements were issued, that SCI intended to challenge the AASB account.  (Doyle, pp. 48-59; 68-69; 75-77; 85-87; Butler Vol. 2, pp. 342-45, 350-51, 361, 366-67; R. Brodzik, pp. 113,

---

[4] In March 2013, under the direction of SCI's counsel, SCI "restated" its financial statements to exclude the $5.4 million. This is evidence of, among other things, Defendants' oppression of Plaintiff.

199-200; 208- 210).   Indeed, even before signing the representation letter, executives at SCI concluded that they were going to eventually restate their financial statements to exclude the $5.4 million from "cash" and lower the amount owed to Plaintiff (R. Brodzik, pp.199-201; Butler Vol. 2, pp. 342-45).   But Defendants withheld their intentions from Plaintiff, who resigned from SCI  and relied on the true financial position of SCI and RVG to make his resignation decision.  (GWB Vol. 2, pp. 404-408, **Ex. Y**).

### c) Judgment should enter for Plaintiff in the amount of $5,653,274.92 (plus interest).

The application of the unambiguous pricing formula and including the $5.4 million from the AASB account yields a price owed to Plaintiff of $5,653,274.92.  The calculation of this number is set forth in Mr. Peterson's report (p. 8), modified by a $1,772,011 deduction of the top line "Net Book Value" calculation per Mr. Peterson's deposition based upon after-acquired information (Peterson, pp. 42-43).

The only other contested aspect of the calculation relied upon by Plaintiff is the argument that if the "modified" cash basis approach is used, then $5.4 million must be deducted as a "cash basis debt."   This assumes that the $5.4 million received by RedViking in 2011 was all for work which had not yet been performed. (Crawford, pp. 106-107,  112-113).   While Crawford assumed this to be the case based upon information from SCI, in fact it is categorically untrue.  The two top executives at RedViking, Plaintiff and Steven Brodzik, both testified that the work necessary to

trigger the payment of the three invoices (Sikorksy Invoices, **Ex. Z**) was in fact performed before the invoices were issued, that they could not have been issued until the work was done, and that all of this was confirmed by the customer itself. (S. Brodzik, pp. 63-64). There is no contrary, credible evidence. As a result, SCI's sole objection to the rest of Plaintiff's calculation methodology fails and entry of judgment is proper.

**2.    SCI breached the Agreement by failing to issue a note and failing to timely make the first payment.**

Independent of the forgoing, SCI breached the Shareholder Agreement by (1) failing to issue a note and (2) failing to make the first payment as required by June 5, 2014. Article 6, Section B of the Shareholder Agreement describes "Payment of Purchase Price":

> The purchase price for any shares being transferred pursuant to this Agreement shall be satisfied by the execution of a promissory note by the buyer, as maker, to the Seller Shareholder, as payee, in the amount of the purchase price. The promissory note **shall be payable in five (5) equal annual installments plus interest** compounded annually at the prime interest rate (as published by the Wall Street Journal on the day the promissory note is executed) plus one (1) percent. The promissory note shall provide that the maker shall have the right to prepay all or any part of the note at any time with interest to the date of prepayment, **that a default in any payment when due shall cause the remaining unpaid balance to become immediately due and payable, and that the maker shall pay all costs and expenses of collection, including reasonably attorneys' fees.** (emphasis added).

First, SCI failed to set a purchase price for Plaintiff's shares at the time it issued the Promissory note. On July 2, 2013, Plaintiff's shares were unilaterally deemed "transferred" effective June 5, 2013, yet there was no purchase price specified by the

11

Promissory Note. (Redemption Letter & Note, **Ex. AA**). Second, nothing in the Shareholder Agreement allows SCI to withhold payment indefinitely. On the contrary, the Agreement provides that the "promissory note issued ***shall*** provide that . . . default in any payment when due ***shall*** cause the remaining unpaid balance to become immediately due and payable . . . ." Accordingly, the Shareholder Agreement required that SCI purchase Plaintiff's shares for a set price and SCI obligated to pay Plaintiff the first installment of the money owed to him on June 5, 2014. (*See id*.). Indeed, even SCI's phantom Promissory Note identified the first payment as due on June 5, 2014. SCI has valued Plaintiff's 89,159 shares at $1,177,790. Thus, even if SCI's interpretation of the valuation formula is correct, then SCI was required to pay the first installment of $235,558 on June 5, 2014. June 5, 2014, has passed and Plaintiff has not received any payment from SCI. SCI is therefore in breach of the Shareholder Agreement by failing to pay Plaintiff as required under Article 6, Section B, as well as under the Promissory Note. Moreover, SCI's default has triggered the acceleration clause of Article 6, Section B. SCI is therefore required to immediately pay Plaintiff the full amount owing.

