UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

G. WESLEY BLANKENSHIP,

      Plaintiff,                            Case No.:  2:13-cv-12386

v                                     Honorable Denise Page Hood

SUPERIOR CONTROLS, INC., a Michigan
corporation, RANDALL E. BRODZIK,
MARK E. SOBKOW, RODERICK L. EMERY,
KEVIN T. BUTLER, GREG D. CAMERON,
CHRISTOPHER J. LAKE, ROGER M.
TEMELIN, individuals,

      Defendants,

v

SUPERIOR CONTROLS, INC.,

      Counter-Plaintiff,

v

G. WESLEY Blankenship,

      Counter-Defendant.

/

| | |
|---|---|
| Daniel D. Quick (P48109) | Mark McGowan (P24188) |
| Robert P. Zora (P74231) | Michael J. Barton (P34509) |
| **DICKINSON WRIGHT, PLC** | **PLUNKETT COONEY** |
| Attorneys for G. Wesley Blankenship | Attorney for Defendants and Counter-Plaintiff |
| 2600 West Big Beaver Road, Suite 300 | 38505 Woodward Avenue, Suite 2000 |
| Troy, MI  48084 | Bloomfield Hills, MI  48304 |
| (248) 433-7200 | (248) 901-4009 |
| dquick@dickinsonwright.com | mmcgowan@plunkettcooney.com |
| rzora@dickinsonwright.com | mbarton@plunkettcooney.com |

/

## DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

**ISSUES PRESENTED**

1.    Where Plaintiff admits an accounting term used in a contract has alternative meanings, is Plaintiff entitled to judgment as a matter of law that Plaintiff 's proposed interpretation of such ambiguous language is the intent of the parties?

2.    Where the parties' accounting experts have different interpretations of the meaning of the accounting language in the contract, and different opinions as to how various accounting methodology should be used to calculate the share price, is Plaintiff entitled to judgment as a matter of law that his expert's opinions must be accepted and Defendant's expert's opinions rejected?

3.    Is Plaintiff entitled to summary judgment on any counts in the Counter Claim?

## AUTHORITIES

*Barnett v. International Tennis Corp.,* 80 Mich. App. 396 (1978)

*Brucker v. McKinlay Transport, Inc.,* 225 Mich. App. 442, 448 (1997)

*Damon Trust v. Mackinaw Financial Corp.,* 2008 WL 53230 (Jan. 2, 2008 WD Mich.) at * 7 and * 8

*Ives v. Kimball,* 1 Mich. 308, 313 (1849)

*Jackson Printing Co., Inc. v. Mitan,* 169 Mich. App. 334, 341-342 (1988)

*Klapp v. United Insurance Group Agency, Inc.,* 468 Mich. 459 (2003)

*People ex rel Attorney General v. Michigan Central R Co.,* 145 Mich. 140 (1906)

*Phillips v. Cohen,* 400 F3d 388, 399 (6th Cir. 2005)

*Shawl v. Dhital,* 209 Mich. App. 321, 325 (1995)

*Shay v. Aldrich,* 487 Mich. 648, 668-669 (2010)

*Techner v. Greenberg,* 553 Fed. Appx. 495 (6th Cir. 2014) (unpublished) at * 507

*Thermatool Corp. v. Borzym,* 227 Mich. App. 366, 375-376 (1998)

*Tomecek v. Bavas,* 482 Mich. 484, 500-501 (2008)

*Tooling Manufacturing & Technology Ass'n. v. Tyler,* 2010 WL 5383529 (Dec. 28, 2010) at * 7 - * 8

*Toy ex rel Ketchum v. Lapeer Farmers Mut. Fire Ins. Ass'n.,* 297 Mich. 188, 192-193 (1941)

## COUNT IV OF PLAINTIFF'S COMPLAINT – BREACH OF SHAREHOLDER AGREEMENT

Plaintiff argues that a term used in the shareholder agreement, "cash basis of accounting" is unambiguous.  Plaintiff then contends that the unambiguous meaning of this language is that the phrase means "modified cash basis of accounting," a term not used in the agreement.   Plaintiff then further maintains that as a matter of law, his expert's implementation of the modified cash basis of accounting has been performed correctly. Each step of Plaintiff's analysis is incorrect.

