## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

G. WESLEY BLANKENSHIP,

                Plaintiff/Counter-Defendant,

v.                                           Case No. 13-CV-12386
                                     Honorable Denise Page Hood

SUPERIOR CONTROLS, INC., a Michigan
corporation, RANDALL E. BRODZIK, MARK
E. SOBKOW, RODERICK L. EMERY,
KEVIN T. BUTLER, GREG D. CAMERON,
CHRISTOPHER J. LAKE, ROGER M.
TEMPLIN, individuals,

                Defendants/Counter-Plaintiffs.

_____/

## ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, (2) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT IV OF PLAINTIFF'S COMPLAINT, AND (3) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT'S COUNTER-COMPLAINT

## I.     INTRODUCTION

     This matter involves Plaintiff's status both as a shareholder and a former

shareholder of Superior Controls, Inc. ("SCI"), including the redemption of

Plaintiff's shares in SCI, allegedly in violation of Mich. Comp. Laws § 450.1489

and the stipulations of their Shareholder Agreement.  Before the Court are

Defendants' Motion for Partial Summary Judgment on Counts I-III and V of Plaintiff's Complaint (Doc. No. 123) and Plaintiff's Motion for Partial Summary Judgment on Count IV of his Complaint and the entirety of SCI's First Amended Counterclaim (hereinafter "Counter-Complaint"). (Doc. No. 124)  This matter has been fully briefed.[1]  Oral argument was heard on October 1, 2014.

For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Partial Summary Judgment with respect to Counts I-III and V of Plaintiff's Complaint; DENIES Plaintiff's Motion for Partial Summary Judgment as it relates to Count IV of Plaintiff's Complaint; and GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Partial Summary Judgment as it relates to SCI's Counter-Complaint.

## II.    BACKGROUND

## A.    The Present Lawsuit

Plaintiff, G. Wesley Blankenship, filed the present action in this Court on July 12, 2013.  The action was brought against Defendants Superior Controls, Inc.,

---

[1]In addition, for the reasons stated therein, the Court GRANTS Defendants' Motion for Leave to File Supplemental Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 163) The Court has reviewed and considered Defendants' Supplemental Brief, though the Court's ruling would have been the same even if such Supplemental Brief had not been filed by Defendants and accepted by the Court.

2

and Randall Brodzick, Mark Sobkow, Roderick Emery, Kevin Butler, Greg Cameron, Christopher Lake, and Roger Templin in their individual capacities. Plaintiff's five-count Complaint includes the following claims: Count I – Application for Order Compelling Inspection of Books and Records Under M.C.L. § 450.1487; Count II – Breach of Fiduciary Duty; Count III – Minority Shareholder Oppression Under M.C.L. § 450.1489; Count IV – Breach of Contract and Declaratory Judgment; and Count V – Civil Conspiracy. (Doc. No. 1)  Plaintiff seeks damages for unpaid dividends in 2011 and 2012, unpaid tax distributions in 2012, and payment for the shares of SCI stock he held at the time this lawsuit was filed.

On July 23, 2013, Defendants filed a counterclaim (Doc. No. 26), and on May 5, 2014, Defendants filed their eight-count amended Counterclaim consisting of the following claims: Count I – Damages for Diversion of Company Funds Utilizing the Equipment Rental Agreement; Count II – Damages for Diversion of Funds Utilizing Paragon Research Group LLC; Count III – Damages for Diversion of Rent Payments for Fictitious Residential Property; Count IV – Tortious Interference with an Existing Business Contract and with Business Expectancies; Count V – Breach of Fiduciary Duty; Count VI – Injunctive Relief and Damages in Connection with Breach of Employment, Noncompetition and Confidentiality

3

Agreement; Count VII – Rescission of Fee Agreement and First Amendment to Employment, Noncompetition, and Confidentiality Agreement; and Count VIII – Fraudulent Inducement. (Doc. No. 104)  Therein, Defendants requests the following relief: (a) "that the Fee Agreement and the First Amendment to Employment, Noncompetition and Confidentiality Agreement be deemed rescinded nunc pro tunc;" (b) "that [SCI] be awarded the return of its $3 million paid under illegal duress and coercion;" and © that SCI be awarded "its attorney fees and costs incurred in bringing this action."

**B.    Factual Background**

Plaintiff became a shareholder in SCI in 2001.  SCI is a corporation that provides mechanical and electrical services to manufacturing companies. (Doc. No. 123-4, Pg ID 3069)  On January 11, 2002, Plaintiff and SCI executed a Shareholder Agreement. *Id.*  On July 15, 2002, Plaintiff signed an Employment, Noncompetition Confidentiality Agreement with SCI which prohibited him from working for any competitor anywhere in the United States for 18 months after he ceased being a shareholder. (Doc. No. 125-3)  Plaintiff served as Chairman and Chief Executive Officer for SCI until January 13, 2012, when he resigned (though the parties agree that his employment terminated effective February 12, 2012). (Doc. No. 124, Pg ID 3087)  Upon resignation, Plaintiff held 89,159 shares — or

4

37.4% — of SCI's outstanding stock. (Doc. No. 1, Pg ID 2; Compl. ¶ 1)

Pursuant to Article 3, Section A of the Shareholder's Agreement, following Plaintiff's resignation, SCI had the "first option to purchase some or all" of Plaintiff's shares, an option that extended up to 180 days. (Doc. No. 123-4, Pg ID 3070-71)  SCI did not exercise its purchase option.  When the option lapsed, Article 3, Section B of the Agreement provided the other shareholders of SCI a "Second Purchase Option" that also extended up to 180 days. *Id.* at Pg ID 3071. This time also lapsed without purchase of the shares.  Article 3, Section C of the Shareholder Agreement states that "[i]f all of the shares to be transferred are not purchased by either Corporation or the Remaining Shareholders, or both, before the expiration of the section option period, [SCI] shall purchase the remaining shares." *Id.*

On June 15, 2012, Plaintiff sent a letter to SCI pursuant to M.C.L. § 450.1487 requesting SCI's books and records. (Doc. No. 134-12, Pg ID 4057)  In the letter, Plaintiff told SCI that he was intending to "sell his stock" and "need[ed] to review each of the documents [the he requested] to monitor the Company's financial health, and to help establish the value of [his] ownership interest." *Id.* Plaintiff sent an additional request for books and records on April 4, 2013 because he felt he had "not been provided the information [he was] entitled to" per his prior

5

request. (Doc. No. 134-13, Pg ID 4061)  Plaintiff told SCI that the documents he had been provided "were completely inadequate to be able to analyze the Company's performance in 2011 or to establish a value for [his] shares." *Id.*

On April 12, 2013, with the buy-out date less than two months away, SCI provided Plaintiff with its unaudited financial statements for the years ending December 31, 2011, and December 31, 2012.  Determining that this information was still inadequate, Plaintiff (through counsel) wrote a letter to SCI on May 9, 2013. (Doc. No. 23-6, Pg ID 189)  In the letter, Plaintiff noted that he incurred Federal and State tax liabilities in 2012 amounting to $72,051 because $433,983 of SCI's taxable income had been attributed to him for the 2012 fiscal year. *Id.* Plaintiff also questioned SCI's decision to refrain from giving distributions and requested that SCI give him a distribution "sufficient to cover, on an after-tax basis, his tax liability related to the Company for 2012" as well as 2011, for which he also alleges he was not paid. *Id.* at Pg ID 190.  Lastly, Plaintiff reiterated his request for details regarding shareholder distributions, bonuses, and other non-salary compensation that was paid to SCI's officers and directors after June 1, 2011. *Id.*

On May 7, 2013, Plaintiff sent Defendants another letter in which he acknowledged Defendants' decision to treat his resignation as having been

6

effective on February 10, 2012. (Doc. No. 23-7, Pg ID 191)  Plaintiff noted that

this necessitated that the sale of his shares to SCI "close no later than June 5,

2013." *Id.*  Article 6, Section A of the Shareholder Agreement states:

> If the parties to a transfer of stock required by this
> Agreement cannot agree on the price to be paid for the
> subject shares of stock, the price will be determined by
> dividing the "Net Book Value" of the Company
> computed on a cash basis of accounting as of the first
> prior business year end (currently December 31) by the
> total number of shares outstanding, including the shares
> subject to resale.  "Net Book Value" shall be computed
> by subtracting all cash basis debit from the total of all
> cash basis assets. (Doc. No. 123-4, Pg Id 3073)

Because Plaintiff's resignation was effective in February 10, 2012, he noted that

the valuation of his shares would be based on SCI's financials for the year ending

December 31, 2011. (Doc. No. 23-7, Pg ID 191)   Plaintiff notified SCI that he had

retained UHY Advisors, Inc. to compute the valuation of his stock in the company

and noted that based on the financial information that he had received, his shares in

the company were valued at $6,316,024. *Id.* at 191-92.  Defendants disagreed with

this valuation and in a letter dated May 16, 2013, notified Plaintiff that their belief

was that Plaintiff's shares were valued at $1,178,093.[2] (Doc. No. 23-8, Pg ID 196)

---

[2] Defendants argued that because "cash basis accounting reflects only 'cash' less the total dollar amount represented by checks issued by the Company but not cleared [through] the Company's bank[,]" the cash basis sum totaled $279,118. Therefore, as of December 31, 2011, the total cash basis value was $6,148,964.