**B.      SCI's Counterclaim should be dismissed.**

**1.      Count I should be dismissed.**

In Count I of SCI's First Amended Counterclaim ("FAC"), SCI alleges that Plaintiff "covertly siphoned" funds from SCI through the Coherix Equipment Rental Agreement between CY Holdings, Inc. and SCI. The sole allegation on this count, per

12

SCI's president, is that SCI made seven or eight $700 monthly payments to Carolina Blue Consulting Group, LLC ("CGBG").  (R. Brodzik, pp. 246-247).[5]  SCI claims that CBCB is owned by Plaintiff's wife, but Plaintiff had told SCI that it was owned by a consultant who should be paid as part of the project.  SCI alleges breach of fiduciary duty for this $5,600 claim. (FAC, ¶ 12).

In 2009, Plaintiff purchased equipment called a "Shapix" machine for $140,000 out of his own personal funds. (GWB Vol. 3, pp. 442-443, **Ex. BB**).

SCI would be receiving funds through a government grant and would then pay Blankenship back in the form of a lease payment. (GWB Vol. 2, pp. 419-427).  In addition, SCI agreed to make two additional payments related to the machine, one of which was to CBCG.

SCI executives were fully aware of the financial structure of the Equipment Rental deal and never objected to it. (Butler Vol. 1., pp. 143-149).  In fact, Kevin Butler processed the internal accounts payable related to the equipment lease and then set it up for repeat payments.  (*Id*. at 149).  Following the termination of the lease, no one raised the Equipment Rental Agreement lease payments with Plaintiff until this litigation.

Michigan law requires that a corporate director or officer discharge his duties in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that he reasonably believes to be

---

[5] SCI has not produced documentation supporting these alleged amounts.

in the best interests of the corporation. MCL 450.1541a(1)(a), (b), and (c).  As Plaintiff testified, he did just this with regard to the equipment payments.  While the payment to CBCG was originally intended to go to Dr. Mahlburg, he pulled out and after unsuccessful attempts to find a replacement, Plaintiff elected to simply retain the funds to offset administrative fees he was incurring, otherwise reimbursable by SCI.  SCI has tendered no evidence that the statutory standard has been violated.

### 2.    Count II should be dismissed.

SCI contends that "on or about December 2010, Blankenship caused sums totaling $566,360 to be transferred from SCI to Paragon without the knowledge or consent of the Board of Directors of SCI as to how the funds would be used." (FAC, ¶ 19).  This is simply untrue.  In December 2010, Plaintiff authorized discretionary bonuses totaling approximately $750,000 to be disbursed to various RedViking employees, third-party consultants, and himself for work done for SCI relative to the CCAD project and other SCI programs.  (GWB Vol. 1., pp. 31-40, **Ex. CC**).  These bonuses were made with the knowledge of SCI President Randy Brodzik.  (GWB Vol. 1, pp. 31-40).  Furthermore, Kevin Butler internally processed the payments associated with these bonuses and Randy Brodzik signed off on the wire transfers. (Butler Vol. 1, pp. 158-162; Dec. 2010 Paragon Distributions, **Ex. DD**).  SCI officers were therefore well aware that funds had been distributed in December 2010.  There is no evidence of this issue being raised at any time until after Plaintiff resigned.