## Meaning of the Contract Language

Plaintiff argues that even though the term "cash basis of accounting" is not defined in the agreement, his expert's definition must be accepted as the unambiguous intent of the parties in using that term.   (Plaintiff's brief at pp 5-6.)  Plaintiff asserts this even though Plaintiff also points out that the parties' accounting experts agree that the term cash basis of accounting can be interpreted in different ways: a pure cash basis or a modified cash basis. *Id.*  See also Crawford dep at pp 46-47 attached as Exhibit A to Plaintiff's motion.  See also Crawford's expert report attached as Exhibit K to Plaintiff's motion at pp 9-11.  Thus, even though Plaintiff admits the language in the contract can have alternative meanings, and therefore is by definition ambiguous, Plaintiff argues that this Court should as a matter of law, adopt Plaintiff's proposed interpretation.  Plaintiff of course cites no authority for this proposition.  Contract language with two alternative meanings is by definition ambiguous and interpretation of such an ambiguous contract is a question of fact.  *Brucker v. McKinlay*

*Transport, Inc.,* 225 Mich. App. 442, 448 (1997) (Where the contractual language is unclear or susceptible to multiple meanings, interpretation is a question of fact).

Further, Plaintiff offers no extrinsic evidence as to why Plaintiff's proposed interpretation of the meaning of the ambiguous term, a term with two alternative meanings, should be adopted as the intent of the parties to the agreement. Plaintiff merely argues that in his view, his interpretation makes more sense. (See, e.g., Plaintiff's brief at p 6.) To the contrary however, the relevant extrinsic evidence shows that the intent of the parties was in fact to use a pure cash basis of accounting.

The share price formula comes from an earlier shareholder agreement. The language in the agreement at issue is virtually identical to the language used in the prior SCI shareholder agreement. That language was drafted by Greg Barber. His Affidavit, attached hereto as **Exhibit B**, establishes that the intent of the language was to mean that the pricing formula would be calculated on a true cash basis formula. Furthermore, this Affidavit establishes that the true cash basis was in fact utilized under the prior agreement in connection with a shareholder buyout. Plaintiff's expert also acknowledges this. **Exhibit C** at pp 98-103; and Exhibit 141 referenced therein attached as **Exhibit D**; see also Crawford dep, **Exhibit A** at pp 30-31, 33-34.)

Additionally, Plaintiff was responsible for implementing the new shareholder agreement in 2002. At the time Plaintiff required the shareholders to sign the new shareholder agreement that is at issue in this case, Plaintiff expressly stated to them that

the stock purchase price formula in the new agreement was intended to be the same as under the old agreement.  (**Exhibit E** at ¶ 2.)

Thus, the extrinsic evidence of the parties' own conduct establishes that the language of the agreement cannot be construed as a matter of law to fit Plaintiff's expert's modified cash basis formula.  The practical construction by the parties constitutes important extrinsic evidence in interpreting ambiguous language in a contract.  *Klapp v. United Insurance Group Agency, Inc.,* 468 Mich. 459 (2003).  The practical interpretation given to contracts by the parties, "while engaged in a performance and before any controversy has arisen concerning them, is one of the best indications of their true intent."  *Klapp,* at 479 (quoting *People ex rel Attorney General v. Michigan Central R Co.,* 145 Mich. 140 (1906).

In *Klapp*, the Court found extrinsic evidence of the parties' past practice under similar language in an older version of an agreement at issue to be relevant extrinsic evidence of the parties' practical construction.  The court in *Klapp* held that because of the language of the contract was ambiguous and because defendant had, in the past, construed this language in a particular manner, the jury was entitled to consider the extrinsic evidence in connection with determining the intent of the parties in using the language.  *Klapp* at 479. The same is true in the present case.

Furthermore, in determining the parties' intent at the time a contract is entered into, the Court or the fact finder is to examine all the surrounding circumstances, including the

parties' statements, conduct and past practices, to establish what the parties intended by the language. *Id.* at pp 469-470.

Obviously, extrinsic evidence of the parties' interpretation of the identical language in a prior shareholder agreement, showing that the parties interpreted that identical language to mean a true cash basis of accounting, establishes that the language in the new contract can also be interpreted in the same way. The extrinsic evidence clearly shows that the language in the new agreement was susceptible to the interpretation that the language meant a true cash basis of accounting. As stated in *Tomecek v. Bavas,* 482 Mich. 484, 500-501 (2008):

> "There is no more useful, just and practical rule of law, then that which admits evidence of surrounding circumstances and collateral facts, within certain well defined limits, for the purpose of enabling courts to ascertain and carry into effect the intention of contracting parties. The cases in which this rule has been applied are almost innumerable." Quoting *Ives v. Kimball,* 1 Mich. 308, 313 (1849).

Even if somehow it could be established that the contract on its face by using the term "cash basis of accounting" really meant "modified cash basis of accounting," the extrinsic evidence would create a fact question regarding the parties' intent under the "latent ambiguity" doctrine. See *Shay v. Aldrich,* 487 Mich. 648, 668-669 (2010), (to verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if, in fact, that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation.) Here, the extrinsic evidence of SCI's prior conduct which the identical

4

language at issue, establishes that the language may be interpreted to mean a true cash basis of accounting.