On June 4, 2013, Defendants again wrote Plaintiff, this time referencing a phone call in which Defendants suggested that Plaintiff stipulate "to the fact that [his] interest in SCI [be] deemed . . . redeemed by SCI effective June 5, 2013, with the actual purchase price to be determined by agreement or otherwise." (Doc. No. 23-9, Pg ID 199)  On June 6, 2013, Plaintiff sent Defendants a letter stating that he would not accept the proposal "as it divest[ed] [him] of his rights as a shareholder and would permit [Defendants] to engage in any number of improper acts injurious to [his] interests." (Doc. No. 23-10, Pg ID 202) Instead, Plaintiff proposed that he retain his shares and continue to be treated as a shareholder until they were able to have a hearing before the Court. *Id.* at Pg ID 202-03  Defendants did not agree with this modification.

In a letter to Plaintiff dated July 2, 2013, SCI notified Plaintiff that pursuant to the terms of the Shareholder Agreement, Plaintiff's shares in SCI were to be considered redeemed as of June 5, 2013.  Pursuant to Article 6, Section B of the Shareholder Agreement, Defendants attached a "PROMISSORY NOTE" to the

---

After deletion of the $3 million dollars that Defendants paid to Plaintiff pursuant to a February 15, 2012, First Amendment to Employment, Noncompetition and Confidentiality Agreement, Defendants concluded that Plaintiff's shareholder interest was valued at $1,178,093.  Defendants noted that a portion of the total Plaintiff used in his calculation ($5,457,809 in Sikorsky deposits) should not have been included because the "cash was not under the control of the company on December 31, 2011." (Doc. No. 23-8, Pg ID 196)

July 2, 2013 letter. (Doc. No. 23-11, Pg ID 205)  The Promissory Note provided that the purchase price (as determined pursuant to the terms of the Shareholder Agreement) was payable in five equal annual installments (plus interest, compounded annually at the annual rate of 4.25%), to begin no later than June 4, 2014. *Id.* at Pg ID 207.  Defendants' counsel also apprised Plaintiff's counsel of his preference to arrange a meeting to discuss their differing opinions on the valuation of the shares. *Id.* at Pg ID 205.

In a motion for preliminary injunction filed July 12, 2013, Plaintiff contended that notwithstanding Defendants' compliance in turning over financial documents in April 2013 (he argued then and has continued to argue that he never received all of the documents that he needed), Defendants' "delay in providing financial information, its bad faith 'restatement' of its 2011 financial statements in early 2013, and its improper calculation of the value of [his] shares were all actions taken . . . [to] deprive him of the value of his significant shareholdings." (Doc. No. 23, Pg ID 145)  Additionally, he argued that his independent assessment of the valuation of his shares completed by UHY Advisors is in accordance with the requirements of the Shareholders Agreement and that, pursuant to Article 6, Section D of the Shareholder Agreement, Defendants could not "redeem [his] shares and deprive [him] of his shareholder status" until SCI complies with the

9

requirement that the sale occur at a "Closing."[3] (Doc. No. 123-4, Pg ID 3073)  On

September 4, 2013, the Court denied Plaintiff's motion for preliminary injunction.

(Doc. No. 31)  Plaintiff's shares have been treated as redeemed as of June 5, 2013.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The presence of factual disputes will preclude granting of

summary judgment only if the disputes are genuine and concern material facts.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a

material fact is "genuine" only if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Id*.  Although the Court must view the

motion in the light most favorable to the nonmoving party, where "the moving

party has carried its burden under Rule 56(c), its opponent must do more than

---

[3]Article 6, Section D states:

[u]nless otherwise provided, the closing of any purchase and sale of
stock contemplated by this Agreement shall take place at the office of
[SCI] at a date designated by [SCI], which shall not be more than one
hundred twenty (120) days following the date of the notice of intent to
purchase, and not less than ten (10) days following that date. (Doc. No.
123-4, Pg ID3073)

simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary

judgment must be entered against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial. In such a situation, there can be

"no genuine issue as to any material fact," since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look

to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at

248.

## IV.    ANALYSIS

## A.    DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants contend that they are entitled to summary judgment with respect

to Counts I-III and Count V of Plaintiff's Complaint.

### 1.    Count I - Access to Books and Records under M.C.L. § 450.1487

Plaintiff argues that SCI violated his shareholder rights by denying him

access to the corporate books and records he had a right to review pursuant to

M.C.L. § 450.1487. (Doc. No. 1, Pg ID 17-18; Compl. ¶¶ 85-93) SCI contends it

11

is entitled to summary judgment on this claim because Plaintiff fails to show that

he did not receive access to all records to which he was entitled. (Doc. No. 22, Pg

ID 3051)

Plaintiff agrees that "he has received SCI's records during discovery." (Doc.

No. 134, Pg ID 3896)  In similar circumstances, the Sixth Circuit recently

concluded that a plaintiff's M.C.L. § 450.1487 claim must be dismissed:

> [T]here is not a genuine dispute of material fact regarding whether
> Plaintiff was denied access to the company books and records. *See
> Nagia v. Chota*, No. 229311, 2002 WL 1308335, at *3 (Mich.Ct.App.
> June 14, 2002) (holding that plaintiffs failed to meet their burden of
> establishing a factual dispute to prevent summary judgment where
> defendants provided plaintiffs with documents since the initiation of
> the suit and plaintiffs failed to identify any documents to which they
> were entitled that defendants failed to produce).

*Wolding v. Clark*, 563 F. App'x 444, 452 (6th Cir. 2014). Accordingly, the Court

holds that Defendants are entitled to summary judgment with respect to Count I of

Plaintiff's Complaint, *i.e.*, Plaintiff's claim that SCI violated M.C.L. § 450.1487.

The Court notes that the focus of Plaintiff's response regarding his M.C.L. §

450.1487 claim was to seek compensation with respect to obtaining SCI's records

because he "had to incur significant and unnecessary costs to obtain the records."

(Doc. No. 134, Pg ID 3896) Likewise, the Court notes that M.C.L. §§ 450.1487(4)

and (5) provide (emphasis added):

(4) A director shall have the right to examine any of the corporation's

books and records for a purpose reasonably related to his or her position as a director. The director may apply to the circuit court of the county in which the principal place of business or registered office of the corporation is located for an order to compel the inspection. <u>The court may, in its discretion, order the corporation to permit the director to inspect any and all books and records, on conditions and with limitations as the court may prescribe and may award other and further relief as the court may consider just and proper</u>.

(5) If the court orders inspection of the records demanded under subsection (3) or (4), it shall also order the corporation to pay the shareholder's or director's costs, including reasonable attorney fees, incurred to obtain the order unless the corporation proves that it failed to permit the inspection in good faith because it had a reasonable basis to doubt the right of the shareholder or director to inspect the records demanded.