14

In addition to lacking factual support, this claim is time-barred.  This count is raised under MCL 450.1541a, which has a 2 year statute of limitations from discovery of the claim ("within 2 years after the time when the cause of action is discovered or should reasonably have been discovered, by the complainant").  Here, SCI officers knew of and funded the request – without any backup or inquiry to Plaintiff – in December 2010.  (Butler Vol. 1, p. 171).  There is no record of any inquiry to anyone on this topic but Butler alleges he made a verbal inquiry to Plaintiff soon after the payment was made and did not receive an answer. (Butler Vol. 1, p. 178).  SCI thus knew, or reasonably should have known, in December 2010 or shortly thereafter that it had wired funds without backup or explanation and did not receive one.  "Michigan courts have held that a plaintiff 'is deemed to be aware of a possible cause of action when he becomes aware of an injury and its possible cause.'" *Virginia M. Damon Trust v. Mackinaw Fin. Corp*., Docket No. 03-135 2008 U.S. Dist. LEXIS 21 (W.D. Mich. Jan. 2, 2008) (quoting *Shawl v. Dhital*, 209 Mich. App. 321, 325, 529 N.W.2d 661, 663 (1995)). Thus, SCI's claim is time-barred.

### 3.    Count III should be dismissed.

Count III of the Counterclaim alleges breach of fiduciary duty in connection with a lease for a residence Plaintiff was using on company business in North Carolina. SCI does not question that Plaintiff was entitled to lease a residence and be reimbursed for same from SCI. Nor does SCI challenge the amount of the lease payment.  Rather, SCI claims that in early 2011 it discovered that Plaintiff had placed an address on the

15

lease different that the actual address where the residence was located. SCI investigated this and discovered that the address listed on the lease was not leased by Plaintiff but in fact he was residing in another residence (the same residence previously used by another SCI executive located in North Carolina).  SCI initially suspended the lease payments in August 2011, but then re-authorized the lease payments (and all makeup payments) in November 2011, so long as the funds were going directly to Plaintiff. (11/13/2011 E-mail, **Ex. EE**; R. Brodzik, pp. 77-78).   Plaintiff admits putting the incorrect address on the lease agreement, but says he did so simply for privacy purposes and without any intention to defraud anyone.

First, SCI's claims relating to the residential lease are again time-barred.  SCI approved the initial lease of the residential property for Plaintiff, with the knowledge of senior SCI officials, in June of 2010.  (A-Dawn Lease, **Ex. FF**; Butler Vol. 1, p. 200). SCI first learned that the lease agreement contained the wrong address on March 15, 2011 (Butler Vol. 1, p. 206), yet SCI continued to pay the lease payments until August of 2011.  (Butler Vol. 1, p. 215; R. Brodzik, p. 74).   The lease payments were momentarily terminated until SCI subsequently paid a lump sum to retroactively cover lease payments for the property that had not been paid.  (11/13/2011 E-mail; R Brodzik, pp. 77-78).  Now SCI is attempting to recover damages for payments made to CY Holdings, LLC which it continued to pay even after learning that the lease listed the wrong address.  Any cause of action based upon these events was fully known to SCI in the Spring of 2011.  As a result, any action had to be brought by Spring of 2013.

16

The Counterclaim was not filed until July 23, 2013.  As a result, this claim is time-barred.

Second, there is no genuine issue of fact that SCI has not suffered any damages as a result of the wrong address on the lease.  SCI regularly paid for living arrangements for employees based outside of Michigan.  (Butler Vol. 1, p. 200). Indeed, Randy Brodzik admitted in his deposition that "the existence of executive housing would not have been considered out of the scope of normal business."  (R. Brodzik, p. 64).  SCI has also admitted that the amount of the lease was not inconsistent with what it has paid in the past for housing for employees and the price was not an issue.  (R. Brodzik, p. 75; Butler Vol. 1, p. 220).  Therefore, the only real issue was that the lease listed the wrong address.  In other words, had Plaintiff listed the actual address of the residence on the lease agreement, and disclosed the actual property to SCI, SCI would have had no issue paying for the lease payments. Defendants cannot point to any evidence that would support that SCI was monetarily harmed in any way by the lease agreement. In order to establish a prima facie case, SCI must establish that it suffered damages as a proximate result of Plaintiff's actions. *Petroleum Enhancer, LLC v. Woodward*, 2013 U.S. Dist. LEXIS 24180 (E.D. Mich, Feb. 22, 2013). Therefore, SCI's Count III should be dismissed.