Plaintiff admits in his brief there are alternative meanings to the language in the contract and that the parties' accounting experts interpret the accounting term differently. This alone requires the Court to deny summary judgment as to the intent of the parties in using that language. Furthermore, the extrinsic evidence of the intent of the drafts of the language and the prior conduct of SCI under virtually identical language in a previous agreement shows the language cannot be interpreted as a matter of law in accordance with Plaintiff's expert's proposed view. Interpretation of this language and the parties' intent in using it is a question of fact.

Plaintiff next argues that the term "modified cash basis of accounting" is itself unambiguous such that there can be no factual dispute over how calculations should be made under that term. Plaintiff offers no evidence in support of his position that the term "modified cash basis of accounting" has an unambiguous meaning. In fact, Defendant's expert, Rodney Crawford, testified that the term is not a clear concept in the accounting profession. (**Exhibit A** at p 121; see also pp 105-107; see also his expert report, Exhibit K to Plaintiff's motion at p 19.) Plaintiff's expert testimony is similar. He acknowledges that the modified cash basis approach can be implemented differently by different accountants. It can have different modifications. The only limitation is that the modifications be "logical and consistent." (**Exhibit C** at pp 105-107.) Plaintiff's own expert further agrees that in

utilizing the modified method, a number of results can come about and further, there are no clear set of rules as to which accounts to include or not include under the modified cash basis. *Id.*

Not surprisingly, given the fact that the term "modified cash basis of accounting" is not a clear concept, there is a fundamental dispute between the experts as to whether Plaintiff's expert properly applied a modified cash basis accounting in coming up with the Plaintiff's calculation of the buyout price. Defendant's expert's criticism of Plaintiff's expert's calculations under the modified cash basis method, and the numerous flaws he finds in that method, are summarized at pp 105-121 of his deposition. **(Exhibit A**.) Furthermore, they are stated at pp 7-8 and 19-20 of his expert report attached as Exhibit K to Plaintiff's motion.

Crawford states that the methodology used by Plaintiff's expert is "not a method that has general acceptance in the accounting profession for any other purpose. It is a method of Mr. Peterson's invention which happens to maximize in that book value of SCI by ignoring liabilities of $13.5 million dollars of very real deposit obligations to SCI's customers. This liability includes the liability related to the $5,457,809 invalidly factored Sikorsky deposit invoices…" (Crawford report at p 19; see also Crawford dep at pp 105-113.) According to Defendant's expert, a correct application of a modified cash basis would result in a stock purchase price of less than zero. (See dep at pp 113; see also Exhibit D to his expert report.)

Further, Plaintiff's expert's deposition establishes that his utilization of the modified cash basis is not logical and consistent. In fact, he did not properly utilize this methodology because he only used certain assets without including related offsetting liabilities. (See, e.g., **Exhibit C** at pp 107, 110-11, 122.) His calculation ultimately results in a large valuation of the company that is almost triple the net book value of the company under GAAP accounting principles. (**Exhibit C** at pp 126-127; see also Crawford report at pp 7-9.)

Defendant's expert, Rodney Crawford, severally criticizes Peterson's methodology. In particular, the failure to include offsetting liabilities related to certain assets is found to be a fundamental flaw in the method. (**Exhibit A** at pp 106-109; 115-118.) Thus, as noted above, Crawford opines that if the modified cash basis of accounting was correctly applied, the resulting purchase price would be less than zero. (**Exhibit A** at p. 113.)

In short, Plaintiff takes an admittedly ambiguous term in a contract, interprets it in a new way that is also admittedly ambiguous and then states his expert's calculation under this new interpretation must be accepted by the court as matter of law, even though Defendant's expert has given an opinion that the calculations are fundamentally flawed and not consistent even with the new way of interpreting the agreement.

There is simply no basis for this Court to find as a matter of law that Plaintiff's expert's opinion must be adopted in this case. There are obvious fact questions. Plaintiff's expert testimony is directly contradicted by Defendant's expert testimony. As stated by the Sixth Circuit in *Phillips v. Cohen,* 400 F3d 388, 399 (6th Cir. 2005):

"This approach of weighing the credibility of the competing expert reports amounts to improper fact finding…   Indeed, competing expert opinions present the 'classic battle of the experts' and [is] up to a jury to evaluate that weight and credibility each expert opinion deserves."   (Internal citations omitted.)

Next, Plaintiff argues that as a matter of law, the $5.4 million dollars in Sikorsky funds deposited by Plaintiff in a secret account must as a matter of law be included in the price calculation.  (See Plaintiff's brief at p 6 ff.)  This is incorrect.