In this case, Plaintiff acknowledges that "the Court was not required to issue an order requiring inspection," therefore the mandate set forth in M.C.L. § 450.1487(5) that SCI has to pay for Plaintiff's costs is not applicable. Nonetheless, Plaintiff urges the Court to exercise its discretion to award Plaintiff "the unnecessary fees and costs he incurred to obtain these records." Relying on M.C.L. § 450.1487(4) and *Weiner v. Weiner Inter Vivos Trust*, 2008 WL 746960, at *7 (W.D. Mich. Mar. 18, 2008). (Doc. No. 134, Pg ID 3896-97) The Court, however, is not persuaded that Plaintiff is entitled to costs.

Although Plaintiff repeatedly argued that Defendants were not producing records prior to the filing of this lawsuit, Plaintiff was able to determine, prior to filing this lawsuit, a purchase price of $6,316,024 for his shares of SCI stock.

13

Following discovery, Plaintiff's expert determined that the purchase price for Plaintiff's shares of SCI stock should be $6,316,024, *i.e.*, the same price Plaintiff demanded prior to the lawsuit. Accordingly, the Court finds that it is unlikely that Defendants withheld from Plaintiff any critical books and records prior to the filing of this lawsuit. For those reasons, the Court denies Plaintiff's request for sanctions pursuant to M.C.L. § 450.1487(4).

**2.     Count II - Breach of Fiduciary Duty – Individual Defendants and
         Count III - Minority Shareholder Oppression under M.C.L. § 450.1489**

**a.     Standing**

Defendants contend that Plaintiff does not have standing to pursue a minority shareholder oppression claim under M.C.L. § 450.1489 because he no longer is a "current shareholder" of SCI. (Doc. No. 123, Pg ID 3045-51) In support of their argument, Defendants primarily rely on *McCarthy v. Miller*, 2003 WL 462436, at *2 (Mich.Ct.App. Feb. 21, 2003) (footnotes omitted), wherein the court stated:

> MCL 450.1489 clearly provides that any direct or individual cause of action may also be brought by a shareholder. Thus, plaintiff is still required to be a current shareholder rather than a former shareholder. "When interpreting statutory language, our obligation is to ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute." *Koontz v. Ameritech Services, Inc.,* 466 Mich. 304, 312; 645 NW 2d 34 (2002), MCL 450.1109(1) defines "shareholder" as a "person holding units of proprietary interest in a

14

corporation…" The plain and ordinary language of the statute, i.e., "person holding units," indicates that the shareholder must be a current shareholder. See *Sun Valley Foods Co. v. Ward,* 460 Mich. 230, 236; 596 NW2d 119 (1999) (if the plain meaning of the language is clear, judicial construction is normally neither necessary nor permitted). "Holding" is defined as "the act of a person or thing that holds," while "hold" is defined as "to have…" *Random House Webster's College Dictionary* (1992), pp 638-639. We concluded that the word "holding" as used in § 109(1) indicates something that is occurring in the present rather than the past. Moreover, in *Estes, supra* at 282 [*Estes v. Idea Engineering & Fabricating, Inc.*, 250 Mich. App. 270 (2002)]*,* this Court stated, albeit in dicta, that "plaintiffs in a § 489 suit may only be current shareholders."

As Defendants acknowledge, however, the plaintiff in *McCarthy* ceased being a shareholder prior to the filing of the lawsuit. (Doc. No. 123, Pg ID 3048)  Further, as Defendant states, "no [Section 1489] case has specifically addressed the issue of whether a plaintiff who was a shareholder at the beginning of the suit[] must continue to be a shareholder up until the time that relief is established." (Doc. No. 139, Pg ID 4496)

Plaintiff counters that, because he was a shareholder at the time he filed his Complaint, he has standing for purposes of Section 1489. (Doc. No. 134, Pg ID 3876-78)  Plaintiff argues that it is a generally accepted rule of law that "[s]tanding is determined as of the time a lawsuit is filed." *Senter v. General Motors Corp.*, 532 F.2d 511, 520 (6th Cir. 1976).

The Court agrees with Plaintiff—he has standing to pursue his Section 1489

15

claim.  First, the Court finds that *McCarthy* and *Estes* support the conclusion that Plaintiff has standing to bring a Section 1489 claim because he was a "current shareholder" at the time this lawsuit was filed. *See McCarthy*, 2003 WL 462436, at *2 ("MCL 450.1489 clearly provides that any direct or individual cause of action may also be brought by a shareholder. Thus, plaintiff is still required to be a current shareholder rather than a former shareholder."); *Estes*, 250 Mich.App. at 282 ("plaintiffs in a § 489 suit may only be current shareholders").  Second, the Court finds that it would be unreasonable to hold that a plaintiff could have standing to challenge acts or omissions he was subjected while a shareholder when a lawsuit is filed but then lose standing to pursue that same lawsuit about acts or omissions that occurred while he was a shareholder simply because he ceases to be a shareholder after the lawsuit is filed.  As Plaintiff argues, this would mean that, if a plaintiff lost standing to pursue his Section 1489 claim upon ceasing to hold shares of stock in a company, "in the midst of every shareholder oppression case, the majority [shareholder(s)] could simply squeeze out [the plaintiff] shareholder and avoid prosecution for shareholder oppression." (Doc. No. 134, Pg ID 3878).

Accordingly, the Court holds that Plaintiff has standing to pursue his Section 1489 minority shareholder oppression claim.

**b.    Genuine Dispute of Material Fact**

16

Plaintiff contends that the individual Defendants, acting as directors, breached the fiduciary duties they owed to Plaintiff as a shareholder and that SCI oppressed him as a minority shareholder. Plaintiff's claims are based on the failure of Defendants to pay dividends in 2011 and 2012, the failure of Defendants to make tax distributions in 2012, alleged breaches of the Shareholder Agreement, the retroactive restatement of SCI's financial statements in March 2013 (the original 2011 SCI financial statement was dated March 29, 2012 and certified by Randy Brodzik and Kevin Butler on March 29, 2012), and the alleged failure of Defendants to disclose critical documents that evidenced Defendants' conduct. Plaintiff alleges such conduct began in or before April 2011 and has continued since then.

As the Sixth Circuit recently stated:

Section 489 of the Michigan Business Corporations Act, MCL § 450.1489(1), provides that "[a] shareholder may bring an action ... to establish that the acts of the directors or those in control of the corporation are illegal, fraudulent, or willfully unfair and oppressive to the corporation or to the shareholder." Under the statute, "willfully unfair and oppressive conduct" is defined as:

> a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the shareholder as a shareholder. Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other shareholder interests

17

> disproportionately as to the affected shareholder. The
> term does not include conduct or actions that are
> permitted by an agreement, the articles of incorporation,
> the bylaws, or a consistently applied written corporate
> policy or procedure.

MCL § 450.1489(3).

*Wolding v. Clark*, 563 F. App'x 444, 450-51 (6th Cir. 2014). M.C.L. § 450.1489

provides a statutory avenue by which a minority shareholder can bring a direct

action to remedy "illegal, fraudulent, or willfully unfair and oppressive" conduct

by those in control of a corporation. *Estes*, 250 Mich.App. at 278. Further,

"Michigan courts have consistently held that the purpose of § 450.1489 is to

protect minority shareholders, particularly in close corporations, from overreaching

and heavy handed actions by the majority." *Bromley v. Bromley*, No. 05-71798,

2006 WL 2861875, at *5 (E.D. Mich., Oct. 4, 2006) (citing *Estes*, 250 Mich.App.

at 284).

Defendants state, "[t]he same standards apply to the breach of fiduciary duty

claim that applied to the minority oppression claim in connection with the payment

of dividends." Citing *Wolding*, 563 F. App'x at 444, 453-54 (citing *Matter of*

*Estate of Butterfield*, 418 Mich. 241, 254-56 (1983)).

> . . . Moreover, Michigan courts have historically held . . . shareholders
> [in a close corporation] to a higher degree of fiduciary duties, stating
> "[t]he law requires of the majority the utmost good faith in the control
> and management of the corporation as to the minority, and it is the

essence of this trust that it must be so managed as to produce to each stockholder the best possible return upon his investment." *Vesser v. Robinson Hotel Co.,* 275 Mich. 133, 138 (1936).