### 4.    Counts IV-VI should be dismissed

In Counts IV-VI, SCI alleges claims relating Plaintiff's relationship with Wilbur ("Butch") Dyer.  Dyer was a former employee of SCI who, on July 15, 2011, became

an independent sales representative through his company, Program Management Solutions, LLC. (*See* FAC, Ex. 6)  Dyer resigned from SCI on December 28, 2011. (*See* FAC, ¶ 52, Ex. 8).  SCI alleges that Blankenship induced Dyer to quit and then worked with Dyer to improperly compete with SCI.  Thus, in these 3 counts, SCI alleges:

- Count IV – Plaintiff tortuously interfered with Dyer's Sales Representative Agreement ("PMS Agreement") with SCI by inducing Dyer to divert his loyalty from SCI (FAC, ¶ 43), by inducing Dyer to "siphon" business from SCI (FAC, ¶ 50), by acting in concert with Dyer to terminate the PMS Agreement (FAC, ¶ 52) and to compete against SCI (FAC, ¶ 58);

- Count V – Plaintiff breached his fiduciary duties as an officer, director, and employee of SCI as result of his alleged actions in concert with Dyer.  (FAC, ¶ 67);

- Count VI – Plaintiff breached the ENC Agreement as a result of his alleged actions in concert with Dyer.  (FAC  ¶ 73)

In order to establish these claims, SCI must present evidence that it suffered damages as a result of Plaintiff's actions.  *See Mino v. Clio School Dist.*, 255 Mich App 60, 78; 661 NW2d 586 (2003) (tortious interference); *Petroleum Enhancer, LLC v. Woodward*, 2013 U.S. Dist. LEXIS 24180 (E.D. Mich, Feb. 22, 2013) and MCL 450.1541a (breach of fiduciary duty); *Miller-Davis Co. v. Ahrens Constr., Inc.*, 495 Mich. 161, 178 (2014) (breach of contract).  Furthermore, a plaintiff may not recover damages based solely on speculation or conjecture.  *Hofmann v. Auto Club Ins. Ass'n.*, 211 Mich. App. 55, 108; 535 NW2d 529 (1995) (citing *Sutter v Biggs*, 377 Mich 80, 86; 139 NW2d 684 (1966)).  "It is well-established that a plaintiff is not entitled to an award of damages unless both the fact of damage and the amount of damages are

18

established with reasonable certainty; neither may properly be based upon mere speculation, guess, or conjecture." *Zirin Laboratories International v. Mead-Johnson & Company*, 208 F. Supp. 633, 635 (E.D. Mich. Jun. 28, 1962).

SCI's claims for damages with respect to these counts are purely speculative. With respect to Dyer's resignation, SCI is unaware of any contracts that were procured from his efforts as a RedViking employee. (R. Brodzik, p. 239). SCI cannot point to any evidence of damages resulting from Dyer's resignation, in the form of lost profits or otherwise.[6] Nor can SCI reasonably identify any contracts that SCI or RedViking missed out on as a result of Dyer's departure from RedViking. Similarly, the alleged competitive corporation established by Dyer and also allegedly by Plaintiff, STI, "never got off the ground." (GWB Vol. 2, pp. 311-312). SCI cannot provide a single piece of evidence of damages because STI has never been awarded a contract and has never received any income. Nor can SCI provide any evidence that Plaintiff diverted business from SCI to STI, because no such business was ever awarded to STI or Plaintiff. (*Id.*). Accordingly, there is no genuine issue of material fact that SCI did not suffer any damages as a result of Plaintiff's alleged actions and any allegation of damages is speculation and conjecture. The Court should therefore dismiss SCI's claims for tortious interference (Count IV), breach of fiduciary duty (Count V), and breach of the NCE (Count VI).

### 5.      Counts VII and VIII should be dismissed.

---

[6] SCI is not even aware if it paid Dyer's company for services performed under the PMS Agreement (R. Brodzik, pp. 238-239).

In February of 2012, SCI and Blankenship executed a Fee Agreement, which pertained to "a bonus claimed by Blankenship." (*See* Ex. F). SCI agreed to pay Blankenship $3 million. In addition, Blankenship agreed to attend certain meetings with a key customer and help transition that customer to other executives at SCI, which he did. SCI now seeks to nullify the Fee Agreement under theories of duress and fraud. The claims are based upon the same alleged facts: that Blankenship reported to SCI that his resignation would be upsetting to a key customer (CCAD) and that the customer was in fact upset. (R. Brodzik, p. 179). This opinion was echoed directly by CCAD when the program director, Ron Howe, wrote to SCI on January 27, 2011, stating that "any plan [by SCI] that does not provide CCAD with the continued support from Dr. Blankenship on the [the program] will be considered unacceptable." (Howe Letter, p.1, **Ex. GG**). SCI notes that Plaintiff was asked by Howe to write a portion of this letter and thus accuses both Plaintiff and Howe of "fraud", even though the only evidence on this issue is that of Plaintiff, who testified that all that happened was that Howe asked Plaintiff to provide some content for the letter after a discussion between the two men wherein Howe expressed his dismay at the potential loss of Plaintiff on the project. (GWB Vol. 1, p. 124).