In 2011, Plaintiff attempted to purchase a subsidiary of Defendant, Superior Controls, Inc. ("SCI"), known as Red Viking Group.  In connection with the negotiations regarding this purchase, Plaintiff attempted to keep a $5.4 million dollar payment by Sikorsky to Red Viking off Red Viking's books so that the company would be under-valued.  To accomplish this, he established a secret bank account controlled by him and off the books of Red Viking.  He deposited the $5.4 million into that account without notifying SCI of the existence of the account, nor of the payment.  SCI discovered the existence of the account, terminated the negotiations, and attempted to have the funds transferred to SCI.  However, since SCI had no corporate authority over the account, the bank refused the transfer.  Blankenship did not release the funds to SCI until 2012.  See Mark Sobkow dep at pp 188-190, attached hereto as **Exhibit F**; Kevin Butler dep, pp 293-302 attached hereto as **Exhibit G**; R. Brodzik dep at pp 106-114, attached as **Exhibit K.**

The Sikorsky payment was received at the Ann Arbor Bank in December, 2011.  Plaintiff instructed Red Viking employee Steve Brodzik (as distinguished from SCI officer

Randy Brodzik) not to inform the Board of Directors of the receipt of the money.  (Steve Brodzik dep at **Exhibit H** at pp 89-90.)  Steve Brodzik then in turn informed Red Viking Group's controller, Mike Ingram, not to tell SCI of the receipt of the money.  (Ingram dep, **Exhibit I** at pp 114-115.)  Ingram decided to disobey Brodzik and did inform Butler of the account.  *Id.*  Butler went to Ann Arbor Bank in December, 2011 to attempt to get the funds frozen.  The bank officer stated he would refuse to freeze the funds.  (**Exhibit G** at pp 300-302.)  However, internally the bank did freeze the funds.  The President of the bank states however this was done by mistake.  Only authorized signors could withdraw or freeze the account.  (**Exhibit H** at pp 15-16.)

In January, 2012, SCI demanded Blankenship transfer the funds to the control of SCI by transferring signing authority on the account to SCI.  See Randy Brodzik's dep, **Exhibit K** at pp 115-116; see also pp 116-122.  At that time, Randy Brodzik was still attempting to get Plaintiff to facilitate the transfer of signing authority of the Ann Arbor Bank account to core Superior Controls operations.  **Exhibit K** at p 139 and Exhibit 131 referenced therein attached hereto as **Exhibit L**.  Blankenship refused.  See **Exhibit M**.  Eventually the funds were transferred to SCI in February, 2012.  **Exhibit G** at p 313.

It appears to be Plaintiff's position that the fact the bank froze the account means SCI had access to the funds for the purpose of a cash basis of accounting.  There is no basis for this position.  Defendant's expert explained this to Plaintiff's counsel in his deposition:  "I do not believe the ability to freeze the account establishes control because it

9

doesn't establish the right of withdrawal and use of the funds." **Exhibit A** at p 61; see also pp 58-60, 126; see also Crawford report at pp 12-14 attached as Exhibit K to Plaintiff's motion.

There is therefore a fact question as to how the funds should be included in the calculations. Defendant's accounting expert has opined that given the facts of this case, the $5.4 million dollar payment should not be considered in the cash basis of accounting calculation. The mere fact that the bank froze the account, did not make funds available to SCI since SCI could not withdraw the funds. The Court has no basis to find that SCI could access the funds when the bank itself froze the funds. All Plaintiff does here is request this Court to disregard the testimony of Defendant's expert as a matter of law. The Court has no authority to do so in the context of the summary judgment motion. *Phillips, supra.*

Plaintiff next makes an estoppel argument. This argument is frivolous. Nowhere is the estoppel claim pled in the Complaint. Further, as alleged in the Complaint, Plaintiff resigned his position and triggered the buyout provisions of the shareholder agreement in January, 2012. (See Complaint at ¶ 40.) Plaintiff argues in his motion that he relied on the March 29, 2012 management letter that was issued in connection with the financial statements issued by the company's accountants in March of 2012. Thus, Plaintiff's argument is that in resigning his position in January of 2012, he relied on a March 29, 2012 management letter. Obviously, this is an absurd argument. Plaintiff could not have relied

on the March, 2012 management letter in support of his decision to terminate his employment in January, 2012.