This view is reasonable in light of the statutory directive to liberally construe the Act to better serve the unique needs of close corporations, and the distinct standard of care the majority owes to the minority provided for in § 450.1489. *See Estes,* 250 Mich.App. at 278. Therefore, it is reasonable to conclude that the type of conduct amounting to a breach of fiduciary duties in close corporations is the type of conduct prohibited by § 450.1489. Examples of such conduct include investments deemed not to be in the corporation's best interest, denying access to corporate books and records, diverting corporate opportunities and assets to other entities, removing minority shareholders from positions in management, refusing to declare dividends, and diluting minority equity interests. *See* 19 Am.Jur. 2d *Corporations* § 2372 (citing cases from numerous jurisdictions). *See also* 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS § 3.11. It is also clear that conduct need not be illegal or fraudulent to be willfully unfair and oppressive under § 450.1489. *See Moore v. Carney,* 84 Mich.App. 399 (1978). Thus, actions that may be permissible under the Act may nevertheless constitute willfully unfair and oppressive acts towards the minority.

*Bromley*, 2006 WL 2861875, at *5. Plaintiff concurs that the same analysis should be conducted with respect to the Section 1489 and common law breach of duty claims. (Doc. No. 134, Pg ID 3880-81) Based on *Bromley, Estes* and *Wolding,* the Court agrees that it is appropriate to conduct the same analysis for Plaintiff's breach of fiduciary duty and Section 1489 claims in Counts II and III, respectively.

Defendants heavily rely on *Wolding* to support their arguments that

19

Plaintiff's minority oppression and breach of fiduciary duty claims should be

dismissed as a matter of law.  In *Wolding*, the Sixth Circuit explicitly recognized:

> [S]hareholders' rights include receiving corporate dividends.
> *Franchino,* 687 N.W.2d at 628 [*Franchino v. Franchino*, 687 N.W.2d
> 620 (Mich.Ct.App. 2004)]. Thus, Plaintiff may state a claim under §
> 489 for violation of his right to receive dividends. Refusal to declare
> dividends can be considered willfully unfair and oppressive conduct
> under § 450.1489. *Bromley v. Bromley,* No. 05–71798, 2006 WL
> 2861875, at *5 (E.D.Mich. Oct. 4, 2006). However, in the absence of
> bad faith or fraud, courts will not interfere with the discretion of the
> directors in deciding whether to declare a dividend. *Matter of Estate
> of Butterfield,* 418 Mich. 241, 341 N.W.2d 453, 458 (1983). (Courts
> will not interfere with the decision of management not to declare a
> dividend "unless it is clearly made to appear that [the directors] are
> guilty of fraud or misappropriation of the corporate funds, or refuse to
> declare dividends when the corporation has a surplus of net profits
> which it can without detriment to its business, divide among its
> stockholders, and when a refusal to do so would amount to such an
> abuse of discretion as would constitute fraud, or breach of that good
> faith which [directors] are bound to exercise toward shareholders.").
> Thus, a court will only interfere with the director's decision whether to
> declare dividends if the refusal to declare dividends amounts to a
> breach of its fiduciary duty. *Id.* at 458–59.

*Wolding*, 563 F. App'x at 453-54.

When it dismissed the minority shareholder plaintiff's cause of action for the

defendant corporation's failure to pay dividends, the *Wolding* court concluded that

the minority shareholder could not show that the corporation's decisions (namely,

not paying dividends because the corporation opened two new stores and made

$500,000 (rather than its typical $300,000) in prepayments) were made

fraudulently or in bad faith.  The *Wolding* court found that:

> Assuming that Plaintiff is correct and Defendant eliminated and
> reduced dividends in order to prepay expenses and to cover the
> expenses of opening two unprofitable company stores, he has not
> shown that these decisions were fraudulent or made in bad faith.
> Furthermore, Plaintiff has not shown a surplus of net profits that
> Defendant could have distributed to shareholders without detriment to
> the business, or that the failure to do so constituted fraud or a breach
> of good faith. *See* [*Butterfield*, 341 N.W.2d] at 458. (Plaintiff must
> show a surplus of dividends and that refusal to declare a dividend
> amounts to fraud or a breach of good faith for a court to interfere with
> the discretion of the directors of the corporation not to declare a
> dividend.) Nor has Plaintiff shown that the failure to declare dividends
> affected him disproportionately as a minority shareholder. Therefore,
> we find that there is no genuine dispute of material fact regarding
> whether it was willfully unfair and oppressive for Defendant to refuse
> to declare the year-end dividend and reduce monthly dividends.

*Wolding*, 563 F. App'x at 454.  For several reasons, the instant case presents a

much different set of circumstances.

First, Plaintiff has produced evidence that SCI had a "surplus of net profits

that [SCI] could have distributed to shareholders without detriment to the

business." (Doc. No. 134, Pg ID 3889)  Plaintiff has offered evidence that SCI had

$11,700, 671 in cash in 2011 (according to the original 2011 Balance Sheet (Doc.

No. 134-7)) and $11,260,825 in cash in 2012 (according to the 2012 Balance Sheet

(Doc. No. 134, Pg ID 3889)).  According to Kevin Butler, SCI's controller,

Treasurer and Chief Financial Officer:

>[SCI] was profitable in 2011, had significant cash reserves.  It could
>have made a distribution. [SCI] was profitable in 2012, had significant
>cash reserves, and could have made a distribution.

(Doc. No. 134-6, Pg ID 4014)

Second, Plaintiff has produced evidence that "the failure to declare

dividends affected him disproportionately as a minority shareholder."  Although no

shareholders received dividends in 2011 or 2012 (or tax distributions in 2012), (1)

it is undisputed that the other shareholders received tax distributions in 2013 after

Plaintiff's shares were "redeemed," (2) if there were profits not paid as dividends

in 2011 and 2012 (as Plaintiff contends), the increase in value, if any, would have

carried over to dividends paid to the other shareholders in 2013 and/or thereafter,

and (3) it is undisputed that one or more of the other shareholders increased their

percentage of share ownership after June 5, 2013.  As a result of that increased

ownership (and the absence of Plaintiff's ownership), the remaining shareholders

(most, if not all, of whom were also Directors of SCI) would reap the benefit of not

making 2011 and 2012 dividend payments and delaying distribution of profits until

Plaintiff's shares had been redeemed and they held an increased share ownership

percentage.  In other words, while the other shareholders still had/have an

opportunity to receive dividends for the profits of SCI from 2011 and 2012,

Plaintiff was the only shareholder from that time who would not have such an opportunity to do so; as such, he would be affected disproportionately.

Third, unlike the defendant in *Wolding*, Defendants in the instant case have not offered reasons for not issuing dividends that are sufficient to have the Court apply the business judgment rule in such a manner as to find as a matter of law that Defendants did not breach their fiduciary duties.  Defendants have offered the following "three" reasons for not issuing dividends in 2012:

> a.   The need to preserve cash to meet various substantial and unprecedented contractual commitments to customers;
>
> b.   The unexpected cancellation of the Company's line of credit with its primary lender, caused by [Plaintiff]; and
>
> c.   The unpredictable impact on the Company's future cash flow and future business prospects by future disruptive activity by [Plaintiff]."

The Court recognizes that some of the allegations in Plaintiff's Complaint support the reason set forth at part a., *i.e.*, that SCI "needed to preserve cash to meet various substantial and unprecedented contractual commitments to customers." *See, e.g.*, Doc. No. 1, Compl. ¶81 (wherein Plaintiff alleged, in part, "Defendants know that they are in deep trouble with regard to CCAD and Sikorsky contracts and will likely have to return most of the contract amounts already received due to non-delivery and breach.").  As it relates to part b., Defendants do not identify in their briefs what line of credit allegedly was canceled due to Plaintiff.  Courts have

23

recognized that a company may be entitled to be free from second guessing by a court in situations where a claimed reason for not paying dividends was because of pending litigation and/or disputes with shareholders. *See, e.g., Wolding*, 563 F. App'x at 455.

In this case, however, the Court finds that the surplus of profits, the ability of SCI to pay dividends, and the evidence that Plaintiff was disproportionately affected by the failure to pay such dividends creates a genuine dispute of material fact regarding whether it was willfully unfair and oppressive for Defendants to refuse to declare the year-end dividends in 2011 and 2012 and to not pay the tax distributions in 2012. Therefore, the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's common law breach of fiduciary duty and Section 1489 claims set forth in Counts II and III, respectively.