Randall Brodzik agreed that Plaintiff was fully entitled to resign from SCI and RedViking and discontinue his work with CCAD, or otherwise decline to aid in the transition. (R. Brodzik, pp. 179-180). Mr. Brodzik also admitted that Plaintiff was a central player in SCI's relationship with CCAD and that there is always a risk that a

relationship with a client may be affected when a central player in that relationship is no longer a participant. (R. Brodzik, pp. 180-181). And perhaps most important, Mr. Brodzik admitted that he believed, even prior to receiving the January 27, 2012 letter from Ron Howe, that SCI's relationship with CCAD would change if Plaintiff declined to stay involved in the project following his resignation. (*Id*.). This same opinion was held by numerous others within SCI, independent of any statements by Plaintiff. (S. Brodzik, pp. 48-49). In other words, SCI *also wanted* to keep Plaintiff involved in the CCAD project following his resignation.

The Fee Agreement was negotiated over a period of weeks between SCI (represented by Plunkett Cooney) and Plaintiff. Drafts were exchanged and advice from legal counsel received. (*See i.e.* 2/11/12 E-mail, **Ex. HH**). On the eve of signing the agreement, Defendants met in a board meeting to discuss whether to move forward and, after deliberation, a decision was made to proceed. (R. Brodzik, pp. 195-197).

### a)   SCI's duress claim fails.

In Count VII , SCI alleges that Plaintiff placed extreme duress on SCI to pay Plaintiff $3 million and to execute the Amended ENC by threatening "substantial financial duress and possible economic ruin to the Company by virtue of representations he would make to existing customers and existing prospects" of SCI. (FAC, ¶ 80).

"Duress exists when one by the unlawful act of another is included to make a contract or perform some act under circumstances which deprive him of the exercise of

free will." *Beachlawn Bldg. Corp. v. St. Clair Shores*, 370 Mich. 128, 133 (1963) (citations omitted). Duress can only render a contract void when there exist "highly unusual circumstances." *Flannery v. Tri-State Div.*, 402 F. Supp. 2d 819, 825 (E.D. Mich. Dec. 2, 2005). Furthermore, "[f]ear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully." *Apfelblat v. Nat'l Bank,* 158 Mich. App 258, 263; 404 N.W.2d 725 (1987); *Transcontinental Leasing v. Michigan Nat'l Bank of Detroit*, 738 F2d 163, 166 (6th Cir. 1984) ("a claimant who relies on a theory of economic duress must also prove a wrongful or unlawful act on the part of the defendant.").

In *Barnett v. International Tennis Corp.*, 80 Mich. App. 396; 263 N.W.2d 908 (1978), a director of the defendant company (Barnett) withheld a personal guaranty of a financially critical mortgage until two other directors (Brode and Greenspan) agreed to execute management agreements. *Id*. at 400-401. The company tried to void the management agreements under a theory of economic duress on part of Barnett. The Court of Appeals rejected the company's duress claim because Barnet did not engage in any unlawful or wrongful acts and he was not obligated to personally guarantee the loan. *Id*. at 406-407. Furthermore, Brode and Greenspan were knowledgeable businessmen, had considered the terms through negotiations, edited the agreement, and had adequate resources to evaluate their alternatives. *Id*.

The February 15, 2012 agreements were executed under identical circumstances. Plaintiff had no obligation to continue on with the CCAD project following his

resignation.  SCI management consisted of experienced businessmen, SCI negotiated the terms of the agreements, it had adequate resources to evaluate its alternatives, and SCI was represented by counsel who drafted and edited the agreements.  (*See* 2/11/12 E-mail).  The February 15, 2012 agreements could not have been the result of duress because they obtained the continued involvement of Plaintiff, which SCI was willing and eager to obtain to maintain their lucrative relationship with CCAD.  Not only were Plaintiff's implications and corresponding requests lawful and proper, but all parties involved also believed them to be true.  There is nothing "highly unusual" about a mutually beneficial agreement that was willingly entered into by all parties involved.  There is simply no evidence to support SCI's claim for rescission of the February 15, 2012 agreements and certainly no issue of fact that SCI was not under duress when it executed the agreements.  In fact, Randy Brodzik could not provide a single example of how Plaintiff threatened to ruin the relationship with CCAD.  (R. Brodzik, pp. 190-191).  Accordingly, SCI's Count VII should be dismissed in its entirety.