Further, Plaintiff mis-cites his own testimony (pp 404-408 of his deposition testimony attached as Exhibit Y to his motion.)  What Plaintiff testified to was that he had an oral conversation with SCI's accountant, Mr. Doyle, in which Doyle allegedly told him that his shares would have a valuation in the $6 million dollar range.   Nowhere does Mr. Blankenship testify that he relied on some statement by management issued in connection with quarterly financial statements prepared by the accounting firm, especially quarterly financial statements not prepared until March, 2012, two months after he resigned.  The exact nature of this conversation with Doyle, what Doyle's alleged statement was based on and whether it had anything to do with the secret $5.4 million dollar account, is nowhere explained by Mr. Blankenship in his testimony.

In any event, there is no evidence of any representation by SCI Management that the $5.4 million dollar account would be included in the cash basis of accounting calculations required by the shareholder agreement.

Next at pp 10-11 of its brief, Plaintiff argues that a certain judgment amount must be entered in Plaintiff's favor based on Mr. Peterson's expert opinion report.  It is important for the Court to recognize that this argument only has relevance if the Court accepts Plaintiff's initial argument that the contract unambiguously requires application of a "modified" cash basis method of accounting.   Plaintiff's argument here is essentially that Mr. Pearson's

treatment of the $5.4 million dollar secret account in his modified cash basis accounting calculation, must be accepted as correct by this Court as a matter of law.  As noted above, Plaintiff does not even get to this point because the contract itself is ambiguous as to whether a modified cash basis method of accounting was intended by the parties when they entered into the contract.

In any event, Plaintiff's analysis is not supported by undisputed facts.  Plaintiff offers nothing more than his expert's opinion which is contradicted by Defendant's expert's opinion, a classic fact question.  *Phillips, supra.*

As noted by Defendant's expert, Mr. Crawford, even if the $5.4 million dollar account were included in the modified cash basis analysis utilized by Mr. Peterson, there was a corresponding offset to that account due to the status of the work with the customer that had to be recognized.  Mr. Crawford explained at length the numerous revisions to Peterson's report that, in his opinion, had to be made due to the fact that SCI had customer deposits in excess of payments owed and thus, required offsetting liabilities.  (See **Exhibit A**, dep at pp 77-78, 86, 89-90, 107, 111-120.  See also Crawford report at Exhibit K to Plaintiff's motion at pp 7-8 and 17-19.)  Crawford's opinion directly contradicts Peterson's opinion on this point.

Plaintiff also mis-cites Steven Brodzik's testimony on this point.  Mr. Brodzik does not state that the work was fully performed for the $5.4 million dollar payments.  Rather, he states that milestones were met.  The milestones are merely a trigger event for payment.

Milestones do not establish that the work supporting the invoice was itself received and performed.  (**Exhibit A** at pp 85-86.)  Mr. Brodzik's testimony that a milestone was met is not the same as stating that the work had been fully performed such that the customer deposit would have no offsetting liability.   Therefore, Plaintiff entirely misstates the testimony of Mr. Brodzik.

The meaning of a milestone is not the same thing as "the work was done," as suggested in Plaintiff's brief.  Milestones are merely triggering events for payment.  They do not mean the payment is not an advance for work yet to be done.  (**Exhibit A** at pp. 85-86.)  Indeed, Plaintiff himself wrote emails to this effect with the respect to the $5.4 million dollar deposit.   He expressly stated that the cash receipts from Sikorsky "must be reserved" because of the potential for the need to make refunds, as well as to meet the cash requirements for performing the program in the future.     (**Exhibit M** at p 2, starred paragraph.)   Thus, by Blankenship's own admission, the Sikorsky payment was a mere deposit that had to be held in reserve against future liabilities.   It did not constitute full payment for services already rendered.   That is the whole point of Defendant's Expert's criticism of Plaintiff's expert's opinion.  A customer deposit if it is treated as an asset, must be offset by any related liabilities such as the obligation to use the funds to work on the project, or the potential for a refund in the event the project is not completed.  **Exhibit A**, pp 77-78, 86, 89-90, 107, 118-120; see also Crawford report, Exhibit K to Plaintiff's motion at pp 17-19.)

13

This is also confirmed by the testimony of Randall Brodzik.  He testified that as of 2011, only a small fraction of the work on the Sikorsky contract had been performed whereas the payment received amounted to 25% of the entire contract price.  The only work that had been done was a review.  (See **Exhibit K** attached hereto at pp 201-204.)