## 4.   Count V - Concert of Action/Civil Conspiracy

Defendant asserts that Plaintiff's concert of action/civil conspiracy claim must be dismissed for several reasons: (a) where tort claims are dismissed, so must the conspiracy claims because a "claim for civil conspiracy may not exist in the air, rather, it is necessary to prove a separate actionable tort." *Advocacy Org. for Patients and Providers v. Auto Club Ass'n*, 250 Mich.App. 365, 384 (2003), *aff'd* 472 Mich. 91 (2005); (b) the "intra-corporate conspiracy doctrine" provides that "a

24

corporation cannot ordinarily conspire with its agents or employees . . ." *Muzquiz v. W.A. Foote Mem. Hosp., Inc.*, 70 F.3d 422, 429 (6th Cir. 1995); and © Plaintiff does not identify or allege facts supporting the application of the "independent personal stake" exception to the intra-corporate conspiracy doctrine. (Doc. No. 123, Pg ID 3052-53)  The Court is not persuaded by any of Defendant's arguments.

First, as discussed immediately above, Plaintiff's breach of fiduciary duty claim will not be dismissed.  Accordingly, a tort exists upon which a concert of action/civil conspiracy claim may be based.  Second, the Court notes that Plaintiff's concert of action/civil conspiracy claim is against the individual Defendants only, not SCI.  As such, the critical "person" for purposes of applying the intra-corporate conspiracy doctrine (*i.e.*, SCI, the corporate entity) is not subject to Plaintiff's concert of action/civil conspiracy claim.  As the *Muzquiz* court recognized, "in certain situations, [the intra-corporate conspiracy doctrine] does not preclude a conspiracy among individual members of the [corporation's] staff." *Id.* (citation omitted).

Third, even if the intra-corporate conspiracy doctrine applied, one of the "certain situations" the *Muzquiz* court undoubtedly meant is the "independent personal stake" exception referenced by Defendants.  In Michigan, where a

corporation's agents have a personal stake in the conspiracy, a concert of action claim may be viable. *Blair v. Checker Cab Co.*, 219 Mich.App. 667, 674 (1996). All of the individual Defendants are Directors of SCI and most, if not all of them, are shareholders of SCI.  As discussed in Section IV.A.3. above, Plaintiff has proffered evidence to show that a genuine dispute of material fact exists whether most, if not all, the individual Defendants had a personal stake in ensuring that: (a) Plaintiff did not receive dividends in 2011 and 2012, (b) did not receive tax distributions in 2012, and © SCI's 2011 financial statements were retroactively restated in March 2013.

The Court finds that Plaintiff has set forth evidence that the absence of the 2011 and 2012 dividend payments and the 2012 tax distributions, as well as the decision to reduce the December 31, 2011 "Net Book Value" of SCI, would result in the individual Defendants: (1) being able to make some dividend and tax distributions solely to themselves (rather than themselves and Plaintiff); (2) having increased ownership percentages with respect to distributions that should have been made while Plaintiff was eligible to receive them; and (3) being able to share in the difference between the amount Plaintiff would have received for his shares using the original 2011 financial statements for SCI less the amount Plaintiff would receive for his shares pursuant to the restated 2011 financial statements.

26

For the foregoing reasons, the Court finds that there is a genuine dispute of material fact as to whether the individual Defendants conspired or engaged in concerted acts to breach their fiduciary duties and oppress Plaintiff. The Court denies Defendants' motion for summary judgment as it relates to Count V of Plaintiff's Complaint.

**B.    PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT IV OF PLAINTIFF'S COMPLAINT**

In Count IV of his Complaint, Plaintiff asserts a claim for breach of contract based on SCI's failure to pay for Plaintiff's shares pursuant to the terms of the Shareholder Agreement. (Doc. No. 124, Pg ID 3086)  Plaintiff contends that there is no genuine dispute of material fact that Defendant owes him $5,653,274.92, plus pre-judgment interest, for his shares. *Id.* at Pg ID 3087.  Plaintiff also asserts that, because SCI breached Article 6, Section B of the Shareholder Agreement by not issuing a timely promissory note or a timely first payment of the purchase price, Plaintiff is entitled to the acceleration of all amounts due thereunder. *Id.* at Pg ID 3086.  Defendants respond that there are several issues of material fact as it relates to the amount Plaintiff is owed for his shares (Defendants contend that the purchase price should be $1,178,093, after a $3 million reduction previously paid to Plaintiff pursuant to the February 15, 2012 Fee Agreement), whether a

27

promissory note was issued, and whether the first payment of the purchase price was due by June 4, 2014. (Doc. No. 136, Pg ID 4153-67)

It is undisputed that the parties were not able to agree on the purchase price to be paid for Plaintiff's shares. The parties do agree that, since they could not agree on a purchase price for Plaintiff's shares, Article 6, Section A of the Shareholder Agreement governs the method for determining the purchase price to be paid for Plaintiff's shares. Article 6, Section A provides:

> If the parties to a transfer of stock required by this Agreement cannot agree on the price to be paid for the subject shares of stock, the price will be determined by dividing the "Net Book Value" of the Company computed on a cash basis of accounting as of the first prior business year end (currently December 31) by the total number of shares outstanding, including the shares subject to resale. "Net Book Value" shall be computed by subtracting all cash basis debit from the total of all cash basis assets. (Doc. No. 123-4, Pg ID 3073)

The parties also agree that, for purposes of this litigation, SCI's "Net Book Value" as of December 31, 2011 is the amount to be used to compute the purchase price for Plaintiff's shares. The parties' agreement with respect to anything regarding the purchase price for Plaintiff's shares ends there, however, as they dispute both the methodology for determining the purchase price and the amount of the purchase price of Plaintiff's shares.

Based on Plaintiff's motion and brief alone, it is clear there are several methodologies or interpretations of the term "cash basis of accounting." For

28

example, although Plaintiff contends that the term "cash basis of accounting" is unambiguous, Plaintiff then states that "the parties' accounting experts agree that there are two types of cash basis accounting: 'pure' cash basis accounting and 'modified' cash basis accounting." (Doc. No. 124, Pg ID 3090) Plaintiff also notes that while Defendants advocate for the "pure" cash basis method, Plaintiff utilizes the "modified" cash basis accounting method. *Id. See also* footnote 2, *supra*. Even assuming Plaintiff is ultimately deemed to have used the "correct" method for calculating the purchase price, at this point, there is a genuine dispute as to the "cash basis of accounting" methodology to be used in this case.  Plaintiff's contention that the "plain language of the Shareholder Agreement requires adoption of Plaintiff's approach" does not obviate the genuine dispute of this material fact.

Likewise, Plaintiff acknowledges that there is a disagreement with respect to whether $5.4 million should be included in the price calculation. (Doc. No. 124, Pg ID 3092) It is undisputed that: (a) SCI reported $5.4 million related to the "Sikorsky" transaction as "cash" in the original 2011 SCI financial statements prepared in March 2012 (and relied upon by Plaintiff to determine Net Book Value), and (b) SCI did not include that $5.4 million in its restated 2011 financial statements prepared in March 2013 (that SCI relied on to determine Net Book

29

Value).  Therefore, while Plaintiff may disagree with the calculations SCI made in its restated 2011 financial statements and may challenge SCI's reasons for restating its 2011 financial statements, the different 2011 financial statements present a genuine dispute as to whether $5.4 million must be included in the purchase price calculation.