      **b)**      **Count VIII should be dismissed.**

SCI's fraud claim similarly suffers from a lack of evidentiary support.  SCI alleges Plaintiff falsely represented that CCAD would discontinue its relationship with the company if SCI did not provide for Plaintiff's continued involvement on CCAD projects.  (FAC, ¶ 86).  This allegation is based upon the January 27, 2012 letter from Ron Howe to Randy Brodzik requesting that SCI maintain Plaintiff's involvement in the CCAD projects and a draft of that same letter created by Plaintiff.

23

To prove fraud in the inducement, a plaintiff must establish that the defendant made a material representation that was false, or that it was made recklessly and without knowledge of its truth. *Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC*, 276 Mich. App. 146, 161; 742 N.W.2d 409 (2007). A party claiming fraud must also prove that the fraud caused the damages suffered. *Kheder Homes at Charleston Park v. Charleston Park*, No. 307207, 2014 Mich. App. LEXIS 3 at *7 (Jan. 2, 2014).

SCI cannot support its allegations that Plaintiff made false representations. First, the representations that SCI relied upon were not made by Plaintiff, but by Ron Howe. While Plaintiff does not deny drafting an initial version of Howe's letter to Randy Brodzik, he did so only because Howe requested that he do so. (GWB Vol. 1, p. 124). It was ultimately Howe who sent the letter to Mr. Brodzik on his own behalf and on behalf of CCAD, regardless of the fact the Plaintiff drafted a version of the letter. Second, Mr. Brodzik described the "false" representations made by Plaintiff as "implications" that "[SCI's] relationship [with CCAD] would change dramatically" after Plaintiff's resignation. (R. Brodzik, pp. 178-179). These representations were ultimately confirmed by CCAD when Howe sent the letter to Mr. Brodzik, which was obviously modified from Plaintiff's draft. Indeed, the best evidence of CCAD's sentiments is ultimately the substance of the letter sent by Howe. In the letter, Howe confirms that "any plan [by SCI] that does not provide CCAD with the continued support from Dr. Blankenship on [the program] will be considered unacceptable." (1/27/12 Howe letter, p. 1). These sentiments were eventually conveyed by Howe to

24

Mr. Brodzik in person on February 15, 2012, in the presence of another CCAD representative, and Mr. Brodzik admitted that Howe's in-person representations were wholly consistent with his letter. (R. Brodzik, p. 184). SCI cannot present any evidence that the "implications" made by Plaintiff (and Howe) were false, or made recklessly and without knowledge of their truth. The fact that Howe asked Plaintiff to draft an initial version of the letter only confirms that Plaintiff's statements were true.

Finally, SCI cannot prove that Plaintiff's alleged fraud proximately caused SCI to enter into the February 15, 2012 agreements. Again, during the negotiations leading up to February 15, 2012, Randy Brodzik admitted that he believed, even prior to receiving Howe's letter, that SCI's relationship with CCAD would change if Plaintiff declined to stay involved. (R. Brodzik, p. 181). And as explained above, Howe was present to personally convey the true sentiments of CCAD. Thus, any alleged damage suffered by entering into the February 15, 2012 agreements could not have been caused by Plaintiff's perceived implications to SCI.

## IV.   CONCLUSION

Plaintiff respectfully requests that this Court grant summary judgment in his favor on Count IV of his Complaint and dismiss SCI's First Amended Complaint.

Dated: June 13, 2014

Respectfully submitted:

By: _/s/ Daniel D. Quick_____
       Daniel D. Quick (P48109)
       Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing counsel of record.

/s/  Robert P. Zora
Dickinson Wright PLLC
500 Woodward Ave., Ste. 4000
Detroit, MI 48226-3425
313-223-3500
rzora@dickinsonwright.com