Plaintiff has failed to establish that there are no fact question as to how the Sikorsky deposit should be treated under the shareholder agreement.  Plaintiff has provided no basis for this Court to rule as a matter of law on that issue in light of the conflicting expert opinion, and the evidence regarding what the deposit from Sikorsky represented.  Plaintiff's motion on this issue must be denied.  *Phillips, supra.*

Plaintiff's next argument that there has been a breach in failing to make the first payment on the promissory note makes no sense.  The amount of the payment has yet to be determined.  As noted above, Defendant's expert has opined that if Plaintiff's expert's modified cash basis method is accurately applied, the value of the shares would be zero dollars.  Further, Plaintiff vigorously disputes SCI's calculation of the amount owed.  Is Plaintiff arguing to this Court that he would accept an initial payment based on SCI's calculation of the amount owed?  Of course not.  Thus, Plaintiff's argument to this Court is that SCI is in breach of the agreement for failing to make a payment that Plaintiff himself would refuse.  In any event, given the fact questions regarding how much is owed, whether anything is owed, and furthermore, what may be owed and offset under the counterclaims

and affirmative defenses of SCI, Plaintiff has no basis to obtain a ruling on this issue as a matter of law.

## COUNTER COMPLAINT

### Counter Claim – Count I

Plaintiff misstates the facts regarding this count.  Plaintiff claims that the rental payments were originally intended to go to a consultant, Dr. Mahlburg and that after he pulled out, Plaintiff merely retained the payments for himself.  In fact, however, the payments were a sham from the beginning.  Plaintiff represented that the payments should be made to an entity called "Carolina Blue Consulting Group, LLC" (CBCG) which Plaintiff represented was owned by Dr. Mahlburg.  (See **Exhibit O**.)  In fact, however, that entity was owned by Plaintiff's mistress (Blankenship dep, **Exhibit P** at pp 423-424.)  SCI had no knowledge of this fraud until several years later.  (See Affidavit of Brodzik dated August 5, 2013 attached as **Exhibit Q**.)  Plaintiff argues that he was entitled to retain these fees as administrative expenses, but offers no support for this position.  In any event, it is a breach of fiduciary duty for an officer of a corporation to divert funds to his mistress through misrepresentations as to whom the funds are being paid.  There are no grounds for summary judgment.

### Count II

Plaintiff mischaracterizes Count II of the Counterclaim.  The claim is not that the funds were disbursed to Paragon without knowledge that the funds were being disbursed to

Paragon.   The claim is that the funds were disbursed to Paragon at the request of Blankenship based on Blankenship's representation that the funds were being used for legitimate expenses of Paragon.   It was only after the funds were disbursed that SCI learned the funds were not used for legitimate expenses of Paragon.   Rather, Blankenship used the funds to pay himself a large unauthorized "bonus."   (See Affidavit of Randall Brodzik attached hereto as **Exhibit E** at ¶s 3-8.)

As stated in his Affidavit, Randy Brodzik adamantly denies Plaintiff's claim that Brodzik had authorized an extra bonus to the Plaintiff.   (**Exhibit E** at ¶ 7.   Thus, there is a fact question as to whether SCI authorized the Plaintiff to pay himself an extra bonus.

The claim is also not barred by the statute of limitations.   There is no dispute that this claim has been brought within the three year statute of limitations provided in MCLA 450.1541(a).   Plaintiff however argues that the claim was discovered or should have reasonably been discovered within two years, and therefore, is barred by the shorter two year "discovery" provision.   Under the discovery rule, a party "is deemed to be aware of a possible cause of action when he becomes aware of an injury and its possible cause." *Shawl v. Dhital,* 209 Mich. App. 321, 325 (1995); see also *Damon Trust v. Mackinaw Financial Corp.,* 2008 WL 53230 (Jan. 2, 2008 WD Mich.) at * 7 and * 8.

In the context of a fiduciary relationship such as Plaintiff had to SCI as a director and as an officer, the question when a corporation should have discovered a wrong committed by that fiduciary has unique characteristics.   As the CEO and director of SCI, Blankenship

16

had a fiduciary obligation to disclose his true intended use of the funds and any misappropriation of the funds.  See *Techner v. Greenberg,* 553 Fed. Appx. 495 (6th Cir. 2014) (unpublished) at * 507.  In fact, as held in *Techner,* since an officer of a corporate entity is responsible for disclosing how distributions from the company's coffers are made, the failure to make that disclosure even tolls the statute of limitation under the stringent discovery provisions of the fraudulent concealment statute, MCLA 600.5855.  *Id.*

Here, Plaintiff was the CEO and a director of SCI.  As stated in the Brodzik Affidavit attached as **Exhibit E**, Plaintiff falsely represented the purpose of the disbursements to Paragon and how those funds were used.  SCI did not have any reason to know that Blankenship improperly used the funds to pay himself an extra bonus until March, 2013, when SCI learned through another Paragon employee that extra bonuses had been paid.  It was only then that SCI was put on notice that the funds had been used for some purpose other than Paragon expenses, and therefore, conducted an investigation which lead to the discovery that Blankenship had paid himself a large bonus without knowledge or authorization of SCI.  (Brodzik Affidavit attached as **Exhibit E** at ¶s 3-8.)