The Court also is persuaded that there is at least a genuine dispute regarding whether SCI breached the Article 6, Section B of the Shareholder Agreement by failing to: (1) issue a promissory note, and/or (2) timely make a first payment of the purchase price by June 4, 2014.  Article 6, Section B of the Shareholder Agreement, which sets forth the manner for payment of the purchase price, provides:

> The purchase price for any shares being transferred pursuant to this Agreement shall be satisfied by the execution of a promissory note by the buyer, as maker, to the Seller Shareholder, as payee, in the amount of the purchase price. The promissory note shall be payable in five (5) equal annual installments plus interest compounded annually at the prime interest rate (as published by the Wall Street Journal on the day the promissory note is executed) plus one (1) percent. The promissory note shall provide that the maker shall have the right to prepay all or any part of the note at any time with interest to the date of prepayment, that a default in any payment when due shall cause the remaining unpaid balance to become immediately due and payable, and that the maker shall pay all costs and expenses of collection, including reasonably attorneys' fees. (Doc. No. 123-4, Pg ID 3073)

On July 2, 2013, SCI sent Plaintiff a document titled "Promissory Note," with an effective date of June 5, 2013, that stated:

> The undersigned promises to pay to the order of G. Wesley Blankenship the "Purchase Price" for his shares of stock in Superior Controls, Inc. (the "Maker") as such purchase price shall be determined pursuant to the terms of the Shareholder Agreement between the undersigned and Mr. Blankenship dated January 11, 2002 (hereafter the "Obligation").
>
> The Obligation shall be payable in five (5) equal annual installments plus interest from the date hereof on the outstanding balance from time to time, compounded annually at the annual rate of 4.25%.
>
> The Maker shall have the right to prepay all or any part of the Obligation at any time with interest to the date of prepayment. A default of any payment when due shall cause the remaining unpaid balance to become immediately due and payable, and the Maker shall pay all costs and expenses of collection, including the reasonable attorneys' fees.

(Doc. No. 123-5, Pg ID 3077) Based on the document titled "Promissory Note" sent by SCI to Plaintiff (prepared at a time when the parties had not agreed upon/determined a purchase price for Plaintiff's shares), the Court finds that, at a minimum, there is a genuine dispute of material fact as to whether a promissory note was issued.

In addition, the Court finds that there is a genuine dispute whether SCI was obligated to pay 1/5 of the purchase price on or before June 4, 2014 because the parties still had not agreed upon the purchase price by that date. In this instance,

31

Plaintiff insists that SCI was obligated to pay 1/5 of the (lower) purchase price SCI asserts is appropriate because SCI will have to pay at least that amount for his shares. Plaintiff does not cite any authority for this proposition, however, and the Court is not persuaded that such a conclusion should be reached as a matter of law. Therefore, the Court finds that there is, at a minimum, a genuine dispute of material fact as to whether SCI breached the Shareholder Agreement by not making a first payment on June 5, 2014.

For the reasons set forth above, the Court concludes that Plaintiff's Motion for Partial Summary Judgment must be denied as it pertains to Count IV of Plaintiff's Complaint.

## C.    SCI's Counter-Complaint

## 1.    Count I

In Count I, SCI contends that Plaintiff: (a) diverted SCI's funds utilizing an equipment rental agreement, and (b) in doing so, violated his fiduciary duty as an officer and director of the company pursuant to common law and M.C.L. § 450.1541a. M.C.L. § 450.1541a(1) provides:

> (1)    A director or officer shall discharge his or her duties as a director or officer including his or her duties as a member of a committee in the following manner:
>
> (a)    In good faith.

(b)     With the care an ordinarily prudent person in a like position would exercise under similar circumstances.

©     In a manner he or she reasonably believes to be in the best interests of the corporation.

In essence, SCI contends Plaintiff breached his fiduciary duty when he directed SCI to make payments totaling approximately $5,600 to an entity called Carolina Blue Consulting Group, LLC ("CBCG") in conjunction with an Equipment Rental Agreement between SCI and CY Holdings, Inc. The Equipment Rental Agreement related to a machine Plaintiff had purchased himself years earlier but with respect to which SCI entered into as lessee in 2009. (Doc. No. 104-5 and Doc. No. 136-16, Pg ID 4416)

CBCG was an entity owned by Plaintiff's wife (or, according to Plaintiff, at the time of the payments, his future wife), although Plaintiff had communicated to SCI at the time the lease was entered that the payments go to "Dr. Mahlburg," as owner of CBCG. Plaintiff states that when Dr. Mahlburg pulled out, Plaintiff "elected to simply retain the funds to offset administrative fees he was incurring, [which were] otherwise reimbursable by SCI." (Doc. No. 124, Pg ID 3099) Plaintiff further contends that he is entitled to judgment as a matter of law on this claim because: (1) he took all the risk (and lost money) in purchasing the machine, (2) SCI does not refute that the payments made to Plaintiff were to compensate him

for administrative expenses incurred, (3) no breach of fiduciary standard has been identified, and (4) it was a cash neutral transaction for SCI, so there were no damages suffered by SCI. (Doc. No. 124, Pg ID 3098-99; Doc. No. 140, Pg ID 4543)

Plaintiff's argument has several deficiencies for purposes of summary judgment. First, there is evidence that Plaintiff lied to SCI regarding the true ownership of CBCG. Second, Plaintiff's (future) wife and/or Plaintiff received the payments that were intended for CBCG/Dr. Mahlburg, and there is evidence that SCI was not made aware that the payments would benefit Plaintiff. Third, Plaintiff has cited absolutely no authority for his argument, in particular his assertion that he had a right "to simply retain the funds to offset administrative fees he was incurring," as he did so without disclosing to SCI that he was doing so.

For the reasons stated above, the Court concludes that there is a genuine dispute of material fact regarding whether Plaintiff acted in good faith, with the care an ordinarily prudent person in a like position would have exercised under similar circumstances, and/or in a manner he reasonably believed to be in the best interests of SCI. The Court holds that Plaintiff is not entitled to judgment as a matter of law with respect to the breach of fiduciary duty claims set forth in Count I of the Counter-Complaint.

34

2.      **Count II**

In Count II, SCI contends that Plaintiff diverted funds to Paragon Research

Group LLC ("Paragon") by authorizing discretionary bonuses totaling

approximately $750,00 in discretionary bonuses to employees of RedViking

Group, a wholly-owned subsidiary of SCI ("RedViking"), and others (including

Plaintiff), without the knowledge or consent of the Board of Directors of SCI as to

how the funds would be used.  SCI contends that by doing so, Plaintiff violated his

fiduciary duty as an officer and director of the company pursuant to common law

and M.C.L. §  450.1541a.  According to SCI, it made these payments to Paragon at

Plaintiff's request, "based on [Plaintiff's] representation that the funds were being

used for legitimate expenses of Paragon." (Doc. No. 136, Pg ID 4168)

Plaintiff asserts that he is entitled to judgment as a matter of law because the

bonuses were made with the knowledge of SCI President Randy Brodzik and SCI

controller, Treasurer and Chief Financial Officer, Kevin Butler. (Doc. No. 124, Pg

ID 3099-3100)  Plaintiff contends that because SCI knew of, and funded, the

request in December 2010, SCI should be deemed to have known the purpose of

the payments to Paragon at that time. Relying on *Virginia M. Damon Trust v.*

*Mackinaw Fin. Corp.*, 2008 WL 53230, at *7-8 (Jan. 2, 2008, W.D. Mich.)

(quoting *Shawl v. Dhital*, 209 Mich.App. 321, 325 (1995)) (a party "is deemed to

35

be aware of a possible cause of action when he becomes aware of an injury and its possible cause.").  Plaintiff argues there is no evidence that he violated his fiduciary duty at common law or pursuant to M.C.L. § 450.1541a.

SCI President Randy Brodzik has submitted an affidavit denying that he authorized the discretionary bonuses that Plaintiff awarded himself and other RedViking employees. (Doc. No. 136-6, Pg ID 4244, at ¶ 7)  Randy Brodzik also averred that Plaintiff falsely represented the purpose of the disbursements to Paragon and that SCI did not learn until March 2013 that the funds paid to Paragon in December 2010 were used to pay extra bonuses to RedViking employees and others (including Plaintiff). *Id.* at Pg ID 4244-45, at ¶¶ 3-8.  Despite Plaintiff's protestations that Randy Brodzik's affidavit is self-serving, Randy Brodzik's averments create a genuine dispute of material fact with respect to whether such bonuses were authorized by SCI and whether SCI had any knowledge (or any reason to know) that the December 2010 payments to Paragon requested by Plaintiff were for extra bonuses to Plaintiff and other RedViking employees.

Plaintiff also argues that this claim is time-barred under M.C.L. § 450.1541a(4). (Doc. No. 124, Pg ID 3100).  M.C.L. § 450.1541a(4) provides:

> (4) An action against a director or officer for failure to perform the duties imposed by this section shall be commenced within 3 years after the cause of action has accrued, or within 2 years after the time

when the cause of action is discovered or should reasonably have been
discovered, by the complainant, whichever occurs first.