Under these circumstances, there is clearly a fact question as to when SCI knew or reasonably should have known, that its director and CEO had surreptitiously paid himself a bonus.  See e.g., *Damon Trust, supra; Techner, supra.*

**Counter Claim – Count III**

Plaintiff's argument regarding Count III fails. Plaintiff does not truly dispute the central claim that he misled SCI into making payments to his girlfriend. The facts show in the summer of 2011, Randall Brodzik sought an explanation from Plaintiff and agreed that Plaintiff could receive a payment for out-of-state living expenses, but not for lease payments to his girlfriend. (See Brodzik deposition, **Exhibit K** at pp 73-77; Affidavit of Brodzik, **Exhibit E** at ¶ 9 – "I at no time waived the right to recover payments to the girlfriend.")

Brodzik sought an explanation from Blankenship regarding the lease, and all he got was that Plaintiff was trying to protect his private life. (Brodzik dep at pp 73-75.) This was in the late summer or early fall, 2011. (See Brodzik dep at p 76.) Brodzik determined after this conversation that he was not going to allow payments to the girlfriend's company, Adawn. SCI did not waive recovery of the payments already made to Adawn. SCI is not seeking the payment made to Blankenship. (See **Exhibit E** at ¶ 9.)

Mr. Brodzik's discussions with Plaintiff occurred in late summer and fall of 2011, at which time he determined Blankenship had no rational explanation and agreed to pay Blankenship directly some personal expenses. His receipt of the explanation from Blankenship occurred in late summer or early fall, 2011, therefore, occurred within the two year time frame. The payment to Blankenship does not amount to a waiver of the prior payments to Blankenship's girlfriend. Therefore, there are fact questions regarding Count III and Plaintiff's motion must be denied.

**Counts IV - VI**

Plaintiff argues that these counts must be dismissed because Plaintiff cannot prove damages.  Plaintiff is incorrect.  SCI is entitled to damages in form of the compensation it paid to Plaintiff during the time Plaintiff engaged in misconduct in connection with his fiduciary obligations to SCI.  Plaintiff was an officer and director, indeed, the CEO of SCI, until the time of his resignation in January.  He continued as a director and beyond that date.  An agent of a corporation such as an officer may through wrongful conduct, forfeit all compensation received during the period of wrongful conduct.  See *Toy ex rel Ketchum v. Lapeer Farmers Mut. Fire Ins. Ass'n.,* 297 Mich. 188, 192-193 (1941); see also *Tooling Manufacturing & Technology Ass'n. v. Tyler,* 2010 WL 5383529 (Dec. 28, 2010) at * 7 - * 8. The Affidavit of Kevin Butler attached hereto as **Exhibit R** shows the amount of compensation paid to Blankenship during the time Blankenship was actually engaged in wrongful competition with SCI.  Plaintiff is entitled to recovery of this compensation.

Additionally, with respect to these intentional torts, SCI may recover exemplary damages.  A corporation may recover exemplary damages when actual damages are insufficient to compensate for an intentional tort.  See *Jackson Printing Co., Inc. v. Mitan,* 169 Mich. App. 334, 341-342 (1988).

Finally, SCI may be entitled to equitable relief in the form of an extension of Blankenship noncompete agreement.  See *Thermatool Corp. v. Borzym,* 227 Mich. App. 366, 375-376 (1998).

19

**Count VII - Duress**

Plaintiff argues the duress claim fails because SCI cannot establish a wrongful or unlawful act.  This is incorrect.  The facts before the Court show that a director of SCI breached his fiduciary duties to SCI by threatening to destroy the company's relationship with its major customer and thus, financially ruin the company unless he was paid a $3 million dollar fee.  Furthermore, the director falsely represented the position of the management of the major customer, by stating that that customer would terminate its relationship if the director did not remain in the relationship between the customer and SCI.  Thus, through a breach of fiduciary duty and false representations, Blankenship threatened the financial ruin of SCI if he was not paid the $3 million dollars.  (See Brodzik Affidavit attached as **Exhibit E** at ¶s 10-11; see also **Exhibit K** at pp 179-189.)  Obviously, threatening to sabotage a key customer relationship is a breach of a corporate officer's fiduciary obligations. See e.g., MCLA 450.15.41(A)(1)(a), (b) and (c).  Obviously making fraudulent representation is a breach of that duty, as well as being in itself unlawful and wrongful conduct.