The Court concludes that SCI's claim regarding the Paragon payments is not time-barred. According to Randy Brodzik, (1) Plaintiff requested the December 2010 payments for Paragon "to be used by Paragon to pay for goods, equipment or services for the Corpus Christi Army Deport ("CCAD") project that frequently required immediate use of funds to meet project demands," and (2) the true (and allegedly improper) use of such funds was not discovered until March 2013, when a RedViking employee communicated to SCI officers that an extra bonus was paid in December 2010. (Doc. No. 136-6, Pg ID 4242-44, at ¶¶ 3, 6).

The Court notes Plaintiff's argument that Randy Brodzik stated at his deposition that the "issue with regard to the 2010 payments to Paragon" first came to Randy Brodzik's attention in "early 2011." (Doc. No. 140-5, Pg ID 4583) To the extent that Randy Brodzik's deposition statement was inconsistent with his affidavit (which is also not undisputed), however, that inconsistency only serves to further demonstrate that there is a question of fact as to when SCI discovered or should have discovered the true purpose of the 2010 Paragon payments. Therefore, even though M.C.L. § 450.1541a requires a two-year statute of limitations from discovery of the claim, where there is a genuine dispute as to when a cause of action was or should reasonably have been discovered (as is the case here), the

37

statute of limitations period is three years.  Because there is a genuine dispute

whether the facts of this case support a two-year or a three-year statute of

limitations, the Court concludes that SCI's breach of fiduciary duty claim arising

out of the 2010 Paragon payments is not time-barred, pending a determination by

the factfinder when SCI discovered or reasonably should have discovered that the

2010 Paragon payments were used to pay bonuses to RedViking employees.

For these reasons, the Court concludes that there is a genuine dispute of

material fact, and that Plaintiff is not entitled to judgment as a matter of law, with

respect to SCI's common law and statutory breach of fiduciary duty claims at

Count II of the Counter-Complaint.

**3.    Count III**

In Count III, SCI claims that Plaintiff misled SCI into making payments

regarding a rental payment for residential property in North Carolina.  The Court

finds the merits of this claim need not be reached because the claim is time-barred.

As Plaintiff asserts, SCI approved the initial lease of the residential property in

June 2010, and SCI first learned that the lease agreement contained the wrong

address on March 15, 2011. (Doc. No. 124, Pg ID 3101)  At that point, which was

more than two years prior to the date SCI filed its Counter-Complaint, the instant

"cause of action [was] discovered or should reasonably have been discovered" by

SCI. M.C.L. § 450.1541a. Accordingly, the Court grants Plaintiff's motion for summary judgment with respect to SCI's breach of fiduciary duty claim set forth at Count III of its Counter-Complaint.

### 4.    Counts IV-VI

In Counts IV-VI of its Counter-Complaint, SCI alleges that Plaintiff's relationship with Wilbur Dyer ("Dyer") resulted in: (a) tortious interference with an agreement Dyer had with SCI, (b) a breach of Plaintiff's fiduciary duties as an officer, director, and employee of SCI, and © a breach of Plaintiff's Employment, Noncompetition and Confidentiality Agreement. (Doc. No. 104, Pg ID 2375-87 and Doc. No. 124, Pg ID 3103)  Dyer resigned from SCI on December 28, 2011, after having begun working as an independent sales representative through his company, Program Management Solutions, LLC ("PMS") in July 2011. (Doc. No. 124, Pg ID 3102-03)  Plaintiff argues that he is entitled to judgment as a matter of law with respect to Counts IV-VI because SCI did not suffer any damages as a result of Plaintiff's alleged actions. (Doc. No. 124, Pg ID 3102-04)

SCI counters that it is entitled to damages in the form of the compensation it paid to Plaintiff during the time Plaintiff engaged in misconduct and violated his fiduciary obligations to SCI. (Doc. No. 136, Pg ID 4171)  SCI argues that the period of misconduct was from December 27, 2011 through February 10, 2012,

during which time Plaintiff was compensated a total of approximately $49,182 ($44,110 in salary and $5,072 in benefits). *Id.* SCI relies on two cases in support of its argument: *Toy ex rel. Ketcham v. Lapeer Farmers Mut. Fire Ins. Ass'n*, 297 Mich. 188, 193 (1941); *Tooling Mfg. & Technologies Ass'n v. Tyler*, No. 293987, 2010 WL 5383529, at *7-8 (Mich. Ct. App., Dec. 28, 2010).

As Plaintiff argues, both cases cited by SCI involved an employee who caused financial harm to his company. In *Tyler*, the plaintiff "engaged in serious misconduct by diverting commissions that belonged to the" company, which "the trial court found . . . amounted to a breach of his fiduciary duties, conversion of his principal's property, fraudulent misrepresentation, and tortious interference with his principal's business relationships." *Tyler*, 2010 WL 5383529, at *8. For those reasons, the Michigan Court of Appeals held that "[t]he trial court did not err when it barred Tyler's claim for additional compensation on the basis of his misconduct." *Id.* In *Toy ex rel Ketchum*, the Michigan Supreme Court rejected a claim by the plaintiff (a former employee) for compensation where "[t]he evidence [was] overwhelming that there was gross neglect of duty in the management of the affairs of the insurance company; and that [plaintiff] was largely responsible for such mismanagement." *Toy ex rel. Ketcham,* 297 Mich. at 193. In both instances, the employer suffered losses as a result of the employee's conduct.

40

In the instant case, although SCI alleges that Plaintiff engaged in misconduct and wrongful competition with SCI, SCI has offered no evidence that Plaintiff: (a) diverted business or commissions from SCI, (b) in any way mismanaged CSI between December 27, 2011 and February 10, 2012, or © caused any harm to SCI during that period or as a result of Plaintiff's relationship with Dyer.  As there is no genuine dispute that SCI suffered damages as a result of Plaintiff's alleged misconduct pursuant to his relationship with Dyer between December 27, 2011 and February 10, 2012, the Court concludes that Plaintiff is entitled to judgment as a matter of law with respect to Counts IV-VI of SCI's Counter-Complaint.[4]

## 5.    Count VII-Duress

In Counts VII and VIII, SCI seeks to rescind both the Fee Agreement and the First Amendment to Employment, Noncompetition and Confidentiality

---

[4]As the Court has concluded that there is no evidence SCI suffered any damages with respect to claims in Counts IV-VI, SCI's argument that it may recover exemplary damages with respect to such claims is rendered moot. (*See* Doc. No. 136, Pg ID 4171)  In addition, although Counts IV-VI of CSI's Counter-Complaint seek equitable relief for Plaintiff's alleged misconduct in conjunction with such claims, CSI offers no evidence that supports a finding that Plaintiff violated his noncompete such that the Court should find that SCI is "entitled to equitable relief in the form of an extension of [Plaintiff's] noncompete agreement." Relying on *Thermatool Corp. v. Borzym*, 227 Mich.App. 366, 375 (1998) (an extension of a noncompete agreement may be appropriate "[i]n cases where a party has flouted the terms of a noncompetition agreement"). (Doc. No. 136, Pg ID 4171)

Agreement SCI entered into with Plaintiff, each which was effective as of February

15, 2012. (Doc. No. 104, Pg ID 2387-92)  SCI contends that it was induced to enter

into both documents as the result of duress and/or fraud by Plaintiff.  Although

Plaintiff addressed the two claims together in his motion (and SCI's supplemental

brief also discussed the claims in tandem), the Court finds that the claims must be

considered separately.

SCI argues that it signed those two documents under duress after Plaintiff

breached his fiduciary duties to SCI. (Doc. No. 136, Pg ID 4172)  SCI contends

that Plaintiff "made clear to [Randy Brodzik] on several occasions that he

[Plaintiff] could ruin the SCI relationship with CCAD if he was not paid the money

[a $3 million fee] he demanded" or SCI did not continue its relationship with him.