*Barnett v. International Tennis Corp.,* 80 Mich. App. 396 (1978) is distinguishable from the present case.  The director there had no fiduciary obligation to execute a personal guarantee.  The director did not threaten to sabotage the relationship with a key account that would cause financial ruin to the company, nor did the director falsely represent some

20

position.  There was no unlawful or wrongful act on the part of the director and *Barnett*.  In contrast, there is such an act here, breach of fiduciary duty and misrepresentation.

Plaintiff also claims that the deposition of Randy Brodzik at pp 190-191 stands for the proposition that Plaintiff in fact did not threaten to ruin the relationship with CCAD.  That is not how Mr. Brodzik testified.  He merely testified he could not quote Plaintiff's exact words, but the threat was clear.  (See also Affidavit of Randy Brodzik attached hereto as **Exhibit K** at ¶s 10-11.)

Additionally, as testified by Mr. Brodzik and explained more fully below, Plaintiff's claims that he needed to be involved in the project were false.  (**Exhibit K** at pp 179-189; see also Affidavit of CCAD Deputy Commander, William L. Braddy (**Exhibit N**), stating that the January 27, 2012 letter of Ronald G. Howe, that was in fact written by Plaintiff, did not reflect the actual position of CCAD.  There are fact questions on the issue of whether Plaintiff engaged in wrongful or unlawful acts.  Plaintiff's motion on this point must therefore be denied.

## Count VIII

Plaintiff argues that as a matter of law, SCI cannot support its allegations that Plaintiff made false representations.  Plaintiff claims that the letter he drafted to have Mr. Howe of CCAD send to SCI is in fact true.  Therefore, SCI cannot show a misrepresentation.  In fact, however the statements in the so called Howe letter were untrue and did not represent CCAD's position.  This is confirmed by the Affidavit of CCAD's Deputy

21

General and former Executive Director, in which he states that the representations of the Howe letter "did not represent the true position of CCAD on January 27, 2012, nor has it represented the position of CCAD at any time."  See **Exhibit N**.

Thus, the entire premise of Plaintiff's motion is incorrect.  Plaintiff admits to drafting the letter sent in Mr. Howe's name.  The statements in the letter drafted by Mr. Blankenship are obviously untrue.

Plaintiff also argues that the Howe letter did not influence SCI's decision to enter into the agreement.  Plaintiff cites Randy Brodzik's deposition at p 181 in support of his position that SCI did not rely on the letter, and instead itself, believed the relationship would change if Plaintiff declined to stay involved.  This is a misrepresentation of Brodzik's testimony.  His testimony at pp 179-180 was that absent Plaintiff's representations, he did not believe Plaintiff's departure would in, and of itself, cause the relationship to change.  (**Exhibit K**.)

Brodzik further testified that after the February 15th agreement, he learned that what was said by Mr. Howe and by Plaintiff regarding the need for Plaintiff's continued involvement with CCAD was untrue.  In fact, Plaintiff had no further involvement of the project after he received his $3 million dollar payment, and his involvement was not necessary to finish the project.  (*Id.* at pp 187-189.)  Thus, the false representations contained in the Howe letter and also made by Blankenship regarding his needed involvement in the project did cause SCI to enter into the $3 million dollar agreement.  (See also Affidavit of Brodzik attached hereto as **Exhibit E** at ¶ 11.)  Thus, Plaintiff's proximate

cause argument that the misrepresentations regarding the need for Blankenship's continued involvement at CCAD were not relied on by SCI in entering into the February 15, 2012 agreement, is completely contradicted by the Affidavit of Brodzik and his testimony.  There is, therefore, a fact question and the motion on this issue must be denied.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant SCI respectfully requests that Plaintiff's motion be denied.

Respectfully submitted,

PLUNKETT COONEY

/s/  Michael J Barton (P34509)

By: _____

Mark McGowan (P24188)
Michael J. Barton (P34509)
**PLUNKETT COONEY**
Attorney for Defendants
38505 Woodward Avenue, Suite 2000
Bloomfield Hills, MI  48304
(248) 901-4009
mmcgowan@plunkettcooney.com

Dated:  July 17, 2014                     mbarton@plunkettcooney.com

23

**PROOF OF SERVICE**

The undersigned certifies that on **July 17, 2014** a copy of the foregoing was served upon all attorneys of record to the above cause at their respective addresses disclosed in the pleadings by.

\_\_\_U.S. MAIL              \_\_\_FAX
\_\_\_HAND DELIVERY          \_\_\_OVERNIGHT MAIL
\_\_\_EMAIL                  \_**x**\_ OTHER - efile

I declare under penalty of perjury that the foregoing statement is true to the best of my information, knowledge and belief.

   /s/  Michael J Barton (P34509)
_____
     Michael J. Barton  (P34509)

Open.22142.31608.14294200-1

24