(Doc. No. 126-6, Pg ID 4246-47)  As an example of Plaintiff's alleged threats, SCI

attached an email dated January 22, 2012 that, according to SCI, suggested SCI

would lose its accounts with CCAD (SCI's biggest customer) and Sikorsky,

another major customer.  That January 22, 2012 email from Plaintiff to Randy

Brodzik provided, in relevant part:

> . . . You are going to be told in no uncertain [] terms that there will be
> radical program changes without my further involvement at an
> executive level regardless if I am with SCI or an independent
> scientific advisor to the government.  I am the chief architect for a
> system that extends far beyond the FTM equipment under

construction at SCI and have program responsibilities that extend
beyond my role at SCI/RVG.  They are more than pissed off, they
cannot believe the stupidity of the ownership team and they are
[adamant] that they will change horses mid stream if they do not get
the assurances/confidence they need from you[,] which I think is
highly unlikely.

Stay tuned.  Sikorsky must be dealt with next and I anticipate their
response to be brutal.

(Doc. No. 136-6, Pg ID 4253)  Randy Brodzik states that, after receiving that email

(and other threats) from Plaintiff, he "felt [he] had no choice but to make the

demanded payment to [Plaintiff] in order to prevent the destruction of SCI . . ." *Id.*

at Pg ID 4346.

In his motion, Plaintiff asserts, without opposition or any distinction by SCI:

"Duress exists when one by the unlawful act of another is included to
make a contract or perform some act under circumstances which
deprive him of the exercise of free will." *Beachlawn Bldg. Corp. v. St.
Clair Shores*, 370 Mich. 128, 133 (1963) (citations omitted). Duress
can only render a contract void when there exist "highly unusual
circumstances." *Flannery v. Tri-State Div.*, 402 F. Supp. 2d 819, 825
(E.D. Mich. Dec. 2, 2005). Furthermore, "[f]ear of financial ruin alone
is insufficient to establish economic duress; it must also be established
that the person applying the coercion acted unlawfully." *Apfelblat v.
Nat'l Bank,* 158 Mich. App 258, 263; 404 N.W.2d 725 (1987);
*Transcontinental Leasing v. Michigan Nat'l Bank of Detroit*, 738 F2d
163, 166 (6th Cir. 1984) ("a claimant who relies on a theory of
economic duress must also prove a wrongful or unlawful act on the
part of the defendant.").

(Doc. No. 124, Pg ID 3107) As the law cited by Plaintiff makes clear, duress exists

43

when one party engages in an unlawful act that "deprive[s] [another] of the exercise of free will," *Beachlawn, supra*, or the circumstances involved would enable a finding of "highly unusual circumstances." *Flannery, supra*.

In this case, SCI has offered evidence that, based on Plaintiff's alleged false representations (which form the basis of Count VIII and are addressed below), Randy Brodzik/SCI "felt [he/it] had no choice to make the demanded payment to [Plaintiff] in order to prevent the destruction of SCI which would have resulted if CCAD terminated its relationship with SCI."  The evidence produced by SCI, however, does not demonstrate–or even generate a genuine dispute of material fact–that: (a) Randy Brodzik or anyone else at SCI was deprived of his or her ability to exercise free will, or (b) "highly unusual circumstances" existed, such that SCI executed the Fee Agreement or the First Amendment to Employment, Noncompetition and Confidentiality Agreement under duress.  Rather, SCI/Randy Brodzik asserted only a fear of financial ruin, which is insufficient to establish economic duress. *See Abfelblat*, 158 Mich.App. at 263.

For the reasons stated above, Court finds, as a matter of law, that SCI's duress claim set forth in Count VII of its Counter-Complaint is not viable.  Plaintiff is entitled to summary judgment as to SCI's duress claim at Count VII of SCI's Counter-Complaint.

44

6.      **Count VIII - Fraudulent Inducement**

In Count VIII of SCI's Counter-Complaint, SCI alleges that Plaintiff

fraudulently induced SCI to enter into the Fee Agreement and the First

Amendment to Employment, Noncompetition and Confidentiality Agreement on

February 15, 2012.  SCI alleges that Plaintiff falsely represented and/or caused

another person (Ron Howe) to falsely represent to SCI that CCAD would

discontinue its relationship with SCI if SCI did not provide for Plaintiff's

continued involvement and support on contracts and projects then in place between

CCAD and SCI. (Doc. No. 104, Pg ID 2390)

Plaintiff argues that, in order to prove fraud in the inducement, a plaintiff

must establish that the defendant made a material misrepresentation that was false,

or that it was made recklessly and without knowledge of its truth. *Rooyakker &*

*Sitz, PLLC v. Plante & Moran, PLLC*, 276 Mich. 146, 161 (2007).  In addition, a

party claiming fraud must prove that the fraud caused the damages suffered.

*Kheder Homes at Charleston Park, Inc. v. Charleston Park Singh*, LLC, 2014 WL

60326, at *3 (Mich.Ct.App., Jan. 2, 2014) (citation omitted).  Plaintiff contends

that SCI cannot prevail, as a matter of law, because: (1) the representations were

made by Ron Howe—orally on February 15, 2012, and in a letter/email sent to

Randy Brodzik on January 27, 2012—not by Plaintiff, and (2) SCI cannot establish

45

that the alleged misrepresentation was a proximate cause of SCI entering into the February 15, 2012 agreements because Randy Brodzik "admitted that he believed, even prior to receiving Howe's letter, that SCI's relationship with CCAD would change if Plaintiff declined to stay involved." (Doc. No. 124, Pg ID 3109-10)

Plaintiff's assertion that there is no evidence that he made any false representation(s) or that any false representations constituted a proximate cause of SCI entering into the February 15, 2012 agreements fails for several reasons. First, not only is there evidence that Plaintiff was aware of the January 27, 2012 letter sent to SCI that suggested CCAD would discontinue its relationship with SCI absent Plaintiff's involvement, Plaintiff has admitted writing the first draft of that letter. (Doc. No. 124, Pg ID 3109)

Second, Randy Brodzik did not admit "that SCI's relationship with CCAD would change if Plaintiff declined to stay involved." What Randy Brodzik actually said was that Plaintiff "was the central player, but I disagree that . . . his departure would in and of itself cause that relationship to change."(Doc. No. 124-10, Pg ID 3259-60) Third, according to William Braddy, the Deputy Commander for Production at CCAD, the email sent by Ron Howe to Randy Brodzik on January 27, 2012 "did not represent the true position of CCAD on January 27, 2012[,] nor has it represented the position of CCAD at any time subsequent to that date." (Doc.

46

Id. 136-15, Pg ID 4411)  Fourth, Randy Brodzik has averred that, as a result of Plaintiff's comments and the January 27, 2012 letter, he "recommended to the other SCI Board of Directors that the demands by [Plaintiff] for a $3 million payment and for an amendment to its Covenant Not to Compete Agreement be granted and the Board followed my recommendation." (Doc. No. 136-6, Pg ID 4247)

For the foregoing reasons, the Court finds there is a genuine dispute of material fact as to whether: (a) Plaintiff made false representations to SCI regarding the CCAD relationship, and (b) such false representations were a proximate cause of SCI entering into the February 15, 2012 Fee Agreement and First Amendment to Employment, Noncompetition and Confidentiality Agreement. The Court denies Plaintiff's motion for summary judgment as it relates to SCI's claim of fraudulent inducement at Count VIII of SCI's Counter-Complaint.

## 7.    Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment as it relates to SCI's Counter-Complaint is granted as to Counts III-VII and denied as to Counts I-II and VIII.

## V.    CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendants' Motion for Partial Summary Judgment on Plaintiff's cause of action (Doc. No. 123) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment as to Count IV of his Complaint and Defendant SCI's Counter-Complaint (Doc. No. 124) is GRANTED IN PART and DENIED IN PART. More specifically, Plaintiff's Motion for Partial Summary Judgment is DENIED as it relates to Count IV of his Complaint, GRANTED as it relates to Counts III-VII of SCI's Counter-Complaint, and DENIED as it relates to Counts I-II and VIII of SCI's Counter-Complaint.

IT IS FURTHER ORDERED that the Motion for Leave to File Supplemental Brief (Doc. No. 163) is GRANTED.


S/Denise Page Hood
Denise Page Hood
United States District Judge


Dated: September 30, 2015


I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2015, by electronic and/or ordinary mail.

48

S/LaShawn R. Saulsberry
LaShawn R. Saulsberry
Case Manager